Kellie Nelson Fetter (Wyo. Bar No. 7-4597)
Scott M. Flaherty (*pro hac vice* pending)
TAFT STETTINIUS & HOLLISTER LLP
675 Fifteenth Street, Suite 2300
Denver, Colorado 80202
Telephone:  (303) 297-2900
Facsimile:  (303) 298-0940
Email:  kfetter@taftlaw.com
        sflaherty@taftlaw.com

Tim Phillips (*pro hac vice* pending)
LAW OFFICE OF TIM PHILLIPS, PLLC
331 Second Avenue South, Suite 400
TriTech Center
Minneapolis, Minnesota 55401
Telephone:  (612) 470-7179
Email:  tim@timphillipslaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| **ANTHONY WEBSTER**, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**ROCKY MOUNTAIN RECOVERY SYSTEMS, INC.**,<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Anthony Webster, through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Rocky Mountain Recovery Systems, Inc., and alleges:

## INTRODUCTION

1.    Defendant Rocky Mountain Recovery Systems, Inc. ("RMR" or "Defendant") is one of three debt collection companies owned or operated by Wyoming attorneys Michael B. Wilkerson and Daniel B. Wilkerson, who also operate a law firm, Wilkerson & Wilkerson, LLC d/b/a Wilkerson Law Group, that represents RMR in an average of approximately 100 lawsuits filed against consumers every month.

2.    Plaintiff, individually and on behalf of all others similarly situated, brings this action for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (the "FDCPA"), and for fraud, negligence, and negligence per se, for RMR's pattern and practice of violating consumer rights, including by:

(a)    Using template debt collection letters that provide consumers with shorter dispute deadlines than what is required by law.

(b)    Sending sham "pre-collection notices" under the guise of "protect[ing] you as a consumer" while threatening credit reporting, backdated interest, and legal action, and not providing required dispute right notices.

(c)    Pressuring consumers to pay alleged medical debts of less than $500 or medical debts that are less than a year old by threatening credit reporting, despite knowing that medical debts under $500 or less than a year old are not eligible for credit reporting under credit bureau policies.

(d)    Falsely backdating principal balances to collect more interest.

(e)    Failing to disclose that it is a debt collector, as required by law.

2

(f)     Serving Wyoming consumers with lawsuits demanding 35% "collection fees," even though Wyoming courts have found RMR's 35% collection fee to be unenforceable and unconscionable.

(g)     Sending debt collection letters demanding that consumers pay interest and collection fees greater than authorized by contract or law so long as "someone is able to pay it," even though, as RMR admitted to Plaintiff, "we would know from experience that a court probably will not award those to us."

(h)     Hiding extra fees and interest in alleged principal balances and then adding even more fees or interest on top of that alleged principal balance.

(i)     Sending debt collection letters to consumers without reviewing contracts or account statements to properly assess whether the interest and fees RMR is demanding were ever expressly authorized, as required by law.

(j)     Collecting on alleged debts after receipt of a written dispute without first providing validation, as required by law.

(k)     Presenting a false appearance that RMR is a law firm; deferring RMR's statutory duty to ensure accuracy in the amounts demanded of consumers until litigation is being considered, which maximizes attorney fee recovery; signing notarized affidavits for default judgment wherein the affiant is not identified by name; and publicly filing private, highly sensitive, and protected information in court—including details of patients' specific medical conditions and procedures, full unredacted Social Security Numbers, and credit scores.

(l)     Operating as a third-party debt collector—including sending collection letters, collecting fees and interest, filing lawsuits, garnishing wages, and obtaining default judgments—during a period of time that RMR was delinquent on its tax obligations and dissolved by the State of Wyoming, thus being prohibited from conducting business in this state.

## PARTIES

3.     Plaintiff Anthony Webster ("Plaintiff") is an adult natural person and Wyoming resident. He is a graduate of the University of Wyoming and resides in Albany County, Wyoming.

4.     Plaintiff is a "consumer" as that term is defined under the FDPCA at 15 U.S.C. § 1692a(3), and also under Wyo. Stat. § 33-11-101(a)(v).

5.     All other members of the putative classes or subclasses are each a "consumer" as that term is defined under the FDPCA at 15 U.S.C. § 1692a(3), including residents of Wyoming and persons who are not residents of Wyoming.

6.     Defendant Rocky Mountain Recovery Systems, Inc. is a Wyoming domestic corporation. RMR maintains offices in Campbell County, Wyoming, and Park County, Wyoming. RMR's registered agent can be found in Park County, Wyoming.

## JURISDICTION AND VENUE

7.     This action arises out of and challenges Defendant's violations of the FDCPA, 15 U.S.C. §§ 1692, *et seq.*, and Defendant's fraud, negligence, and negligence per se, all of which has harmed Plaintiff and class members.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 15 U.S.C. § 1692k(d), which creates both individual and class liability for FDCPA violations.

9.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims in this Complaint, as they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III.

10.     This Court has general personal jurisdiction over Defendant RMR. RMR is a Wyoming corporation, maintains its principal office in Wyoming, its registered agent can be found in Wyoming, and it conducts business within Wyoming, including by sending debt collection letters to Wyoming residents and addresses.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS

## I.    ROCKY MOUNTAIN RECOVERY SYSTEMS' CORPORATE STRUCTURE

12.     The principal purpose of RMR is the collection, for profit, of debts owed or due, or asserted to be owed or due, to others. RMR is regularly engaged in the collection, for profit, of third-party debts allegedly owed by consumers.

13.     RMR regularly collects debts inside and outside the State of Wyoming.

14.     RMR is a "debt collector" as that term is defined under the FDCPA, pursuant to 15 U.S.C. § 1692a(6).

15.     RMR is a "collection agency" as that term is defined under Wyo. Stat. § 33-11-101(a)(iii).

16.     RMR is licensed with the Wyoming Collection Agency Board.

17.     RMR also does business as "Recovery Systems, Inc."

18.     RMR also does business under the names "RSI" and "RSIWY."

19.     RMR owns and operates the internet domain name RSIWY.COM.

20.     RMR is registered with the Montana Secretary of State as a foreign profit corporation and has been since approximately 2015.

21.     RMR is registered with the Idaho Secretary of State using the assumed name of Rocky Mountain Recovery, Inc., and has been since approximately 2010.

22.     RMR is beneficially owned by attorneys Michael B. Wilkerson and Daniel B. Wilkerson (the "Wilkersons"), who also operate Wilkerson & Wilkerson LLC d/b/a The Wilkerson Law Group ("Wilkerson & Wilkerson").

23.     Wilkerson & Wilkerson routinely appears as counsel for RMR in RMR's lawsuits.

24.     Both RMR and Wilkerson & Wilkerson maintain an office at 101 Hastings Horseshoe in the City of Powell, Park County, Wyoming.

25.     Both RMR and Wilkerson & Wilkerson maintain an office at 400 South Kendrick Ave., Suite 202, in the City of Gillette, Campbell County, Wyoming.

26.     Both RMR and Wilkerson & Wilkerson maintain an office at 400 E. 1st St., Suite 312, in the City of Casper, Natrona County, Wyoming.

27.     Michael B. Wilkerson is the President of RMR.

28.     Daniel B. Wilkerson is the Vice President of RMR.

29.     The Wilkersons or their family members are the sole officers of RMR.

30.     The Wilkersons direct, oversee, control, and manage RMR.

31.    Daniel B. Wilkerson is an adult natural person and an Idaho resident. He resides in Bonneville County, Idaho, and also maintains property in Wyoming.

32.    Michael B. Wilkerson is an adult natural person and Wyoming resident. He principally resides in Campbell County, Wyoming, and owns property in Idaho.

33.    Wilkerson & Wilkerson is a "debt collector" as that term is defined under the FDCPA, pursuant to 15 U.S.C. § 1692a(6).

34.    Michael B. Wilkerson and/or Daniel B. Wilkerson also own and operate Trust Financial, LLC (d/b/a CBS Collections, d/b/a Bingham Collections, f/k/a Bingham Collections, Inc.), a Wyoming limited liability company, which is another collection agency. Trust Financial, LLC is also registered to do business in Idaho.

35.    Michael B. Wilkerson and/or Daniel B. Wilkerson also own and operate Statewide Collections, Inc., an Idaho corporation, which is another collection agency.

36.    Michael B. Wilkerson and/or Daniel B. Wilkerson also own and operate Mountain Plains Financial, LLC, a Wyoming limited liability company, which owns the property 101 Hastings Horseshoe in Powell, Wyoming.

37.    Michael B. Wilkerson and/or Daniel B. Wilkerson also own and operate M & D Financial, LLC, a Wyoming limited liability company with its principal office address at 101 Hastings Horseshoe in Powell, Wyoming.

38.    Wyoming attorney Bret T. Allred also appears as counsel in many of RMR's lawsuits against consumers in Wyoming state courts.

39.    RMR and Wilkerson & Wilkerson share staff members.

40.    RMR and Wilkerson & Wilkerson share offices.

## II.   ROCKY MOUNTAIN RECOVERY SYSTEMS REPEATEDLY VIOLATED PLAINTIFF'S CONSUMER RIGHTS

41.    On or about April 29, 2024, Plaintiff visited Wyoming Health Fairs, a medical clinic ("WHF" or the "Medical Provider"), for the purpose of blood testing (the "Medical Service").

42.    Plaintiff had desired to pay the Medical Provider any amount owed, in full, on the day of the Medical Service, but the Medical Provider discouraged it.

43.    Plaintiff accepted the Medical Provider's suggestions regarding specific blood testing to have performed in reliance on the Medical Provider's representations regarding Plaintiff's insurance coverage. The Medical Provider initially stated that Plaintiff owed no money for the Medical Service.

44.    Then, in July 2024, the Medical Provider sent Plaintiff an invoice with a pre-insurance balance of $272.00 (the "Pre-Insurance Balance"), which was then reduced to $239.00 after insurance adjustments (the "Post-Insurance Balance").

45.    In July 2024, Plaintiff paid the Medical Provider in full, $239.00, yet the Medical Provider did not process Plaintiff's payment of $239.00.

46.    Defendant RMR sent Plaintiff a letter dated December 12, 2024 (the "Notice of Debt"), which is attached with redactions as **EXHIBIT A**.

47.    RMR's Notice of Debt demanded that Plaintiff pay $390.48 (the "Alleged Debt") relating to the Medical Service on April 29, 2024 at the Medical Provider.

48.    Plaintiff's Alleged Debt was for personal, family, or household purposes, meeting the definition of a "debt" under the FDCPA. *See* 15 U.S.C. § 1692a(5).

49.    RMR's Notice of Debt stated, among other things:

8

| As of 04-29-24, you owed: | | $ 289.19 |
|---|---|---|
| Between 04-29-24 and today: | | |
| You were charged this amount in interest: | + | $ 0.07 |
| You were charged this amount in fees: | + | $ 101.22 |
| You paid or were credited this amount toward the debt: | − | $ 0.00 |
| Total amount of the debt now: | | $ 390.48 |

50.    Plaintiff did not owe the Medical Provider $289.19 as of April 29, 2024.

51.    Plaintiff did not owe RMR $289.19 as of April 29, 2024.

52.    The full cash price for the Medical Service was less than $289.19.

53.    RMR's Notice of Debt falsely claimed that Plaintiff's principal balance was higher than the Pre-Insurance Balance.

54.    RMR's Notice of Debt falsely claimed that Plaintiff's principal balance was higher than the Post-Insurance Balance.

55.    Plaintiff later discovered that of the purported $289.19 principal amount demanded by RMR's Notice of Debt, $239.00 (an amount matching the Post-Insurance Balance) was the principal, and $50.19 was interest.

56.    RMR's Notice of Debt did not disclose the existence of $50.19 in interest.

57.    The practice of hiding fees or interest in principal balances, which is what RMR did in its Notice of Debt, is an illegal debt collection practice. Because it is a false representation of the character, amount, or legal status of an alleged debt, it violates the FDCPA. *See* 15 U.S.C. § 1692e(2)(A).

58.    Plaintiff did not owe the Medical Provider $50.19 in interest as of December 12, 2024.

59.    Plaintiff did not owe RMR $50.19 in interest as of December 12, 2024.

60.    RMR's demand for $50.19 in interest is at least 41% in interest per year.

61.    RMR's demand for $50.19 in interest is at least 3.5% in interest per month.

62.    RMR's Notice of Debt demanded $0.07 in other "interest" from Plaintiff.

63.    The $0.07 in interest RMR demanded in its Notice of Debt is calculated as a percentage on top of $289.19, so it is interest-on-interest.

64.    RMR's Notice of Debt did not explain what the "interest" was for, did not disclose the interest rate, and did not disclose how the "interest" was calculated.

65.    Plaintiff is not the only one who has been charged illegal interest with respect to Wyoming Health Fairs invoices that were later sent to RMR for collection. For example, in a review of just some of RMR's lawsuits against Wyoming consumers, M.T., a county jail worker, attended a Wyoming Health Fairs employee wellness event and had a screening. Later, he was billed $50, and $10.50 was added in interest, amounting to over 60% annualized interest. RMR sued M.T, related to this alleged debt. Another county worker, H.T., a public-school teacher, attended the same employee wellness event, and Wyoming Health Fairs later billed her for a $60 medical service, and added $12.60 in interest, amounting to over 60% annualized interest. RMR sued H.T. related to this alleged debt.

66.    RMR's Notice of Debt sought to collect $101.22 in "fees" from Plaintiff.

67.    Plaintiff did not owe the Medical Provider $101.22 in fees as of December 12, 2024.

68.    Plaintiff did not owe RMR $101.22 in fees as of December 12, 2024.

69.    RMR's Notice of Debt did not explain what the "fees" it demanded were for, nor how those "fees" were calculated or purportedly authorized.

70.    RMR's Notice of Debt included a demand for approximately 42% of the principal amount as a collection fee on top of the principal amount.

71.    RMR's collection fee demanded in the Notice of Debt amounts to 35% of what RMR falsely claimed was the principal ($289.19), which already had at least 41% interest in it.

72.    RMR often sends demands to consumers including a 35% collection fee.

73.    The Medical Provider did not invoice Plaintiff in April 2024.

74.    The Medical Provider did not invoice Plaintiff in May 2024.

75.    The Medical Provider did not invoice Plaintiff in June 2024.

76.    The Medical Provider first invoiced Plaintiff for the Medical Service on or about July 9, 2024.

77.    RMR's Notice of Debt backdated the purported principal obligation date to April 29, 2024, while the Medical Provider did not send an invoice until later.

78.    RMR's Notice of Debt provided no accounting for fees or interest.

79.    Plaintiff disputes the Alleged Debt.

80.    The FDCPA prohibits debt collectors from using abusive, deceptive, misleading, unfair, or unconscionable means to collect a debt. *See* 15 U.S.C. §§ 1692, 1692d, 1692e, 1692f.

81.    As a remedial statute, the FDCPA should be construed liberally in favor of the consumer. *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002).

82.     Courts in this Circuit analyze debt collector communications from the perspective of the "least sophisticated consumer." *Hamilton v. Capio Partners, LLC*, 237 F.Supp.3d 1109, 1113 (D. Colo. 2017) (collecting cases).

83.     "The least-sophisticated-consumer standard is measured by how the 'least sophisticated consumer' would interpret the notice received from the debt collector. The test is how the least sophisticated consumer—one not having the astuteness of a 'Philadelphia lawyer' or even the sophistication of the average, everyday, common consumer—understands the notice he or she receives." *Id.*, citing *Ferree v. Marianos*, 129 F.3d 130, at *1 (10th Cir. 1997) (unpublished) (cleaned up).

84.     The FDCPA enumerates examples of unfair and unconscionable means to collect a debt, including "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

85.     Chapter X of Title 12 of the Code of Federal Regulations contains "Regulation F," which implements the FDCPA by prescribing federal rules governing the activities of a "[d]ebt collector," as that term is defined in the FDCPA.

86.     The prohibition in 15 U.S.C. § 1692f(1) is further specified in 12 C.F.R. § 1006.22(b), which provides that "[a] debt collector must not collect any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law … the term 'any amount' includes any interest, fee, charge, or expense incidental to the principal obligation."

87.    No contractual agreement exists between Plaintiff and RMR.

88.    No contractual agreement between Plaintiff and the Medical Provider authorized an interest rate of 41% per year.

89.    No contractual agreement between Plaintiff and the Medical Provider authorized a collection fee of 42%.

90.    No contractual agreement between Plaintiff and the Medical Provider authorized collecting $50.19 in interest.

91.    No contractual agreement between Plaintiff and the Medical Provider authorized collecting $0.07 as interest on top of the $289.19 amount RMR demanded.

92.    No contractual agreement between Plaintiff and the Medical Provider authorized collecting $101.22 in fees.

93.    An interest rate of 41% is prohibited by law.

94.    No law or contract relevant to this Complaint permits interest-on-interest or fees-on-interest.

95.    A 42% collection fee is unconscionable, unenforceable, and an unlawful penalty, and is prohibited by law.

96.    A 35% collection fee is unconscionable, unenforceable, and an unlawful penalty, and is prohibited by law.

97.    Even when consumers have signed documents purportedly agreeing to a 35% collection fee, RMR's 35% collection fee has repeatedly been found by Wyoming courts to be unconscionable.

98.    By way of example, attached hereto as **EXHIBIT B** are multiple redacted court orders finding RMR's 35% collection fee unconscionable, all dated prior to RMR's Notice of Debt to Plaintiff.

99.    RMR's 35% collection fee has been found to be an unenforceable penalty.

100.    Attached hereto as **EXHIBIT C** are redacted copies of a default judgment order denying RMR's claim for a 35% collection fee and an order denying a motion for reconsideration of the same in *Rocky Mountain Recovery Services, Inc. v. B.P.*, Washakie County Circuit Court No. CV-2024-0007. In that case, the Court found that RMR's 35% collection fee is an unenforceable penalty. These orders were issued prior to RMR's Notice of Debt to Plaintiff.

101.    RMR's attempted collection of interest and fees from Plaintiff and class members violates the FDCPA.

102.    Multiple statements on RMR's Notice of Debt violate the FDCPA, including the FDCPA's provisions regarding false and misleading representations (15 U.S.C. § 1692e), unfair practices (§ 1692f), and validation of debts (§ 1692g). By way of example, and as discussed further below, RMR's Notice of Debt provides statements regarding Plaintiff's dispute rights that are inconsistent with the requirements of the FDCPA because, among other things, the Notice of Debt provides a deadline for Plaintiff to dispute the Alleged Debt that is earlier than what Plaintiff is afforded by the FDCPA.

103.    RMR's Notice of Debt demanded payment, including for unlawful fees and interest, through asking Plaintiff to "contact [RMR] about [his] payment options,"

and prompting Plaintiff to "[m]ake [his] check payable to Rocky Mountain Recovery." RMR's Notice of Debt itself accepts payment via check.

104.    On or about December 21, 2024, Plaintiff called RMR at the telephone number listed on the Notice of Debt. This telephone call was a "communication" pursuant to 15 U.S.C. § 1692a(2). RMR was closed, but a voicemail greeting solicited Plaintiff's personal information, including contact information and account number. The voicemail greeting did not state that RMR was a debt collector, that RMR was attempting to collect a debt, or that any information obtained would be used for that purpose, constituting a violation of the FDCPA. *See* 15 U.S.C. § 1692e(11).

105.    On or about December 21, 2024, RMR's voicemail greeting stated: "Thank you for calling Rocky Mountain Recovery, Recovery Systems, Trust Financial, or Wilkerson & Wilkerson…." Each of these companies are owned by the Wilkersons.

106.    The FDCPA prohibits even the mere implication that a communication is from an attorney when it is not from an attorney. *See* 15 U.S.C. § 1692e(2)(3).

107.    The inclusion of Wilkerson & Wilkerson, the name of a law firm, in RMR's voicemail greeting, has the effect on consumers of misleading and deceiving them to believe RMR is a law firm, or that RMR is so tightly connected to a law firm that consumers' alleged debts have been reviewed by an attorney, or implies that communications from RMR are communications from an attorney, all of which overshadow consumers' rights to dispute debts and constitutes one or more violations of the FDCPA.

108.    Plaintiff left RMR a voicemail message on or about December 21, 2024. RMR received Plaintiff's voicemail message on or about December 21, 2024.

109.    In Plaintiff's December 21, 2024 voicemail message, Plaintiff stated: he believed the amount demanded by RMR was inaccurate; that the stated principal amount was higher than the full cost of the Medical Service; that the Alleged Debt had already been paid in full; that he was being charged interest and fees unlawfully; that he demanded an accounting; that he demanded copies of all documentation, contracts, and invoices supporting the amounts RMR demanded; that he disputed the Alleged Debt; that he demanded verification and validation of the Alleged Debt; and that he desired written confirmation that the Alleged Debt had been paid in full.

110.    In Plaintiff's voicemail message on or about December 21, 2024, Plaintiff stated that he was nervous about the Notice of Debt and what else RMR might do to him.

111.    In Plaintiff's voicemail message on or about December 21, 2024, Plaintiff stated, "Do not call me back. I am really concerned about your company … I don't want you to call me."

112.    Plaintiff was nervous, fearful, and upset when calling RMR on or about December 21, 2024.

113.    A debt collector must cease communication and collection of a debt or any disputed portion thereof upon receipt of a dispute, until verification of the debt is provided. *See* 15 U.S.C. § 1692g(b).

114.    RMR was obligated to accept Plaintiff's telephone message on or about December 21, 2024 as a dispute of the Alleged Debt, because, among other things, RMR's Notice of Debt, Exhibit A, states, "*Call* or write to us by 01-14-25 to dispute all or part of the debt" (emphasis added). In the alternative, if RMR informed Plaintiff that it accepted disputes via telephone call (which it did), but a telephone dispute did not invoke Plaintiff's dispute rights under the FDCPA, then the Notice of Debt is unfair, misleading, and deceptive, and overshadows consumer dispute rights, constituting one or more violations of the FDCPA.

115.    On or about December 21, 2024, Plaintiff wrote to RMR stating, among other things: that he disputed the Alleged Debt; that he demanded verification and validation of the Alleged Debt; that he demanded an accounting, documents, and contracts to support RMR's demands for fees and interest; that demanded the name and address of the original creditor; that he wanted to be provided a factual and legal basis to support why RMR could collect a debt, fees, costs, or commence any statutory period while it was dissolved by the State of Wyoming; and Plaintiff demanded that RMR cease collection and not call him.

116.    RMR received Plaintiff's dispute letter dated December 21, 2024.

117.    On or about December 23, 2024, an individual who identified themselves as Mark Edwards with RMR called Plaintiff (the "Edwards Call"), even though Plaintiff had asked two days before not to be contacted via phone.

118.    The Edwards Call was an attempt by RMR to collect the Alleged Debt.

119.    On the Edwards Call, Edwards said, "This is an attempt to collect a debt."

120.    Because Plaintiff had already disputed the Alleged Debt, via phone and in writing on or about December 21, 2024, the Edwards Call on or about December 23, 2024, and each of Edwards's statements therein, each constitute collection efforts and communications in violation of the FDCPA.

121.    During the Edwards Call, RMR increased its demand of Plaintiff from $390.48 to $391.32, based on more interest RMR unlawfully added.

122.    Plaintiff had not paid the full amount Edwards demanded, $391.32, prior to the Edwards Call.

123.    The difference between $390.48 and $391.32, or $0.84, is interest being charged on top of interest that already exceeded any lawful amount.

124.    RMR was attempting to collect interest from Plaintiff that accrued daily.

125.    Failing to disclose the accrual of interest when it is occurring, or suggesting that interest is accruing when it is not, are each violations of the FDCPA, including as false representations of the character, amount, or legal status of any debt. Failing to disclose that interest is accruing daily, and failing to state the interest rate or terms, are each a violation of the FDCPA, including as false representations of the character, amount, or legal status of any debt.

126.    During the Edwards Call, Plaintiff asked, "What is the interest rate?" Edwards responded, "Two percent."

127.    Edwards's statement that 2% interest was being charged on the Alleged Debt was false and misleading, and thus a violation of the FDCPA.

128.    During the Edwards Call, Plaintiff asked, "What's the actual cost of the, like, medical services before all of these fees and interest?" Edwards responded, "$289.19." Plaintiff asked, "So, $289.19 does not include any fees or interest or anything like that?" Edwards responded, "Correct, yes." Plaintiff asked, "It's just medical services actually provided and the value of that for the $289.19?" Edwards responded, "Yes."

129.    Edwards's statement that $289.19 did not include fees or interest, when it did, is false and thus a violation of the FDCPA.

130.    During the Edwards Call, Plaintiff stated that he disputed the Alleged Debt, and that he demanded verification and validation.

131.    During the Edwards Call, Edwards stated: "If you want to get this taken off, you know, $391.32 is what you owe … it will be sent to collections, which it is, and interest will continue to accrue until it is taken care of. So, it's not just gonna magically go away."

132.    The FDCPA is clear that "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor." 15 U.S.C. § 1692g(b).

133.    Edwards's statements that Plaintiff owes funds, that interest will continue to accrue, and that the Alleged Debt is not magically going to go away, overshadowed Plaintiff's right to dispute the debt and request the name and address of the original creditor, constituting violations of the FDCPA.

134.    On the Edwards Call, Plaintiff asked, "Is this going to go on my credit?" RMR's debt collector, Edwards, responded, "Yes. Yes, it is." Plaintiff asked, "When?" Edwards responded, "So we received it from them on December 9th, you have 30 days, so you have until January 9th to get it resolved."

135.    On the Edwards Call, Plaintiff stated, "You're not going to report this to my credit." Edwards responded, "Yes, we are going to report it to your credit."

136.    On the Edwards Call, Edwards stated, "Unfortunately, we're going to report it to your credit bureau."

137.    Edwards's statement that Plaintiff had until January 9, 2025 to "get it resolved" before RMR "report[s] this to [his] credit" constitutes multiple violations of the FDCPA, including violations of the false and misleading representations (15 U.S.C. § 1692e), unfair practices (§ 1692f), and validation of debts (§ 1692g) provisions.

138.    Edwards's threat to report the Alleged Debt on January 9, 2025, 30 days from the date RMR allegedly received the purported collection file from the Medical Provider, but not 30 days after Plaintiff's receipt of the Notice of Debt, was less than the validation period required by law, thus overshadowing Plaintiff's dispute rights in violation of the FDCPA and constituting unlawful continued collection attempts.

139.    Plaintiff's Alleged Debt was an alleged medical debt.

140.    As of the Edwards Call, and at all other times, Plaintiff's Alleged Debt was under $500.

141.    As of the Edwards Call, Plaintiff's Alleged Debt was under one year old.

142.    As of the Edwards Call, Plaintiff did not actually owe any money to RMR or the Medical Provider.

143.    Effective July 1, 2022, medical debts that are less than one year old are prohibited from being reported to any of the three major credit reporting agencies.

144.    Effective on or about April 11, 2023, medical debts that are less than $500 are prohibited from being reported to any of the three major credit reporting agencies.

145.    Effective July 1, 2022, paid medical debts are prohibited from being reported to consumer credit reports at all three major credit reporting agencies.

146.    During the Edwards Call, Edwards knew the Alleged Debt was an alleged medical debt, that it was under one year old, and that it was under $500.

147.    The Alleged Debt was not eligible for credit reporting.

148.    Had RMR reported any information related to the Alleged Debt to Plaintiff's credit report, it would have included unlawful amounts of interest and fees.

149.    Based on RMR's policies, practices, and procedures, had RMR reported any information related to the Alleged Debt to Plaintiff's credit report, the amount of the purported debt reported would have exceeded $390.00.

150.    Collection accounts can significantly drop consumer credit scores.

151.    Collection accounts on a credit report are derogatory and negative.

152.    Collection accounts on a credit report harms consumer creditworthiness.

153. Plaintiff had already paid all amounts legitimately owed related to the Alleged Debt prior to December 23, 2024, without admitting that any amount was validly owed to RMR or the Medical Provider.

154. One of RMR's debt collection letter templates states, "Most accounts are credit reporting and interest is being added daily."

155. RMR is reporting most of its accounts to consumer credit reports.

156. Through the Edwards Call, RMR used false, deceptive, and misleading representations in connection with the collection of the Alleged Debt, including by threatening to take action(s) that cannot legally be taken or that are not intended to be taken, in violation of 15 U.S.C. §§ 1692e, 1692e(5), 1692e(8), and 1692e(10).

157. RMR sent Plaintiff a letter dated December 26, 2024 (the "December 26 Letter"), which is attached with redactions as **EXHIBIT D**.

158. The December 26 Letter is dated exactly two weeks after the date on the Notice of Debt.

159. RMR routinely sends debt collection letters to consumers that are substantially similar to Exhibit D two weeks after the first notice of debt sent by RMR.

160. RMR sent the December 26 Letter after its receipt of Plaintiff's written notice of dispute, which contained demands for the name and address of the original creditor, a refusal to pay, and demands for verification and validation.

161.    RMR placed the December 26 Letter into the U.S. Mail after its receipt of Plaintiff's written notice of dispute, which contained demands for the name and address of the original creditor and demands for verification and validation.

162.    The December 26 Letter states, among other things:

> Previous efforts to collect this past due account have been disregarded, therefore we have been authorized to take any lawful action necessary to enforce collection.
>
> There are two ways of settling a legitimate debt – payment in full immediately or recommendation for further action. At this time the choice is still yours.
>
> Should you choose to avoid the consequences of non-payment, remit the balance to our office without further delay.

163.    RMR was required to cease its communications and collection activity after Plaintiff's dispute, so the December 26 Letter violated the FDCPA, 15 U.S.C. § 1692c, and the language of the December 26 Letter—including statements that previous efforts were disregarded, that RMR was authorized to take any lawful action necessary to enforce collection, that the alleged debt was legitimate, demanding payment in full or further action, suggesting that Plaintiff had an immediate choice to make, informing Plaintiff to avoid consequences of non-payment, and demanding remittance of payment without further delay—overshadowed Plaintiff's right to dispute the Alleged Debt, constituting a violation of 15 U.S.C. § 1692g.

164.    The December 26 Letter did not provide verification or validation, and did not provide the original creditor's address.

165.    The December 26 Letter is a form or template that RMR routinely uses.

166.    The December 26 Letter demanded $391.52 from Plaintiff.

167.    The December 26 Letter stated that Plaintiff owed RMR:

| CREDITOR | AMOUNT | INTEREST | FEES | TOTAL |
|---|---|---|---|---|
| WYOMING HEALTH FAIRS | 390.41 | 1.11 | 0.00 | 391.52 |

168.    In the December 26 Letter, RMR purported that the principal balance of the Alleged Debt was now $390.41. Within this number, RMR included: the Post-Insurance Balance of $239.00, $50.19 in interest, and a $101.22 collection fee.

169.    In the December 26 Letter, RMR stated that $1.11 in interest was being collected. This was false, because interest was already included in the $390.41 in the 'Amount' column.

170.    In the December 26 Letter, RMR stated that $0.00 in fees were being collected. This was false, because fees were already included in the $390.41 in the 'Amount' column.

171.    Through the December 26 Letter, RMR was demanding $51.30 in interest on the Alleged Debt.

172.    RMR's December 26 Letter falsely represented the character, amount or legal status of the Alleged Debt in violation of the FDCPA. *See* 15 U.S.C. § 1692e(2).

173.    When Plaintiff received the December 26 Letter, he felt distressed, upset, and concerned.

174.    At some time after Plaintiff received RMR's Notice of Debt, Plaintiff submitted a payment to the Medical Provider. The Medical Provider then gave the funds to RMR. The payment(s) Plaintiff made toward the Alleged Debt after Plaintiff

received the Notice of Debt were made with a notation similar to: "Submitted under duress and without waiver of any rights or remedies. All rights and remedies, including for a full refund, reserved."

175.    Plaintiff paid the amounts that RMR demanded because, among other things, Plaintiff was not fully aware of his rights, he was threatened with credit reporting and he was not aware that medical debts like this one could not be reported to his consumer credit reports, he perceived RMR as being one and the same as a law firm, he did not want to be sued, he was fearful of negative credit reporting, he did not want his privacy (including medical privacy) invaded or violated, he did not want interest to accrue, he wanted to preserve his reputation, and RMR used unfair, deceptive, misleading, and unconscionable debt collection tactics in violation of law that coerced him into paying the amounts that RMR unlawfully demanded.

176.    The total Plaintiff paid in December 2024 was $391.48.

177.    RMR has filed lawsuits against other consumers, including 380 lawsuits in Wyoming state courts in the mere four months between September 1, 2024 and December 31, 2024. RMR filed over 5,000 cases in Wyoming state courts against consumers from 2021 to 2024. In some months during that time period, RMR has filed almost 200 lawsuits against Wyoming consumers. RMR also files lawsuits against consumers in Montana, and possibly other states.

178.    RMR and Wilkerson & Wilkerson routinely reveal medical patients' private and protected health information in public court filings in Wyoming circuit courts. As just a small sampling of only a few cases, RMR publicly revealed that

patients had medical procedures performed such as: a breast biopsy; a psychiatric evaluation; skin tag removal; testicular ultrasound; tooth extractions and fillings; and a surgical procedure performed to remove lesions, tumors, or cysts from the area of the ovary, around the bladder, uterus, rectum, or on the peritoneum. This is in addition to RMR's filings often revealing consumers' cell phone numbers, emergency contact information, and salary information, the chief complaint for medical visits, and responses to medical provider questionnaires, and sometimes revealing credit scores and full unredacted Social Security Numbers.

179.    Medical records in RMR's possession would tend to reveal, or likely reveal, one or more of Plaintiff's medical conditions and/or diagnoses.

180.    RMR has agreements with medical clinics that require RMR to comply with the Health Insurance Portability and Accountability Act ("HIPAA").

181.    Wyoming Health Fairs is a covered entity under HIPAA.

182.    RMR has publicly filed medical information about Wyoming Health Fairs patients in court filings. For example, in 2024, RMR publicly filed a document in court stating that a Wyoming woman had testosterone level testing at Wyoming Health Fairs, along with her name and address.

183.    On December 31, 2024, Michael J. Pinti ("Pinti"), an employee of RMR, called Plaintiff (the "Pinti Call"), even though Plaintiff had asked ten days before not to be contacted via phone.

184.    Pinti resides in Casper, Wyoming.

185.    Pinti works out of the joint RMR/Wilkerson & Wilkerson office in Casper, Wyoming.

186.    On December 31, 2024, Pinti spoke to Plaintiff while Pinti was physically present in the State of Wyoming.

187.    In court filings, RMR has referred to Pinti as, and Pinti indeed is, one of RMR's "keeper[s] of the records."

188.    On December 31, 2024, Pinti conveyed to Plaintiff that RMR credited Plaintiff's account for Plaintiff's payments made after RMR sent its Notice of Debt, but that Plaintiff's payments did not fully cover what Plaintiff owed because of additional interest in an amount unknown to Plaintiff.

189.    The first time RMR conveyed to Plaintiff that his alleged account was resolved was through Pinti's statements on December 31, 2024.

190.    The additional interest that Pinti was referring to was being illegally calculated, demanded, and collected.

191.    While Pinti said the account was resolved, Pinti said the remaining amounts were "forgiven."

192.    Pinti's statement that Plaintiff had forgiven debt caused Plaintiff to fear that a "forgiven" debt could still carry a continuing reputational risk and may impose tax consequences, giving rise to continuing harm, injuries, and damages.

193.    Forgiven debt is sometimes taxable.

194.    RMR and/or the Medical Provider collected from Plaintiff double amounts with regard to at least some of the principal balance of the Alleged Debt.

195.   RMR profited from Plaintiff's payment of unlawfully demanded fees and/or interest on the Alleged Debt.

196.   RMR and/or the Medical Provider collected interest and/or fees that were unlawfully calculated and collected in violation of the FDCPA.

197.   RMR and/or the Medical Provider owe Plaintiff money.

198.   On December 31, 2024, Plaintiff asked Pinti for a refund of double collected principal amounts and illegally collected interest and fees.

199.   On December 31, 2024, Pinti refused to provide Plaintiff with a refund of any amount.

200.   Pinti's refusal to provide a refund on December 31, 2024 was a refusal on behalf of RMR and the Medical Provider.

201.   Pinti's refusal to provide a refund of unlawfully collected fees and interest on December 31, 2024 was after Plaintiff had already notified RMR and the Medical Provider that the fees and interest charged were unlawful.

202.   Plaintiff has asked the Medical Provider to provide him with an accounting and a refund of double-paid principal amounts, interest, and/or fees. On December 31, 2024, the Medical Provider emailed Plaintiff stating, among other things, "Any further discussion about this matter should be directed to Rocky Mountain Recovery, as they are the owners of this debt."

203.   At no time prior to January 1, 2025, did RMR "own" the Alleged Debt.

204.   On December 31, 2024, Pinti told Plaintiff that RMR is WHF's "agent."

205.    On December 31, 2024, Pinti stated that RMR became the authorized agent of the Medical Provider on December 9, 2024.

206.    On December 31, 2024, Pinti told Plaintiff that RMR is WHF's "creditor's rights agent."

207.    RMR's use of the phrase "creditor's rights agent" is intended to misrepresent RMR as a law firm and misrepresent its debt collectors as attorneys. The use of this phrase is deceptive and misleading and violates the FDCPA.

208.    On December 31, 2024, Pinti told Plaintiff: "It was improper for you to be communicating with Wyoming Health Fairs on this matter to begin with … there's legal principles that say you should be communicating with the one and only agent on the matter."

209.    On December 31, 2024, Pinti stated to Plaintiff, "You shouldn't be discussing [with WHF] the remainder of the history of the account and some of the other things that we've talked about today."

210.    But on the December 23, 2024 Edwards call, Edwards had encouraged Plaintiff to contact the Medical Provider.

211.    Pinti's statements that it was improper for Plaintiff to communicate with the Medical Provider, that legal principles say Plaintiff should only communicate with RMR, and that Plaintiff should not be discussing the account history with the Medical Provider, are inaccurate, aim to discourage Plaintiff from investigating the Alleged Debt, and overshadow Plaintiff's dispute rights. These are

false, deceptive, and misleading representations in connection with the collection of the Alleged Debt and violate the FDCPA as unfair debt collection practices.

212. Plaintiff is not a licensed attorney.

213. Pinti is not a licensed attorney.

214. Pinti told Plaintiff on December 31, 2024 that RMR is not a law firm.

215. On December 31, 2024, Pinti stated, "We are only their [the Medical Provider's] attorney if we take a legal action, and then our legal partner The Wilkerson Law Group becomes their creditor's rights attorneys if we go into a legal action. But even if we're not in a legal action, we are still their lawful agent."

216. RMR provides their original creditor clients with advice as to what language to place into their contracts with consumers.

217. RMR sent Plaintiff a letter dated December 31, 2024, a copy of which is attached hereto as **EXHIBIT E** (the "December 31 Letter").

218. RMR's December 31 Letter stated that RMR accepted payment in full of $390.48 effective December 30, 2024.

219. RMR's December 31 Letter stated that RMR accepted payment for $239.00 as "original principle" *[sic]*, $50.19 in "pre-assigned interest," $0.07 in "interest," and $101.22 as a "collection fee," totaling $390.48.

220. Plaintiff paid $391.48, so RMR's letter is false and inaccurate.

221. RMR logged in its systems its receipt of $101.22 paid by Plaintiff toward a collection fee on December 30, 2024, relating to the Alleged Debt.

222. RMR's $101.22 collection fee as reflected in the December 31 Letter, as a percentage of the "original princip[al]" of $239.00, is over 42%.

223. RMR logged in its systems its receipt of $50.19 paid by Plaintiff toward interest on December 30, 2024, relating to the Alleged Debt.

224. RMR logged in its systems its receipt of $0.07 paid by Plaintiff toward interest on December 30, 2024, relating to the Alleged Debt.

225. RMR considers "pre-assigned interest" and "interest" to both be interest.

226. The $50.26 in "pre-assigned interest" and "interest" as reflected in the December 31 Letter, as calculated on the "original princip[al]" of $239.00, exceeds any amount authorized by contract or law.

227. RMR collected, accepted, and/or ledgered payments from Plaintiff toward interest and fees illegally demanded and collected by RMR.

228. RMR collected, accepted, and/or ledgered payments from Plaintiff after RMR received a written dispute, demand for validation and verification, refusal to pay, and demand for the original creditor's name and address, but prior to RMR providing such validation and/or the original creditor's name and address, constituting a violation of the FDCPA.

229. RMR's December 31 Letter referred to Plaintiff as "patient."

230. With regard to the Alleged Debt, Plaintiff was a medical patient.

231. RMR's December 31 Letter states: "We are trying to collect a debt that you owe."

232.    Plaintiff did not owe RMR or the Medical Provider any money on December 31, 2024.

233.    RMR's December 31 Letter does not meet the requirements of the FDCPA as verification or validation of a debt.

234.    At no time has RMR provided Plaintiff with satisfactory verification or validation of the Alleged Debt.

235.    The Notice of Debt, December 26 Letter, and December 31 Letter each include interest exceeding 7% per year.

236.    The Notice of Debt, December 26 Letter, and December 31 Letter each include interest exceeding 21% per year.

237.    The Notice of Debt, December 26 Letter, and December 31 Letter each include interest exceeding 36% per year.

238.    The Notice of Debt, December 26 Letter, and December 31 Letter each include interest exceeding 1.75% per month.

239.    The Notice of Debt, December 26 Letter, and December 31 Letter each include a collection fee exceeding 35% of the principal balance.

240.    The Notice of Debt, December 26 Letter, and December 31 Letter each include a collection fee exceeding 35% of the principal balance and, separately, interest exceeding 1.75% per month.

241.    On January 8, 2025, Daniel B. Wilkerson emailed Plaintiff stating among other things: "Wilkerson Law Group represents Rocky Mountain Recovery in all matters, and Wyoming Health Fair in this specific matter concerning you. Send

all requests, questions, and correspondences to me only." His email was sent from his RMR email address, not his law firm's email address.

242.    RMR and Wilkerson & Wilkerson are functionally the same entity as it relates to RMR's debt collection business.

243.    RMR has entered into an agreement with Hot Springs County Memorial Hospital that it was operating under in 2024, which states, among other things: "No form of legal action will be initiated on the part of RMR without written authority from the Client. When the Client authorizes legal action, the Client has authority to communicate directly with RMR's attorney … RMR shall not accept any compromise settlement without the prior approval of the Client." RMR and Wilkerson & Wilkerson have filed lawsuits on behalf of Hot Springs County Memorial Hospital, including in 2024.

244.    Plaintiff has demanded a refund of all amounts he paid that were not actually owed, were double collected, and for illegally calculated interest and fees. RMR and the Medical Provider have refused to provide such a refund. As of the filing of this Complaint, RMR and/or the Medical Provider are retaining double-collected principal amounts, unlawful collection fees, and unlawful interest.

245.    Plaintiff is entitled to statutory damages, actual damages, injunctive relief, declaratory relief, attorneys' fees, and costs.

246.    Plaintiff is entitled to a declaratory judgment that he owed and owes no funds to RMR and/or the Medical Provider, that Defendant violated his rights, that Defendant's patterns and practices violate his rights and the rights of consumers,

that no alleged debt was "forgiven," possibly leading to tax or reputational consequences, and that Defendant's interest charges and fees were and are unlawful, unconscionable, and unenforceable.

247.    Plaintiff has suffered damages because of Defendant's conduct, including without limitation: stress, anxiety, loss of sleep, humiliation, mental anguish, reputational and professional harm (including due to a requirement to disclose Defendant's collection activity to professional licensing agencies), fear, concern that Defendant would publicly reveal Plaintiff's private and medical information as RMR has done to other consumers, time invested into challenging Defendant's unlawful conduct and investigating and protecting Plaintiff's rights, mailing costs for dispute letters, travel costs and mileage connected to challenging Defendant's unlawful conduct, and out-of-pocket expenses incurred associated with investigating Plaintiff's rights and remedies, and other damages, attorneys' fees, and costs.

248.    Plaintiff has paid an attorney money because of RMR's threats and actions against him in violation of law.

249.    Plaintiff is left with no recourse but to file this lawsuit. An actual controversy exists because Plaintiff is entitled to statutory damages for each violation of the FDCPA, RMR has refused to provide a refund to Plaintiff, Plaintiff has incurred actual damages beyond RMR's refusal to provide a refund, and RMR has violated and is continuing to violate the FDCPA with regard to Plaintiff and all those similarly situated.

### III.    ROCKY MOUNTAIN RECOVERY SYSTEMS HAS A PATTERN AND PRACTICE OF VIOLATING THE LAW

250.    RMR engages in systemically and routinely violating consumer rights as a matter of course, including through FDCPA violations, fraud, negligence, and negligence per se.

251.    RMR is aware of all of the requirements of the FDCPA.

252.    RMR is aware of all of the requirements of Wyoming law and regulations pertaining to debt collectors and the collection of consumer debts.

253.    RMR is owned by debt collection attorneys.

254.    RMR is owned by attorneys aware of the requirements of the FDCPA.

255.    Tammy Jo McNulty, an RMR employee, stated in a Google review of RMR: "This company follows all FDCPA regulations and treats people professionally."

256.    On December 31, 2024, Pinti told Plaintiff: "We're kind of the specialists and the experts who understand the law."

### A.    ROCKY MOUNTAIN RECOVERY SYSTEMS USES "PRE-COLLECTION NOTICES" TO VIOLATE CONSUMER RIGHTS

257.    Attached hereto as **EXHIBIT F** are redacted copies of two letters dated January 17, 2024 and February 10, 2023 (the "Pre-Collection Notice(s)"), that RMR sent to Wyoming residents and J. and K. (p. 1), and K. and K. (p. 2), respectively. RMR filed these documents (without redactions) in a Wyoming county circuit court.

258.    With regard to Wyoming residents J. and K. referenced on page 1 of Exhibit F, J. is/was a first responder, and K. is/was a teacher.

259.    With regard to Wyoming residents K. and K. referenced on page 2 of Exhibit F, the first K. listed is/was a healthcare worker, and the second K. listed is/was a rail worker.

260.    The Pre-Collection Notices are true and accurate copies of a letters RMR drafted, prepared, and sent via U.S. mail on the dates stated on the documents.

261.    The Pre-Collection Notices are substantially the same in content. The J. and K. version states, among other things:

> Original Creditor: Family Dentistry
> …
> Balance Due: $2,134.11
> Patient: Family
>
> **PRE-COLLECTION NOTICE**
>
> To Whom It May Concern,
>
> This letter is to notify you that the above balance has been forwarded to our collection agency. To protect you as a consumer and to ensure that your creditor is paid in a reasonable manner, we are giving you an opportunity to pay this account before it is turned for collection.
>
> **You have <u>30 days</u> from the date of this letter to pay this account to <u>Platte River Family Dentistry</u>**. If you do not pay this bill to Family Dentistry or make satisfactory arrangements with us, we will immediately mail the federal notice that triggers the time period for (1) **Credit Reporting** (2) Statutory **Interest** which will be back dated to the time of service and increase the amount due, and (3) **Legal Action** including fees and higher interest rates and additional damage to your credit report as we may pursue a legal judgment.
>
> To avoid further action, contact:
> Platte River Family Dentistry
> …
> Your prompt attention to this matter is appreciated.
> Rocky Mountain Recovery Systems, Inc.

262.   The Pre-Collection Notices are each an attempt to collect an alleged debt.

263.   The Pre-Collection Notices are each a "communication" as that term is defined pursuant to 15 U.S.C. § 1692a(2).

264.   The Pre-Collection Notices are on RMR letterhead.

265.   The Pre-Collection Notices do not state that any information obtained will be used for debt collection, in violation of 15 U.S.C. § 1692e(11).

266.   Because the Pre-Collection Notices are an attempt to collect a debt by a debt collector, they must include the information required to be in a notice of debt, including statements about the consumer's dispute rights. *See* 15 U.S.C. § 1692g(a). Because they do not, they violate the FDCPA.

267.   The wording of the Pre-Collection Notices is abusive, deceptive, and unfair, especially judged according to the "least sophisticated consumer" standard.

268.   The Pre-Collection Notices falsely, deceptively, and misleadingly state that they seek to protect the recipients, when they do not; they seek to collect an alleged debt through threats.

269.   The Pre-Collection Notices falsely state that the recipients' account has not been "turned for collection," when each letter was in fact sent by a debt collector attempting to collect an alleged debt.

270.   The Pre-Collection Notices state that the recipients have 30 days from the date of the letter to pay, thus misstating the recipients' dispute rights, not

providing the required dispute rights statements, and overshadowing the recipients' dispute rights.

271.    The Pre-Collection Notices state that RMR "…will immediately mail the federal notice that triggers the time period…," which is phrased as a threat rather than the starting of a dispute and validation period.

272.    The Pre-Collection Notices refer to "trigger[ing] the time period for (1) Credit Reporting," implying that credit reporting will occur 30 days from the date of the letter, thus overshadowing the recipients' dispute rights.

273.    The Pre-Collection Notices refer to "trigger[ing] the time period for … (2) Statutory Interest which will be back dated to the time of service and increase the amount due," which implies a severe financial consequence for not paying within 30 days from the date of the letter, thus overshadowing the recipients' dispute rights and constituting a false representation of the character, amount, or legal status of a debt.

274.    Platte River Family Dentistry, P.C. was already charging the recipients of the Pre-Collection Notices attached as Exhibit F at or above the maximum interest rate allowed by contract or law. Therefore, RMR could not lawfully add more interest nor backdate additional interest. Accordingly, RMR's Pre-Collection Notices to these recipients threatened action that could not lawfully be taken, in violation of the FDCPA.

275.    The Pre-Collection Notices refer to "trigger[ing] the time period for … (3) Legal Action including fees and higher interest rates and additional damage to

your credit report as we may pursue a legal judgment," which falsely implies that RMR is a law firm, overshadows the recipients' dispute rights, and falsely implies that some damage has already been done to the recipients' credit report.

276.    Because the recipients of the Pre-Collection Notices were already being charged an interest rate higher than the legal judgment interest rate under law, RMR's threat of "Legal Action including …  higher interest rates" was false, an unlawful threat, and a misrepresentation.

277.    The Pre-Collection Letters were created using a template that RMR uses with many consumers. RMR has used this template since at least 2019.

278.    The Pre-Collection Notices attached as Exhibit F each concern alleged debts that had not been paid in a timely manner as of the date each notice was sent.

279.    The Pre-Collection Notices attached as Exhibit F each concern alleged debts that were in default as of the date each notice was sent.

280.    RMR has entered into an agreement with Hot Springs County Memorial Hospital that states: "WHEREAS, the client has unpaid delinquent accounts which it desires collected…,"and, "RMR agrees to provide pre-collect letters…." RMR was operating under this agreement in 2024.

281.    The Pre-Collection Notices fraudulently seek to collect alleged debts by making false representations of material facts with the intent to induce action by the recipients.

282.    As of the filing of this Class Action Complaint, the recipients of the Pre-Collection Notices (J. and K., and K. and K.) have not released any claims they have

against RMR for violating the FDCPA or any other cause of action pleaded in this Complaint. As pleaded herein, Plaintiff seeks to represent a class of persons similarly situated. The class definitions provided herein would include the recipients of the Pre-Collection Notices (J. and K., and K. and K.), among many others, as class members.

### B.    ROCKY MOUNTAIN RECOVERY SYSTEMS PROVIDES CONSUMERS WITH LESS THAN THE FULL DEBT VALIDATION AND DISPUTE PERIOD REQUIRED BY LAW

283.    RMR routinely, systematically, and as a pattern and practice, violates the FDCPA by providing consumers with less than the full debt validation period required by federal law.

284.    RMR routinely, systematically, and as a pattern and practice, uses a template debt collection notice that is substantially in the same format, stylization, time calculation, and contents as the Notice of Debt sent to Plaintiff, which is attached as Exhibit A.

285.    RMR's Notice of Debt is a "notice of debt" and a "written notice," as each of those phrases are used at 15 U.S.C. § 1692g(a).

286.    Notices of debt, like RMR's Notice of Debt to Plaintiff, must include, *inter alia*:

(a)    "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector," 15 U.S.C. 1692g(a)(3);

(b)    "a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy

of such verification or judgment will be mailed to the consumer by the debt collector," 15 U.S.C. § 1692g(a)(4); and

(c)    "a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor," 15 U.S.C. § 1692g(a)(5).

287.   Importantly, the thirty-day period prescribed by 15 U.S.C. § 1692g(a) does not begin until "after [the consumer's] receipt of the notice." 15 U.S.C. § 1692g(a)(3).

288.   Specifically, the thirty-day period does not commence until "at least five days (excluding legal public holidays identified in 5 U.S.C. 6103(a), Saturdays, and Sundays) after the debt collector provides [the required statements]." 15 U.S.C. § 1692g(a)(3); 12 C.F.R. § 1006.34(b)(5).

289.   This period of time is known as the "validation period," and it terminates "30 days after the consumer receives or is assumed to receive the validation information." 12 C.F.R. § 1006.34.

290.   This delay in commencement of the thirty-day period to account for mailing time is especially important in light of the State of Wyoming's particularly slow U.S. Mail delivery around the time Defendant sent the Notice of Debt.[1]

---

[1] Renée Jean, Wyoming Mail Goes Hundreds Of Extra Miles Before Delivery, COWBOY STATE DAILY, Dec. 26, 2024, https://cowboystatedaily.com/2024/12/26/wyoming-mail-goes-hundreds-of-extra-miles-before-delivery/ [https://perma.cc/7VUU-LLWW]; Renée Jean, Rural Wyoming Can Expect Even Slower Mail Delivery Under New USPS Proposal, COWBOY STATE DAILY, Aug. 23, 2024, https://cowboystatedaily.com/2024/08/23/rural-wyoming-can-expect-even-slower-mail-delivery-under-new-usps-proposal/ [https://perma.cc/L67A-R2MZ]; Renée Jean, Postmaster General Gives Himself An "A" For Gutting Wyoming Mail Delivery, COWBOY STATE DAILY, Dec. 12, 2024, https://cowboystatedaily.com/2024/12/12/postmaster-general-gives-himself-an-a-for-gutting-wyoming-mail-delivery/ [https://perma.cc/P4J5-5ZSQ].

291.    RMR's template notice of debt does not provide the statement required by 15 U.S.C. § 1692g(a), as it does not include the language "thirty days after receipt." Instead, RMR's template notice of debt provides a date-certain that the validation period terminates. But that date falls short of the actual validation period required by law. RMR does this intentionally to pressure consumers to promptly pay alleged debts.

292.    In the case of Plaintiff, RMR's Notice of Debt states that it was sent on December 12, 2024, and provides a specific date of January 14, 2025 upon which the validation period terminates. Specifically, RMR's Notice of Debt to Plaintiff stated, among other things:

- "Call or write to us by 01-14-25, to dispute all or part of the debt. If you do not, we will assume that our information is correct."

- "If you write to us by 01-14-25, we must stop collection on any amount you dispute until we send you information that shows you owe the debt …"

- "Write to ask for the name and address of the original creditor, if different from the current creditor. If you write by 01-14-25, we must stop collection until we send you that information …"

293.    In the case of Plaintiff, RMR's Notice of Debt bears a date of December 12, 2024. Accordingly, excluding Saturdays and Sundays within the first five days, the thirty-day period did not start until December 19, 2024, and did not end until January 18, 2025. Indeed, Plaintiff did not receive the Notice of Debt prior to December 19, 2024.

294.    RMR's template notice of debt sent to other consumers uses substantially the same time period calculation for the validation period as the Notice

42

of Debt sent to Plaintiff, or a time period calculation for the validation period that is even less favorable for consumers than the unlawful one in the Notice of Debt sent to Plaintiff. This demonstrates FDCPA violations, damages, and injuries not only to Plaintiff, but also to all those similarly situated to Plaintiff.

295. By way of example, RMR sent M.C., a mechanic, a notice of debt on February 21, 2024 in the substantially same format as the Notice of Debt that RMR sent to Plaintiff, stating that M.C.'s dispute and validation deadline was March 20, 2024, when in fact this was incorrect and was less time than the amount of time RMR was required by law to provide.

296. RMR's Notice of Debt sent to Plaintiff, and RMR's notices of debt sent to other consumers, provided less than the full validation period to exercise rights than consumers must be afforded by federal law, constituting violations of the FDCPA, specifically: (a) the explicit requirements regarding what must be included in a notice of debt, § 1692(g); and (b) the overshadowing prohibition, § 1692(b).

297. "Overshadowing generally occurs when the debt collector indicates that the time for disputing the debt has passed or when the statements by the debt collector misrepresent or cloud the amount of time remaining to dispute the debt." *Kalebaugh v. Cohen, McNeile & Pappas, P.C.*, 76 F.Supp.3d 1251, 1258 (D. Kan. 2015), citing *Friedman v. Leading Edge Recovery Solutions, LLC*, 2014 WL 1674083, 2014 U.S. Dist. LEXIS 58694, at *7 (N.D. Ill. Apr. 28, 2014). Other circuits have found that a debt collector's misstatements regarding when the validation period starts or

ends in a notice of debt violate the FDCPA. *See, e.g.*, *Jacobson v. Healthcare Fin. Servs., Inc.*, 516 F.3d 85, 92–93 (2d Cir. 2008).

298.   As stated above, courts in this Circuit have applied the objective standard for analyzing debt collector notices from the perspective of the "least sophisticated consumer."

299.   In an FDCPA action against Trust Financial, one of the Wilkerson family's other debt collection companies, the consumer in that case also alleged that the notices of debt provided less than the full validation period, constituting an FDCPA violation. *See Cutler v. Trust Financial, LLC, et al.*, No. 14-cv-541 (D. Idaho), ECF No. 1 at ¶¶ 39–44.

300.   On information and belief, the Wilkersons had a role in reviewing, drafting, and/or approving the template notice of debt that was used to prepare the Notice of Debt that RMR sent to Plaintiff, and otherwise ensuring the implementation of the template notice of debt at RMR.

##### C.   ROCKY MOUNTAIN RECOVERY SYSTEMS COLLECTS ILLEGAL INTEREST AND FEES AND DOES NOT REVIEW APPLICABLE CONTRACTS TO VERIFY WHETHER SUCH INTEREST OR FEES ARE LAWFUL

301.   RMR routinely, systemically, and as a pattern and practice, violates the FDCPA and other laws by not reviewing contractual agreements between original creditors and consumers to verify that RMR has express authorization to assess the interest and fees it assesses, and by not conducting accounting on interest that an original creditor has already assessed.

302.    In the case of Plaintiff, RMR's Notice of Debt and subsequent collection activities constitute attempts to collect interest at a rate of at least 41% per annum above and beyond the principal amount of the Alleged Debt, and a collection fee of approximately 42% of the principal amount on top of the Alleged Debt. RMR also collected interest-on-interest and fees-on-interest.

303.    In the case of Plaintiff, RMR hid interest within the stated principal balance on its Notice of Debt; and hid a collection fee and interest in the December 26 Letter.

304.    In the case of Plaintiff, Plaintiff actually paid interest to RMR at a rate of at least 44% annualized interest, and Plaintiff actually paid a 42% collection fee, both of which RMR has refused to refund.

305.    RMR has sent Plaintiff and other consumers notices of debt seeking to collect a 35% collection fee even after RMR's 35% collection fee was found by one or more courts to be unconscionable and unenforceable.

306.    In an FDCPA lawsuit against Trust Financial, one of the Wilkerson family's other debt collection firms, the consumer in that case alleged: "The amount Trust Financial attempted to collect included … charges that were incidental to that principal obligation, including the late fees, the enhancement fee, and the 40% administration fee … At the time Trust Financial attempted to collect these incidental charges, it had actual knowledge that these incidental charges, including the 40% 'administration fee,' are hidden in the principal demand." *See Castillo v. Trust Financial, LLC*, et al., No. 20-cv-126 (D. Idaho), ECF No. 1 at ¶¶ 21–32.

307.   The Wilkersons have personal knowledge of the claims and defenses in the *Castillo* case.

308.   The FDCPA prohibits debt collectors from using unfair or unconscionable means to collect a debt, and one example provided by statute is "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). This prohibition is further specified in 12 C.F.R. § 1006.22(b), which provides that "[a] debt collector must not collect any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law … the term 'any amount' includes any interest, fee, charge, or expense incidental to the principal obligation."

309.   RMR is obligated to comply with Regulation F.

310.   On December 31, 2024, Plaintiff spoke with Pinti, an RMR employee, who spoke at length about RMR's debt collection practices.

311.   On December 31, 2024, Pinti admitted that it is not RMR's practice to ask original creditors for copies of contractual agreements until RMR is considering suing a consumer.

312.   At all times relevant to this Complaint, it was not RMR's practice to ask original creditors for copies of signed contractual agreements related to alleged debts until RMR was considering suing a consumer in connection with the alleged debt.

313.   On December 31, 2024, Pinti admitted that it is RMR's practice to not conduct an accounting of interest already charged by an original creditor to verify

that RMR is not attempting to collect excess interest on an alleged debt, unless and until RMR is considering suing a consumer related to the alleged debt.

314.   At all times relevant to this Complaint, it was not RMR's practice to conduct an accounting of interest already charged by an original creditor to verify that RMR was not attempting to collect excess interest on an alleged debt, unless and until RMR was considering suing a consumer related to the alleged debt.

315.   On December 31, 2024, after RMR had sent its Notice of Debt to Plaintiff and after Plaintiff had disputed the Alleged Debt, Pinti stated that he had still never seen any contractual agreement between Plaintiff and the original creditor.

316.   On December 31, 2024, Pinti admitted that RMR has an obligation to review original creditor accountings to ensure that RMR's interest calculations are compliant with the law. Pinti defined interest as "late fees, finance charges, or interest … because those are all kind of describing something that a court would consider interest."

317.   At all times relevant to this Complaint, RMR considered late fees, finance charges, and interest to be one and the same, namely, interest.

318.   On December 31, 2024, Pinti stated that if an original creditor has already added late fees, finance charges, or interest to an account, "yes, we'll review their calculations, especially -- actually, we won't unless and until we -- we have to -- we decide to go to a legal action, and then we'll review it in more detail."

319.   At all times relevant to this Complaint, RMR did not review original creditor calculations for late fees, finance charges, or interest that the original

creditor had already added to an account prior to RMR sending a notice of debt to a consumer.

320.   On December 31, 2024, Pinti stated that even if there is no contractual agreement between an original creditor and a consumer allowing for the collection of fees and interest on an alleged debt, RMR will *still* attempt to collect fees and interest from such consumers related to those alleged debts.

321.   At all times relevant to this Complaint, even if there was no contractual agreement between an original creditor and a consumer allowing for the collection of fees and interest on an alleged debt, RMR still attempted to collect fees and interest from such consumers related to those alleged debts.

322.   On December 31, 2024, Pinti stated:

> Um, if -- if we have an original creditor, Anthony, who has no written signed version of those stipulations [interest and collection fees], and they ask us to try to collect those things, we -- we -- we -- we will properly and legally attempt to collect those things. If the consumer is not willing to make those payments voluntarily, and we are forced to consider an actual legal action … if we were to have to consider actually filing a complaint in Circuit Court, we would probably drop those -- um -- uh -- interest and fee categories—either drop them or reduce them to state statute indicated levels. Why would we do that? Because we would know, from experience, that a court probably will not award those to us at those maximum amounts, but there's certainly nothing improper about, uh, billing for them once it gets to our agency and collecting that money, um, to the extent that someone is able to pay it. So, when push comes to shove, uh, if there's no signed contract language, we may have to strike or reduce those categories accordingly.

323.    RMR has filed and served court complaints on consumers asserting a claim that included a 35% collection fee even after RMR's 35% collection fee was found by one or more courts to be unconscionable and unenforceable. These complaints are filed by RMR as the plaintiff, with a Wilkerson & Wilkerson attorney signing the complaint.

324.    RMR and Wilkerson & Wilkerson have filed notarized affidavits in support of default judgments stating that 35% collection fees were owed by consumers even after RMR's 35% collection fee was found by one or more courts to be unconscionable and unenforceable.

325.    Many of these affidavits are signed by Tammy Mattson, "as agent for the Plaintiff" RMR.

326.    A LinkedIn page under Tammy Mattson's name states that she is a Legal Assistant at Wilkerson & Wilkerson.

327.    Many of these affidavits are notarized by Anthea Jones. The Wilkerson & Wilkerson website lists Jones as a paralegal. On Jones's last Wyoming notary commission renewal, she swore that her employer was Wilkerson & Wilkerson, that her email address was an RMR email address, that her work phone number was the same as RMR's phone number, and that her employer's address was the same as RMR's address.

328.    As a pattern and practice, RMR attempts to, and does, collect interest, fees, charges, or expenses incidental to the principal obligation without this being expressly authorized by agreement or law, in clear violation of the FDCPA and other

law; and only when RMR is preparing to sue a consumer will RMR then *sometimes* drop or reduce its demands for interest, fees, charges, or expenses incidental to the principal obligation to what the law allows, because RMR believes courts will not award impermissible fees, charges, or expenses incidental to the principal obligation. This demonstrates FDCPA violations, fraud, and/or negligence, damages, and injuries in fact not only to Plaintiff, but also to all those similarly situated to Plaintiff.

329.    In an Albany County Circuit Court case, *Rocky Mountain Recovery Systems, Inc. v. A.S. and K.S.*, No. CV-2023-0461, RMR sued and obtained a default judgment against other patients of the same Medical Facility at issue with regard to Plaintiff's Alleged Debt. In that action, RMR averred on October 27, 2023 that no collection fee was owed and that the interest rate owed was 7%, significantly less than the amount it demanded from Plaintiff. This substantiates that RMR knew at the time it sent the Notice of Debt to Plaintiff that it was not lawfully entitled to seek the excessive interest and fees stated in the Notice of Debt to Plaintiff. A copy of the complaint, application for default judgment, and affidavit in support of entry for default judgment in *Rocky Mountain Recovery Systems, Inc. v. A.S. and K.S.*, No. CV-2023-0461, are attached hereto as **EXHIBIT G**, with redactions.

330.    RMR's interest charging practices are unconscionable, usurious, and unfair, both to Plaintiff and the class members.

331.    RMR's collection fees are unconscionable, usurious, and unfair, both to Plaintiff and the class members.

332.   RMR engages in credit reporting for the purpose of encouraging or coercing consumers to pay alleged debts.

333.   Credit reporting is part of RMR's debt collection process.

334.   RMR reports consumer balances to credit reporting agencies that include interest, fees, charges, or expenses incidental to the principal obligation.

335.   RMR reports consumer balances to credit reporting agencies that include interest, fees, charges, or expenses incidental to the principal obligation that exceed what is authorized by contract.

336.   RMR reports consumer balances to credit reporting agencies that include interest, fees, charges, or expenses incidental to the principal obligation that exceed what is permitted by law.

337.   RMR sometimes negotiates the removal of alleged debt from credit reports in exchange for consumer payments of the alleged debt, a practice also known as "pay for delete."

### D.  ROCKY MOUNTAIN RECOVERY SYSTEMS RETAINS AND REFUSES TO REFUND ILLEGALLY COLLECTED INTEREST AND FEES ON ALLEGED DEBTS AS A MATTER OF COURSE

338.   In the case of Plaintiff, and as discussed above, RMR demanded interest, fees, charges, or expenses incidental to the principal obligation without being expressly authorized by contract or law, in clear violation of the FDCPA. RMR then actually collected these amounts, and also additional amounts of interest unlawfully accruing after Plaintiff's original payment in full, but refused to refund any interest,

51

fees, charges, or expenses that it collected without express authorization by contract or law.

339.   RMR's interest and fee charges are a percentage of what is allegedly owed as a principal balance. In the case of Plaintiff, RMR and/or the original creditor added interest to the alleged principal balance and wrongfully backdated it. Then, RMR added even more interest and fees as a percentage based on an amount that already included interest. Therefore, RMR sought to collect interest and fees that were based on a percentage of an alleged principal balance that itself was incorrect and already included illegal interest within it.

340.   In the case of Plaintiff, Plaintiff paid all amounts demanded by RMR, including illegal fees and interest, under duress and with a reservation of rights.

341.   Plaintiff demanded that RMR and/or the Medical Provider refund illegally collected double payments of principal balances, fees, and interest, but RMR and the Medical Provider refused to provide a refund.

342.   RMR, and/or the Medical Provider in reliance on RMR, collected, retained, and refused to refund interest that accrued after the date Plaintiff had paid all amounts that RMR demanded. In other words, RMR, and/or the Medical Provider in reliance on RMR, collected, retained, and refused to refund interest charged on the full amount of the Alleged Debt even after the Alleged Debt had been paid to zero.

343.   On December 31, 2024, Plaintiff stated to Pinti: "It looked like they added something and backdated it to April [later discovered to be interest] and I've asked for an accounting to figure out what was added, and so far, I've not received it.

I've also asked for an accounting on the interest and additional fees that were added, and I've not received it . . . I actually believe that *I'm* owed . . . ." Pinti admitted that Plaintiff paid "an amount greater than [the original creditor's] assignment, and [RMR] applied it to the interest category."

344.    On December 31, 2024, Plaintiff stated to Pinti, "I still think if you collected something that wasn't owed, if you made a demand for something that wasn't owed, it should be refunded to me, so I guess my bottom line is I would like an accounting, and -- [cut off by Pinti]," and Pinti responded:

> That's not really a legal principle though. The -- the -- idea of one party paying what the other party demands and then the party who paid it saying, 'now I want an accounting, and I want to be refunded this amount and that amount,' that -- that's -- that's getting real -- it's kind of in the weeds, Anthony, it doesn't really happen that way. I mean, I understand your point, I get what you're saying, and I'm not saying it has zero substance or -- or zero mathematical reality, but that's -- it's really just -- that's not how it's done, right? So, you can look at it a different way. When -- when sometimes consumers are in a position and a mindset the way that you are about those points, they will say 'okay, do a legal action, and I'll have my day in court, and I will argue these points with the judge,' and you know -- you have those rights in these United States and this society of law that we live in, and that would be the venue that you would either win or lose those arguments, and the results would be, you know, probably more gratifying or more disappointing depending on how it went, with some of those arguments and some of those points. But that's not what happened … you made the payment … no, I don't see any kind of refund happening.

345.    On December 31, 2024, Pinti told Plaintiff that it might be possible that Plaintiff could receive a refund from a medical provider of a principal amount if there was an insurance error or double collection from Plaintiff of principal amounts paid. Indeed, Plaintiff contends that both an insurance error and double collection from

Plaintiff of principal amounts occurred. Because RMR's interest and fee calculation is based on an amount Plaintiff contends was in error, Plaintiff sought a refund of any excess interest and fees he paid, and any illegal interest and fees he paid.

346.    On December 31, 2024, Plaintiff had the following exchange with Pinti:

PLAINTIFF:    But if I owed less, then you wouldn't be able to collect the same fees and interest that you were trying to collect. Right?

MR. PINTI:    I would say that I understand your point. However, I don't believe I have ever seen patient refunds issued in those circumstances that took into account the fact that the patient may have had to pay more interest on those things … ultimately if they have a legitimate patient refund, they're gonna kinda calculate it based on what their obligations are with that benefit carrier and specifically with the error that was made. They're probably not going to include any kind of mathematically hypothetical interest amounts like, 'well, if we hadn't made that error, or if this had happened, then the amounts would have been smaller, and then these – ultimately these interest categories would have been smaller.' That's not something that's typically done. I'm not saying it's never done, but I wouldn't expect it if I was in your position.

PLAINTIFF:    But aren't the interest and the collection fee a percentage of the amount that was due?

MR. PINTI:    Yes, but you've already paid them.

PLAINTIFF:    Mm-hmm [affirmative].

MR. PINTI:    We're not in a legal action where -- so, again, if we were in a legal action, and you got the court to recognize that the original creditor had made some missteps when they went through that process with your insurance carrier, and the result was that now the interest amounts and collection fee,

which is a percentage-based amount, that those percentage based amounts were now no longer valid because the amounts that were carried into those were erroneous, *that argument would hold water in that venue* [emphasis added].

347. Pinti's suggestion that a consumer can only dispute RMR's interest and fee collection amounts after RMR brings a lawsuit against a consumer overshadows (if not extinguishes) consumers' rights to dispute debts—especially considering that whether RMR sues or not is in RMR's discretion, allowing RMR to decide to delay or never sue over disputed debts in order to never provide consumers with the opportunity to dispute fees and interest, while such interest allegedly continues to accrue daily, and while damaging credit reporting occurs simultaneously. And, in at least some consumer debt collection actions, a valid agreement allowing for some fee and cost recovery in collection actions may exist. In such actions, RMR's decision to defer verifying the validity and legality of collection fees and interest until an attorney is involved (*i.e.*, RMR's owners' law firm, Wilkerson & Wilkerson) is a decision to verify the validity and legality of collection fees and interest only when performing this statutory duty is subsidized by the consumer.

348. Wilkerson & Wilkerson tends to formulaically seek attorney's fee recovery for the substantially same amount and for substantially identical line items in many cases, with time entries lacking disclosure of the name of the attorney or paralegal who allegedly performed the work, or the date the work was allegedly performed. In *Rocky Mountain Recovery Services, Inc. v. B.B. and S.B.*, Albany

County Circuit Court No. CV-2024-0148, Wilkerson & Wilkerson sought attorney's fees that were "based on studies of the firm's average time expenditures."

349.   On December 31, 2024, Plaintiff asked Pinti, "I'm asking for an accounting. I'd like to see all the plusses and minuses that reached, you know, the end amount, and I'd like a refund for the fees and interest and any double payments, along with that accounting. Is that something that you're still saying you're not going to do?" Pinti responded, "No, that's not going to happen. That's not going to happen. This is closed on our end."

350.   RMR records its calls with consumers.

351.   RMR recorded the Edwards Call.

352.   RMR and/or Pinti recorded the December 31, 2024 call between Pinti and Plaintiff.

353.   RMR's practices with respect to Plaintiff, and Pinti's admissions to Plaintiff, demonstrate that Plaintiff put RMR on notice that its fees, interest, and other amounts demanded and collected from Plaintiff were unlawful, and RMR still refused to provide a refund. RMR's conduct was willful and knowing, and justifies an award of punitive damages where permissible under any applicable law.

354.   RMR's practices with respect to Plaintiff, and Pinti's admissions to Plaintiff, demonstrate that RMR has a pattern or practice of refusing to issue refunds to consumers for amounts of fees and interest unlawfully demanded or collected by RMR. Specifically, and without limitation, Pinti's statements that "it doesn't really happen that way," his observations of consumers "in a position and mindset" such as

Plaintiff, his statement that he "doe[sn't] believe [he] has ever seen patient refunds in [these] circumstances," and his statement that refunds are "not something that's typically done," demonstrate rampant FDCPA violations, injuries in fact, and damages, applicable not only to Plaintiff, but to all similarly situated consumers.

355.   Plaintiff, through this lawsuit on behalf of himself and all those similarly situated, seeks an accounting and refund of all interest, fees, charges, or expenses incidental to the principal obligation collected from Plaintiff and class members without being expressly authorized by contract or law (including refunds of funds paid in response to RMR's collection activity or because of a court judgment), an injunction providing for the same, declaratory relief that RMR's conduct discussed in this Complaint is unlawful, declaratory relief regarding what RMR's obligations are and what consumers' rights are in connection with RMR, and disgorgement of RMR's profits from FDCPA violations or other violations of the law.

      **E.**    **ROCKY MOUNTAIN RECOVERY SYSTEMS' NOTICES OF DEBT ASK CONSUMERS TO CALL RMR, BUT THE RMR VOICEMAIL SYSTEM DOES NOT DISCLOSE THAT RMR IS A DEBT COLLECTOR**

356.   As discussed above, RMR's notices of debt invite consumers to call RMR.

357.   Because RMR's voicemail system is what any consumer who receives an RMR letter would hear upon calling RMR while RMR is closed or unable to answer the phone, any consumer who has encountered RMR's voicemail message, which does not disclose that RMR is a debt collector, has experienced a violation by RMR of the FDCPA.

### F.    ROCKY MOUNTAIN RECOVERY SYSTEMS USES CREDIT REPORTING THREATS TO PRESSURE CONSUMERS TO PAY DISPUTED DEBTS

358.    As described above, RMR pressured Plaintiff into paying an alleged debt by threatening to report it to his credit report after he disputed the debt, but prior to RMR providing validation of the Alleged Debt. This constitutes prohibited continued collection and overshadowed Plaintiff's right to dispute the debt.

359.    RMR's systems, processes, and training—to the extent they exist—should have prevented its debt collector from making credit reporting threats to Plaintiff. That it was possible for RMR's debt collector to make credit reporting threats during a dispute, or to make any collection efforts at all, demonstrates systemic issues and FDCPA violations by RMR that have harmed not only Plaintiff, but the entire class.

### G.    ROCKY MOUNTAIN RECOVERY SYSTEMS PRESSURES CONSUMERS TO PAY MEDICAL DEBTS THAT IT KNOWS CANNOT BE REPORTED TO CREDIT REPORTS

360.    As described above, RMR pressured Plaintiff into paying an alleged medical debt despite the fact that the alleged debt was under $500 and less than a year old, both of which are categories that make medical debt not eligible for credit reporting. This constituted a violation of the FDCPA, specifically its prohibition regarding threatening to take an action that cannot legally be taken or is not intended to be taken. *See* 15 U.S.C. § 1692e(5).

361.    RMR knew prior to sending Plaintiff the Notice of Debt that the Alleged Debt was a medical debt, less than $500, and less than a year old.

362.    RMR is obligated to comply with Experian, Equifax, and/or TransUnion credit reporting rules. Experian, Equifax, and TransUnion each prohibit the credit reporting of medical debt less than one year old or less than $500.

363.    In the case of the Pre-Collection Notice sent to K. and K., Exhibit F at page 2, those consumers had a zero balance with Platte River Family Dentistry as of June 8, 2022, and then allegedly accrued a $211.80 balance after a dental insurance payment dated June 20, 2022. Interest was added until the balance reached $233.25. On February 10, 2023, RMR sent K. and K. its pre-collection notice stating, "You have 30 days from the date of this letter to pay … If you do not pay … we will immediately mail the federal notice that triggers the time period for (1) **Credit Reporting** … and additional damage to your credit report …" (emphasis in original).

364.    Because K. and K.'s alleged medical debt was less than one year old, it was not eligible for credit reporting at the time RMR sent its February 10, 2023 pre-collection notice.

365.    RMR's systems, processes, and training—to the extent they exist—should have prevented RMR from making such credit reporting threats to Plaintiff and other consumers. That it was possible for RMR to make these credit reporting threats demonstrates systemic issues and violations by RMR that harmed Plaintiff and the class members.

**H.    ROCKY MOUNTAIN RECOVERY SYSTEMS COLLECTS DEBTS FROM CONSUMERS AFTER RECEIVING A DISPUTE BUT PRIOR TO PROVIDING VALIDATION**

366.    As discussed above, RMR attempted to, and actually did, collect an alleged debt from Plaintiff after he disputed it, but before RMR validated the Alleged Debt, constituting one or more violations of the FDCPA.

367.    That RMR's systems and processes are designed to allow debt collection efforts to continue, to allow debt collectors to threaten credit reporting, and to allow communication to consumers to continue after a consumer has disputed a debt and before RMR has provided validation, which violates the FDCPA, demonstrates systemic harm applicable to Plaintiff and the entire class.

**I.    ROCKY MOUNTAIN RECOVERY SYSTEMS' LITIGATION CONDUCT RAISES CONCERNS ABOUT ITS DEBT COLLECTION PRACTICES**

368.    RMR has filed over 2,000 court actions against Wyoming consumers in 2023 and 2024 in Wyoming courts.

369.    Many of these lawsuits end in default judgments. From there, RMR levies bank accounts, garnishes wages, and places liens on property.

370.    RMR often serves complaints on consumers stating that a 35% collection fee is owed. Some of these cases settle.

371.    One of RMR and Wilkerson & Wilkerson's practices in Wyoming circuit courts is that RMR files notarized affidavits in support of motions for default judgment where the affiant is not identified by name. This is not an isolated incident but rather is pervasive throughout RMR's court filings. For example, , RMR has routinely filed "Affidavit[s] of Account and Costs," that refers to the affiant as "the

undersigned being first duly sworn," with the affiant stating that they are a manager at RMR, but the signature line simply states "Manager" with an illegible signature, while proclaiming a consumer's indebtedness. One of the notaries who notarizes these documents is Anthea Jones, discussed *supra*.

372.    RMR and/or Wilkerson & Wilkerson routinely prepare affidavits for original creditors to sign. Many of these affidavits have been notarized by Pinti.

373.    RMR and Wilkerson & Wilkerson routinely file motions for attorney's fees, in countless cases, that contain substantially the same or similar line items and claimed time spent. In a review of over 100 of these fee motions, none have stated a date that an attorney or paralegal performed the claimed work, nor the name of the attorney or paralegal who allegedly performed the work.

374.    As described above, RMR routinely files consumers' private and protected health information in public court files, including full Social Security Numbers and specific medical procedures performed.

**J.    ROCKY MOUNTAIN RECOVERY SYSTEMS COLLECTED DEBTS WHILE DISSOLVED BY THE STATE OF WYOMING**

375.    RMR was delinquent on its tax obligations as of October 2, 2024.

376.    RMR was dissolved by the State of Wyoming on December 9, 2024.

377.    Pursuant to Wyo. Stat. § 17-16-1405, a dissolved corporation may not carry on any business.

378.    The Alleged Debt was not RMR's asset.

379. In any balance sheet or assets and liabilities statement RMR has generated or prepared over the last five years, RMR did not list third-party accounts placed for collection with RMR, but not outright bought as debt, as assets.

380. Sending notices of debt are not "proceedings" within the meaning of Wyo. Stat. § 17-16-1405.

381. RMR was not authorized to conduct business in Wyoming at the time RMR sent the Notice of Debt to Plaintiff.

382. RMR's sending of debt collection notices is a business activity.

383. RMR's acceptance of collection files from clients for profit is a business activity.

384. RMR's assessing of collection fees is a business activity.

385. RMR's assessing of interest is a business activity.

386. Commencing any period of statutory rights, including validation periods, is a business activity.

387. RMR's collection fee to Plaintiff was assessed on a date when RMR was dissolved.

388. RMR added and collected daily interest in connection with Plaintiff's Alleged Debt on dates when RMR was dissolved and prohibited from conducting business in Wyoming.

389. Debt collectors who are not authorized to conduct business in Wyoming may not be issued a debt collector license.

390.    RMR was acting in violation of its debt collector license at the time it sent its Notice of Debt to Plaintiff.

391.    RMR was not authorized to commence debt collection, contact Plaintiff, charge fees, charge interest, make demands for payment of alleged debts, or commence any statutory period of time during which Plaintiff could exercise his rights while RMR was dissolved.

392.    The Medical Provider is not a supervised financial organization.

393.    The Medical Provider is not regularly engaged in the business of making loans.

394.    The Medical Provider is not a lender.

395.    The Medical Provider is not an office or agency of the State of Wyoming.

396.    RMR is not a supervised financial organization.

397.    RMR is not regularly engaged in the business of making loans.

398.    RMR is not a lender.

399.    RMR is not an office or agency of the State of Wyoming.

400.    RMR and the Medical Provider have executed an agreement.

401.    On information and belief, the agreement between RMR and the Medical Provider includes RMR's representation that it will comply with the FDCPA.

402.    On information and belief, the agreement between RMR and the Medical Provider is a contingency agreement.

403.    The agreement between RMR and the Medical Provider does not impose any costs or fees on the Medical Provider upon assignment of the alleged debt to RMR.

404.    On information and belief, the agreement between RMR and the Medical Provider does not transfer ownership of any alleged debt to RMR.

### K.    ROCKY MOUNTAIN RECOVERY SYSTEMS VIOLATED THE WYOMING DEBT COLLECTION STATUTE AND COLLECTION AGENCY BOARD REGULATIONS

405.    All Wyoming licensed collection agencies must comply with the Collection Agency Act, Wyo. Stat. §§ 33-1, et seq., and the Collection Agency Rules, 031-1 Wyo. Code R (the "Rules"). *See* 031-1 Wyo. Code R. § 1-4.

406.    "Every [collection agency] licensee shall deal openly, fairly and honestly in the conduct of the collection agency business." 031-4 Wyo. Code R. § 4-1.

407.    "No [collection agency] licensee shall collect, or attempt to collect … by methods of intimidation." 031-4 Wyo. Code R. § 4-5.

408.    The Rules have adopted the FDCPA as of October 13, 2006. *See* 031-4 Wyo. Code R. § 4-6. Accordingly, violations of the FDCPA as of and after October 13, 2006 are violations of the Rules.

409.    "At the consumer's written or verbal request, licensees shall furnish to the consumer a complete written accounting of matters pertaining to him." 031-3 Wyo. Code R. § 3-2.

410.    "No licensee shall collect or sue, either as an assignee or as agent for any creditor, for more than the actual amount due or claimed to be due on any claim or claims, plus legal interest and court costs; provided, when suit is brought upon a note or notes providing for an attorney fee, such attorney fee may be added if the licensee is represented by a duly licensed attorney, in which case the attorney fee shall be paid

to such attorney and no part thereof shall be retained by the licensee." 031-3 Wyo. Code R. § 3-3.

411. Because RMR failed to deal openly, fairly, and honestly, attempted to collect through methods of intimidation, failed to produce a written accounting, collected or sued for more than the actual amount due, and violated the FDCPA as incorporated through the Rules, RMR violated the Collection Agency Rules and the Collection Agency Statute with respect to Plaintiff and the class members.

## CLASS ALLEGATIONS

412. Plaintiff brings this class action on behalf of himself, and all other persons similarly situated and their successors in interest, pursuant to Fed. R. Civ. P. 23.

413. Congress intended to confer substantive rights on consumers by ensuring they are free from abusive debt collection practices like the practices employed by Defendant. Defendant's actions as pleaded herein have created and are poised to create future actual harm and/or an appreciable risk of harm to the interests Congress intended to protect by enacting the FDCPA.

414. Any one consumer may lack knowledge of their rights or the resources to enforce their rights. A class action is the best way to protect the rights and remedies of consumers harmed by Defendant's conduct, especially considering that Plaintiff will be able to prove Defendant's violations of the law were caused by patterns, practices, policies, and techniques that violate the rights of the entire class.

415. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

416. One of Plaintiff's and the class's key claims is that Defendant maintains policies, patterns, and practices of demanding fees and interest from consumers while knowing that no contract expressly authorizes such fees and interest, and no law permits Defendant's request for or collection of such fees and interest. In the case of Plaintiff, Defendant sought to charge at least 41% in interest and 42% in collection fees, conduct that is usurious, unconscionable, and unlawful. At least some of this interest accrued daily, and at least some of the interest and fees were interest-on-interest and fees-on-fees. This conduct pressures consumers not to exercise their rights to dispute debts, and makes it harder for consumers who validly owe debts to pay those debts off, keeping them under the thumb of Defendant's predatory collection tactics, prolonging the time debts may appear on credit reports, and risking perpetually extending one or more statute of limitations periods as consumers may be unable to catch up even when making payments in good faith.

417. The pains and consequences of Defendant's conduct on consumers are serious. As one consumer wrote in a Better Business Bureau review:



418.   Defendant's debt collection notices and practices violate the law, and each member of the putative class and one or more subclasses has a claim for damages including actual, compensatory, exemplary, punitive, and statutory damages.

419.   Plaintiff brings these claims on behalf of the class, with the class ("**Class**") being defined as:

> All consumers with regard to whom RMR engaged in debt collection communications or activities, within four years prior to the filing of this Class Action Complaint, in which RMR violated any provision of law.

420.   Plaintiff seeks to represent a subclass (the "**Debt Collection Letter Subclass**") consisting of:

> All consumers to whom RMR sent a letter, within four years prior to the filing of this Class Action Complaint, which did not include the required dispute language, misstated the validation period end date, demanded unlawful fees or interest, or overshadowed consumer dispute rights, including without limitation consumers who received letters similar to Exhibits A, D, E, or F.

421.   Plaintiff seeks to represent a subclass (the "**$500 Medical Debt Subclass**") consisting of:

> All consumers who experienced RMR's threats to report, or actual credit reporting of, a medical debt of less than $500 since April 11, 2023.

422. Plaintiff seeks to represent a subclass (the "**One-Year Medical Debt Subclass**") consisting of:

> All consumers who, since July 1, 2022, experienced RMR's threats to report, or actual credit reporting of, a medical debt of less than one year old.

423. Plaintiff seeks to represent a subclass (the "**Fee Subclass**") consisting of:

> All consumers from whom RMR attempted to collect or did collect interest, fees, charges, or expenses incidental to the principal obligation without express authorization by contract or law within four years prior to the filing of this Class Action Complaint, including without limitation consumers who paid voluntarily, through a settlement, or following a judgment.

424. Plaintiff seeks to represent a subclass (the "**Voicemail Subclass**") consisting of:

> All consumers who RMR alleged owed a debt, who called RMR, and who reached a voicemail greeting that lacked disclosure that RMR was/is a debt collector or that improperly implied that RMR was/is a law firm, within one year prior to the filing of this Class Action Complaint.

425. Plaintiff seeks to represent a subclass (the "**Phone Dispute Subclass**") consisting of:

> All consumers who initiated a dispute via telephone, but whose dispute RMR did not honor, within one year prior to the filing of this Class Action Complaint.

426. RMR routinely collects debts inside and outside the State of Wyoming.

427. By way of example, RMR has sought to collect debts from Montana residents within the past year, including by way of sending collection letters or notices of debt to Montana addresses, and by filing lawsuits against consumers in Montana state courts.

428. Excluded from the Class and all subclasses are Defendant RMR and its agents, affiliates, parents, subsidiaries; any entity in which Defendant RMR has a controlling interest; any RMR officer or director; any successor or assign of RMR; Daniel B. Wilkerson and his immediate family; Michael B. Wilkerson and his immediate family; any entity which Daniel B. Wilkerson or Michael B. Wilkerson or their immediate family beneficially owns or meaningfully controls; and any judge who adjudicates this case, their staff, and their immediate family.

429. Plaintiff reserves the right to amend the class and subclass definitions.

430. Plaintiff, through this lawsuit on behalf of himself and all those similarly situated, seeks restoration of dispute rights, damages for violations occurring during dispute periods or because dispute periods were unlawfully cut short, refunds for unlawfully collected monies, an injunction providing for the same, declaratory relief that RMR's conduct discussed in this Complaint is unlawful, declaratory relief regarding what RMR's obligations are and what consumers' rights are in connection with RMR, and disgorgement of RMR's profits from FDCPA violations or other violations of the law by RMR.

431. Plaintiff, on behalf of himself and the class(es), requests injunctive relief in the form of a Court order requiring Defendant to (1) cease charging and collecting

unlawful interest rates and fees, (2) conduct a complete audit of all accounts to identify unlawfully charged interest/fees, (3) issue refunds/credits for all unlawfully collected interest and fees and other damages where applicable, and (4) provide detailed accounting to affected consumers showing all interest/fees charged.

432.   Plaintiff, on behalf of himself and the class(es), also requests injunctive relief in the form of a Court order requiring Defendant to undergo systemic reforms, including: (1) implementation of new policies and procedures for interest/fee calculation and collection, (2) regular compliance audits and reporting, (3) enhanced employee training on FDCPA requirements, and (4) independent oversight/monitoring of collection practices.

433.   In addition, Plaintiff, on behalf of himself and the class(es), requests injunctive relief in the form of a Court order as to consumer protection measures, requiring from Defendant: (1) clear disclosures to consumers about interest rates and fees, (2) a simplified process for consumers to dispute charges/debts, (3) regular statements showing interest/fee calculations, and (4) establishment of a dedicated consumer complaint response system.

434.   Plaintiff, on behalf of himself and the class(es), also requests injunctive relief in the form of a Court order requiring Defendant to correct any inaccurate credit reporting of balances that include unlawfully included fees or interest, as to any debts that RMR has reported to or is reporting to consumer credit reports.

435.   Additionally, Plaintiff, on behalf of himself and the class(es), requests injunctive and equitable relief in the form of a Court order requiring Defendant to

serve a copy of any order providing for injunctive relief as to Defendant's practices to all persons who Defendant attempted to collect fees or interest from in the four years prior to the filing of this Complaint, and requiring Defendant to file and serve any such order in each of its debt collection lawsuits for a period of five years into the future.

436.    Plaintiff, on behalf of himself and the class(es), requests injunctive relief in the form of a Court order requiring Defendant to improve its documentation and reporting to such an extent that it complies with the law, including: (1) regular compliance reports to the Court for a period of five years, (2) maintenance of detailed records of all interest/fees charged, (3) documentation of employee training and policy changes, and (4) periodic independent audits with results reported to Plaintiff's counsel and/or the Court.

437.    Ascertainability. All members of the proposed class are readily ascertainable from information in Defendant's custody and control. Defendant has already identified these individuals, including by sending them notices of debt and assigning them account numbers. Defendant has such individuals identified by name and address, and often additionally by date of birth, phone number, employer name, and/or Social Security Number.

438.    As to subclasses: Defendant has information indicating which letters Defendant sent to which consumers, Defendant keeps logs of its communications with consumers including regarding disputes, and Defendant has phone logs indicating who has called and who has left voicemails.

439.    <u>Numerosity</u>. The class members are so numerous that joinder of all class members is impractical. The size of the class is not known at this time, but some facts show numerosity:

440.    RMR files approximately 100 lawsuits per month. Some of RMR's lawsuits are against co-defendants, meaning there is more than one class member per lawsuit RMR has filed. Many of RMR's lawsuits seek 35% collection fees.

441.    RMR filed over 2,000 debt collection lawsuits in Wyoming state courts in the calendar years 2023 and 2024.

442.    RMR typically begins its debt collection activities by communicating with consumers, including in the ways identified in this Complaint that violate the FDCPA and/or other laws, prior to initiating litigation. Three of RMR's template debt collection notices are exhibits to this Complaint, and all three violate the law. Anyone who received a similar letter has had their rights violated by RMR in a way redressable by the proposed class described herein.

443.    On December 31, 2024, RMR's employee, Pinti, stated to Plaintiff, "We actually don't take legal actions on a high percentage of accounts. We -- our particular organization does a little bit more than some of our competitors in the industry, but it's still a relatively small percentage."

444.    If an average of 100 lawsuits per month is a "relatively small percentage" of RMR's debt collection accounts, the class and subclasses are significantly larger than the number of defendants in the approximately 380 lawsuits filed in the last four months of 2024, as discussed above.

445.    In a review of RMR's debt collection lawsuits, many appear to be for alleged medical debt.

446.    RMR representatives have stated to Plaintiff that they received his account from the Medical Provider on December 9, 2024.

447.    On information and belief, based on an investigation and review of hundreds of court filings, RMR account numbers are sequentially assigned.

448.    RMR assigned Plaintiff an account number: 326923.

449.    The Pre-Collection Notice to J. and K. referenced above states that their alleged account was forwarded to RMR. That letter is dated January 17, 2024. RMR assigned that file account number 300776.

450.    There is good cause to believe that RMR sent over 26,147 debt collection notices between approximately January 17, 2024 and approximately December 12, 2024. Some of these debt collection notices, as in the case of J. and K. referenced above, include multiple recipients.

451.    Conservatively then, the class likely exceeds 26,000 members.

452.    <u>Typicality</u>. Plaintiff's claims are typical of the class members' claims, as each arises from the same violative debt collection notices similar to the Notice of Debt, December 26 Letter, or Pre-Collection Notice; same voicemail greeting; same policies and practices of collecting unlawful fees, interest, and/or costs; same type of dispute handling; and other violations of the law identified in this Complaint.

453.    <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed class's common interests. Plaintiff's interests do not conflict with the class members'

interests. Plaintiff has retained counsel experienced with complex litigation, consumer and civil rights issues, and class actions to prosecute this action on behalf of the class.

454.  <u>Commonality and Predominance</u>. Plaintiff's and the class's claims raise common fact and legal questions, which predominate over any questions affecting individual class members. A class-wide proceeding will answer such questions for all class members, without requiring more than 26,000 individual lawsuits over what may be argued to be relatively small amounts of money each.

455.  <u>Superiority</u>. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial harm suffered by individual class members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for class members, on an individual basis, to obtain effective redress for their harm, injuries, and damages caused by Defendant. Not only would individual litigation increase the delay and expense to all parties and the courts, but individual litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, a class action provides the benefits of adjudication of these serious allegations of substantial and systematic FDCPA violations in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

456. Plaintiff has an interest in securing class certification and relief for the class.

457. Plaintiff has expended time and costs in this case while researching and investigating Defendant's conduct, to which Defendant subjected the class; while retaining experienced counsel to prosecute this action on behalf of the class; and while researching and investigating the facts supporting the legal claims of Plaintiff and class members.

458. Plaintiff has an economic interest securing class certification and relief for the class through, *e.g.*, shifting some or all of the costs of investigation and litigation to the entire class, who will share in the benefits of such investigation and litigation if and when the class is certified and this class action ultimately prevails.

459. Plaintiff has retained counsel properly qualified under Rule 23(g) to serve as counsel for the class and subclasses.

460. Attorney Scott M. Flaherty has eighteen years of experience litigating in the areas of civil rights, regulatory, antitrust, complex commercial, and intellectual property matters in state and federal courts, and has participated as an attorney for plaintiffs and defendants in several class action, collective action, and/or multi-plaintiff lawsuits. Mr. Flaherty has experience with the FDCPA, including defending claims involving several of the same FDCPA provisions involved in this case.

461. Attorney Tim Phillips has sixteen years of experience litigating in the areas of civil rights, employment, data access and privacy, and criminal matters in state and federal courts, and has participated as an attorney for plaintiffs in several

class action, collective action, and/or multi-plaintiff lawsuits. Mr. Phillips has experience with the FDCPA, including consumer representation.

462.    Attorney Kellie Nelson Fetter has been licensed to practice in Wyoming state and federal courts since 2009.  She has more than fifteen years' experience litigating in the areas of commercial litigation, healthcare billing litigation, and intellectual property matters. She has served as Wyoming local counsel on multiple matters.

463.    Plaintiff's counsel has conducted extensive research into the FDCPA and investigated members of the class by reviewing Plaintiff's claims, prior lawsuits filed against RMR, the communications between Plaintiff and RMR, public records regarding RMR and its officers, and RMR's litigation against consumers.

464.    Plaintiff's counsel has no interests that might cause them not to vigorously pursue this action.

## CLAIMS FOR RELIEF

### COUNT I
### FAIR DEBT COLLECTION PRACTICES ACT VIOLATIONS

465.    Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

466.    Defendant, including through its employees, contractors, and agents, have violated the FDCPA, including 15 U.S.C. §§ 1692c, 1692e, 1692f, 1692g, with respect to both Plaintiff and the class(es).

467.    Defendant is liable to Plaintiff and the class(es), including for statutory damages, actual damages, attorneys' fees, and costs.

## COUNT II
## FRAUD

468.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

469.   Defendant made false representations to Plaintiff, and members of the class(es), including as to the amount or nature of alleged debts, the amount or nature of alleged interest, the amount or nature of alleged fees, the deadline to respond to demands for payment of alleged debts, what actions Defendant was entitled to or intended to take, and when and if Defendant would report harmful information to credit reports.

470.   Defendant made these knowingly false representations to Plaintiff, and the class members, with an intent to induce action by Plaintiff, and the class members, including without limitation giving up rights, expending money or time, and/or making payments to RMR.

471.   Plaintiff, and the class members, reasonably relied on these representations, and Plaintiff, and the class members, actually relied on these false representations and suffered damages, including without limitation by not exercising rights, not making payments, exercising rights in a manner that was costly or harmful to them, or making payments of amounts that included unlawful interest and/or fees.

## COUNT III
## NEGLIGENCE

472.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

473.    Defendant owed consumers, including Plaintiff and the members of the class(es), a duty of care and honesty as debt collectors and as a collection agency, including without limitation in its supervision of its debt collection activities and its debt collectors. Defendant breached this duty through the conduct alleged herein, causing injuries in fact and damages, and those breaches were and are the proximate cause of the injuries and damages caused to Plaintiff and the class members.

474.    Defendant has unique expertise as a debt collector and a collection agency. Defendant has credit reporting capabilities and contractual relationships with credit reporting agencies. Defendant knows and should know that reporting or threatening to report alleged debts to consumer credit reports has incredibly high personal, financial, and reputational consequences. Defendant acted at least recklessly in at least some of the conduct described in this Complaint. Defendant has the power to sue over debts. Plaintiff, and the class members, suffered damages as stated above due to Defendant's negligence.

475.    To the extent that Defendant or its affiliates, agents, or representatives engaged in false notarizations or false affidavits, notaries and affiants in debt collection actions seeking default judgment are held to a high standard of care, the notary or affiant was acting under the authority of RMR or its affiliates, and the notary or affiant breached their duty to the applicable class members, causing damages, including without limitation judgments including unauthorized fees or interest, or judgments including attorney's fees for time that was not actually spent on the applicable case.

## COUNT IV
## NEGLIGENCE PER SE

476.    Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

477.    Defendant violated the FDCPA, the Collection Agency Act, and the Collection Agency Rules.

478.    Defendant violated these provisions of law by acting in all of the ways pleaded herein, including by refusing to provide Plaintiff and the class members with a complete written accounting of the amounts owed, collecting an amount greater than the actual amount owed due including excessive interest and fees not authorized by contract or law, by violating the FDCPA, and by violating the FDCPA as incorporated within Wyoming law, rules, and regulations.

479.    A violation of a statute or regulation constitutes negligence per se when the statute or regulation is designed to protect a specific class of persons from a particular type of harm, and Plaintiff and members of the class(es) are members of that protected class and have suffered the type of harm that the statute or regulation(s) at issue were intended to prevent. The Wyoming Collection Agency Act and the Collection Agency Rules are designed to protect consumers from unfair or deceptive debt collection practices. Plaintiff and members of the class(es) are consumers and members of the protected class. The harm suffered by Plaintiff and members of the class, including damages due to excessive fees and interest, stress, anxiety, and loss of time spent addressing Defendant's unlawful debt collection practices, is the type of harm the regulations were designed to prevent.

480.   Defendant's violations constitute negligence per se. These violations proximately caused harm to Plaintiff and members of the class(es).

481.   As a direct and proximate result of Defendant's negligence per se, Plaintiff and members of the class(es) seek actual damages, statutory damages as permitted by law, and punitive damages to punish Defendant and deter such conduct in the future. Plaintiff and the class(es) further seek an order enjoining Defendant from continuing its unlawful debt collection practices described in this Complaint, including but not limited to demanding or collecting unauthorized fees and interest and failing to provide accountings upon request. Plaintiff and the class(es) also seek attorneys' fees and costs associated with this action.

## DEMAND FOR JURY TRIAL

482.   Plaintiff, for himself and as a member of and on behalf of the class and subclasses, demands a jury trial on all issues so triable.

## DEMAND FOR RELIEF

Plaintiff, and the class(es), request judgment in favor of Plaintiff, the class(es), and request that the Court enter an order:

a.    Certifying this case as a class action on behalf of Plaintiff and the proposed class(es), including any appropriate subclasses, appointing Plaintiff as class representative, and appointing Plaintiff's counsel to represent the class(es);

b.    Awarding declaratory judgment as necessary to protect the interests of Plaintiff and the class(es);

c.    Awarding injunctive relief or other equitable relief as necessary to protect the interests of Plaintiff and the class(es);

d.      Awarding Plaintiff and the class(es) damages including any applicable actual, compensatory, exemplary, punitive, and statutory damages that may be allowed by law;

e.      Awarding restitution and damages to Plaintiff and the class(es) in an amount to be determined at trial;

f.      Disgorging Defendant's profits with respect to Plaintiff and the class(es) where applicable and allowed by law;

g.      Awarding attorneys' fees and costs as allowed by law, including but not limited to the FDCPA, for the claims of Plaintiff and the class(es);

h.      Awarding pre-judgment and post-judgment interest, as provided by law;

i.      Granting Plaintiff and the class(es) leave to amend this Complaint either before trial or to conform to the evidence at trial;

j.      Awarding nominal damages; and

k.      Granting such other, further, different, and/or additional relief as the Court may deem just and equitable.

Respectfully submitted,

Dated:  January 16, 2025

By: */s/ Kellie Nelson Fetter*
    Kellie Nelson Fetter (WSB 7-4597)
    Scott M. Flaherty (*pro hac vice* pending)
TAFT STETTINIUS & HOLLISTER LLP
675 Fifteenth Street, Suite 2300
Denver, Colorado 80202
Telephone:   (303) 297-2900
Email:  kfetter@taftlaw.com
        sflaherty@taftlaw.com

Tim Phillips (*pro hac vice* pending)
LAW OFFICE OF TIM PHILLIPS PLLC
331 Second Avenue South, Suite 400
TriTech Center
Minneapolis, MN 55401
Telephone:   (612) 470-7179
Email:   tim@timphillipslaw.com

**ATTORNEYS FOR PLAINTIFF
AND THE PUTATIVE CLASS**