Kellie Nelson Fetter (Wyo. Bar No. 7-4597)
Scott M. Flaherty (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
675 Fifteenth Street, Suite 2300
Denver, Colorado 80202
Telephone: (303) 297-2900
Facsimile: (303) 298-0940
Email: kfetter@taftlaw.com
        sflaherty@taftlaw.com

Tim Phillips (*pro hac vice*)
LAW OFFICE OF TIM PHILLIPS, PLLC
331 Second Avenue South, Suite 400
TriTech Center
Minneapolis, Minnesota 55401
Telephone: (612) 470-7179
Email: tim@timphillipslaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| **ANTHONY WEBSTER**, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**ROCKY MOUNTAIN RECOVERY SYSTEMS, INC.**, **WILKERSON & WILKERSON, LLC d/b/a WILKERSON LAW GROUP**, **DANIEL B. WILKERSON**, and **WYOMING HEALTH FAIRS**,<br><br>Defendants. | **AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Anthony Webster, through his attorneys, individually and on behalf

of all others similarly situated, brings this Amended Class Action Complaint against

Defendants Rocky Mountain Recovery Systems, Inc., Wilkerson & Wilkerson, LLC d/b/a Wilkerson Law Group, Daniel B. Wilkerson, and Wyoming Health Fairs, and alleges:

## INTRODUCTION

1.    Defendant Rocky Mountain Recovery Systems, Inc. ("RMR") is one of three debt collection companies owned or operated by Wyoming attorneys Michael B. Wilkerson and Daniel B. Wilkerson, who also operate a law firm, Wilkerson & Wilkerson, LLC d/b/a Wilkerson Law Group, that represents RMR in an average of approximately 100 lawsuits filed against consumers every month.

2.    RMR supplies its creditor clients—often medical clinics—with language to place in purported consumer agreements to maximize debt collection profit, including high interest rates, 35% or greater collection fees, attorney's fees, and costs. However, Wyoming state court judges have repeatedly found RMR's 35% collection fee to be unconscionable, unenforceable, and an illegal penalty. Despite these adverse findings, RMR has continued to send debt collection letters to consumers demanding payment of a 35% or greater collection fee. As a key RMR employee admitted, the company demands the fee so long as "someone is able to pay it," even though "we would know from experience that a court probably will not award those to us."

3.    If consumers don't pay, the RMR letterhead is swapped out for "WILKERSON & WILKERSON, LLC – ATTORNEYS AT LAW," though the letters are generated via the same system, with the same formatting, typography, and phone numbers. This letter is when the attorney's fees start racking up.

4.      If a collection account proceeds to litigation, Daniel Wilkerson is almost always counsel of record. Though his summons and complaint signature block states Wilkerson & Wilkerson, he places RMR's phone number below his signature. A consumer-defendant calling the attorney signing the pleadings would instead be connected to a debt collector. Wilkerson does not disclose to consumers nor judges that the 35% collection fee has been found to be unconscionable, uncollectable, and illegal, nor does he disclose that his client is actually his own company.

5.      Some consumers pay. Most cases proceed to default judgment. Wilkerson's staff routinely file an affidavit in support of default judgment stating that a 35% collection fee is owed, while attaching documents that often include consumers' unredacted medical procedure information and/or full Social Security Numbers ("SSNs"). Some of these affidavits are signed by a "Manager for [RMR]," without identifying an affiant by name—just an unreadable signature with "Manager" below it—which is notarized by a Wilkerson & Wilkerson paralegal who put her RMR email address on her notary application. That unreadable signature belongs to someone whose LinkedIn page identified her as a Wilkerson & Wilkerson legal assistant. She, too, has an RMR email address. Wilkerson then files motions for attorney's fees that almost never state who performed the work or when that work was performed, but rather are based on "studies of the firm's average time expenditures."

6.      Wilkerson and his companies prepare proposed judgments including attorney's fees and often the 35% collection fee. Some judges sign, and then Wilkerson garnishes wages and obtains writs of execution to seize vehicles and property. Some

judges find the 35% collection fee unconscionable over and over. In fact, the Natrona County Circuit Court—whose clerk told Plaintiff they didn't think their computer could even do a query on RMR because there are so many RMR cases—recently acquired a "Found Unconscionable" stamp that gets a lot of use on Wilkerson's proposed default judgments:



7.    In Plaintiff's case, a visit to Wyoming Health Fairs—a 501(c)(3) charity medical clinic serving over 40,000 people a year—led to a surprise $239 bill for a blood draw. Wyoming Health Fairs then added an illegal 67% APR "finance charge" and sent the bill to RMR, who capitalized this "finance charge" into the principal balance and then added a 35% collection fee and 21% interest on top of that. RMR sent Plaintiff a template debt-collection letter demanding interest, fees, fees-on-interest, and interest-on-interest, amounting to over 100% APR above the alleged principal.

8.    RMR's collection letter gave Plaintiff less time than required by federal law to initiate a dispute, and when Plaintiff talked to RMR on the phone, its debt collector threatened daily accrual of interest and credit reporting, even though credit reporting agencies prohibit the reporting of alleged medical debts under $500 or less

than a year old. This alleged debt was under $500 and less than a year old. Within days, RMR sent Plaintiff another letter demanding even more money. Plaintiff did not owe this debt nor all the fees or interest, but he paid it out of fear of negative credit reporting, among other things.

9.     At some point during RMR's debt collection against Plaintiff, RMR was dissolved by the state for delinquent tax obligations. RMR's state collection agency license was terminated in January 2025, but RMR continues to collect debts. As recently as August 1, 2025, Wilkerson continues to sign and file Wyoming state court complaints falsely stating that RMR holds a collection agency license.

10.     Plaintiff isn't alone: Wyoming Health Fairs had a sign-in sheet stating that they charge 1.75% interest per month (21% per year) on purportedly late accounts, but their system is configured to charge a flat 21% after approximately three months, which annualizes to a much higher and illegal rate. To provide just a few examples, Wyoming Health Fairs added an 84% APR "finance charge" to patient M.T.'s 2023 medical bill, an 84% APR "finance charge" to patient H.T.'s 2023 medical bill, and a 79% APR to patient J.O's 2024 medical bill. In each of those cases, a Wyoming Health Fairs employee wrote "Please add 35%" on the invoice before sending it to RMR for collection. Wyoming Health Fairs took affirmative steps to conceal this scheme.

11.     Plaintiff told Wyoming Health Fairs' Director of Accounting Renee Redman that charging, for example, 50% interest and 35% in collection fees isn't legal, and that Wyoming courts have found the 35% collection fee to be

unconscionable. Redman responded, "That is what our standard is. That is what we do." She added, "It is what we do for everybody." Plaintiff asked for a refund of the illegally collected fees and interest, but Redman refused. Plaintiff asked Wyoming Health Fairs to conduct an investigation. They didn't, and Wyoming Health Fairs blocked Plaintiff's email address from contacting anyone at Wyoming Health Fairs.

12.    Plaintiff, individually and on behalf of all others similarly situated, brings this action against RMR, Wilkerson & Wilkerson, and Daniel B. Wilkerson for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (the "FDCPA"), Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), and for fraud, negligence, negligence per se, unjust enrichment, civil conspiracy, breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, unfair and deceptive trade practices, violations of the Wyoming Uniform Consumer Credit Code, Wyo. Stat. § 40-14-101, *et seq.* ("WUCCC"), and declaratory judgment, for their pattern and practice of violating consumer rights.

13.    Plaintiff also, individually and on behalf of all others similarly situated, brings this action against Wyoming Health Fairs alleging the same causes of action, for their pattern and practice of violating patient and consumer rights.

## **PARTIES**

14.    Plaintiff Anthony Webster ("Plaintiff") is an adult natural person and Wyoming resident. He graduated from the University of Wyoming in May 2024 and resides in Laramie, Albany County, Wyoming.

15.    Plaintiff is a "consumer" as that term is defined under the FDPCA at 15 U.S.C. § 1692a(3), and also under Wyo. Stat. § 33-11-101(a)(v).

16.    Defendant Rocky Mountain Recovery Systems, Inc. is a Wyoming domestic corporation. RMR maintains offices in Campbell and Park County, Wyoming. RMR's registered agent can be found in Park County, Wyoming.

17.    Wilkerson & Wilkerson, LLC is a Wyoming limited liability company that also does business as Wilkerson Law Group (hereafter "Wilkerson & Wilkerson"). Its offices are the same as RMR's offices.

18.    RMR is actually and beneficially owned by attorneys Michael B. Wilkerson and Daniel B. Wilkerson (the "Wilkersons"), who also operate Wilkerson & Wilkerson. Charlotte B. Wilkerson is also an officer or director of RMR.

19.    Daniel B. Wilkerson is an adult natural person who claims to be an Idaho resident, but he is or also is a Wyoming resident. He maintains properties in Idaho and Wyoming. He is a licensed attorney in Wyoming (admitted 2020), Idaho (admitted 2019), and Montana (admitted 2020).

20.    Daniel B. Wilkerson is RMR's "resident manager" with the Wyoming Collection Agency Board. Resident managers must be "bona fide resident[s] of Wyoming." Wyo. Stat. § 33-11-105(b)(iii).

21.    RMR, Wilkerson & Wilkerson, and Daniel B. Wilkerson may hereafter be referred to individually and collectively as the "Collector Defendants."

22.    Wyoming Health Fairs ("WHF") is a Wyoming nonprofit corporation with its principal office in Casper, Wyoming, and with additional offices in Cheyenne, Laramie, Lander, Riverton, and Torrington, Wyoming, and Scottsbluff, Nebraska. It is filed as a foreign nonprofit corporation in Nebraska as "Wellness Health Fairs."

23.     Wyoming Health Fairs is a 501(c)(3) charitable organization.

24.     With respect to class claims, members of the putative classes or subclasses are each a "consumer" as that term is defined under the FDPCA at 15 U.S.C. § 1692a(3) and, where applicable, Wyo. Stat. § 33-11-101(a)(v). The class(es) include residents of Wyoming and persons who are not residents of Wyoming.

## JURISDICTION AND VENUE

25.     This action arises out of and challenges the Defendants' violations of the FDCPA, RICO, WUCCC, and Defendants' acts constituting fraud, negligence, negligence per se, unjust enrichment, civil conspiracy, breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, unfair and deceptive trade practices, all of which has harmed Plaintiff and affected members of the class(es), and seeks a declaratory judgment.

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 15 U.S.C. § 1692k(d), which creates both individual and class liability for FDCPA violations.

27.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims in this Amended Complaint, as they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III.

28.     This Court has general personal jurisdiction over all Defendants. RMR and Wilkerson & Wilkerson are Wyoming entities, maintain principal offices in Wyoming, their registered agent can be found in Wyoming, and they conduct business

within Wyoming, including by sending debt collection letters and pleadings to Wyoming residents and addresses. Daniel B. Wilkerson maintains a Wyoming residence and Wyoming law license, he conducts his collections and legal work in Wyoming against Wyoming residents, he directs the Wyoming activities of the Collector Defendants, and he has registered himself as "resident manager" of RMR.

29.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS

## I.    THE COLLECTOR DEFENDANTS' CORPORATE STRUCTURE AND OPERATIONS

30.    The principal purpose of RMR is the collection, for profit, of debts owed or due, or asserted to be owed or due, to others. RMR is regularly engaged in the collection, for profit, of third-party debts allegedly owed by consumers.

31.    Almost all of Wilkerson & Wilkerson's Wyoming litigation work, and Daniel B. Wilkerson's Wyoming litigation work, are debt collection lawsuits for the Wilkersons' collection agencies, including RMR, and the enterprise and activity between RMR, Wilkerson & Wilkerson, Daniel B. Wilkerson, and creditors.

32.    The Collector Defendants, and each of them, regularly collect debts inside and outside the State of Wyoming.

33.    The Collector Defendants, and each of them, are a "debt collector" as that term is defined under the FDCPA, pursuant to 15 U.S.C. § 1692a(6).

34.    RMR and Wilkerson & Wilkerson are each a "collection agency" as that term is defined under Wyo. Stat. § 33-11-101(a)(iii).

9

35.    Wyo. Stat. § 33-11-102 requires collection agencies and debt collectors to obtain a license from the Wyoming Collection Agency Board ("CAB").

36.    RMR was previously licensed by the CAB. However, on January 2, 2025, RMR's CAB license was terminated, and it remained in terminated status as of July 31, 2025. Between these dates, RMR continued debt collection activity, including by way of Daniel B. Wilkerson continuing to sign, file, and serve Wyoming Circuit Court complaints falsely declaring that RMR held a CAB license while it was terminated.

37.    Wilkerson & Wilkerson has never been licensed by the CAB.

38.    RMR also does business as "Recovery Systems, Inc.," "RSI," "RMR," "RMRSI," and "RSIWY."

39.    RMR owns and operates the internet domain name RSIWY.COM. Some Wilkerson & Wilkerson staff have RSIWY.COM email addresses.

40.    RMR is registered with the Montana Secretary of State as a foreign profit corporation, and with the Idaho Secretary of State using the assumed name of Rocky Mountain Recovery, Inc. RMR has filed debt-collection lawsuits in both states.

41.    Both RMR and Wilkerson & Wilkerson maintain an office at 101 Hastings Horseshoe in Powell, Park County, Wyoming.

42.    Both RMR and Wilkerson & Wilkerson maintain an office at 400 South Kendrick Ave., Suite 202, in Gillette, Campbell County, Wyoming.

43.    Both RMR and Wilkerson & Wilkerson maintained offices at 400 E. 1st St. Suite 312, and 800 Werner Ct., Suite 190, in Casper, Natrona County, Wyoming.

44.    Michael B. Wilkerson is the President of RMR and a Wyoming resident.

45.     Daniel B. Wilkerson is the Vice President of RMR.

46.     The Wilkersons or their family members are the sole officers of RMR and Wilkerson & Wilkerson.

47.     The Wilkersons direct, oversee, control, and manage RMR and Wilkerson & Wilkerson, and the debt collection enterprise and activity between them.

48.     Michael B. Wilkerson and/or Daniel B. Wilkerson also own and operate Trust Financial, LLC (d/b/a CBS Collections, d/b/a Bingham Collections, f/k/a Bingham Collections, Inc.), a Wyoming limited liability company, which is another collection agency. Trust Financial, LLC is also registered to do business in Idaho.

49.     Michael B. Wilkerson and/or Daniel B. Wilkerson also own and operate Statewide Collections, Inc., an Idaho corporation, which is another collection agency.

50.     Michael B. Wilkerson and/or Daniel B. Wilkerson also own and operate Mountain Plains Financial, LLC, a Wyoming limited liability company, which owns the property 101 Hastings Horseshoe in Powell, Wyoming.

51.      Michael B. Wilkerson and/or Daniel B. Wilkerson also own and operate M & D Financial, LLC, a Wyoming limited liability company with its principal office address at 101 Hastings Horseshoe in Powell, Wyoming.

52.     RMR and Wilkerson & Wilkerson share staff members, offices, resources, systems, databases, court affiants, and notaries. On information and belief, RMR and Wilkerson & Wilkerson share letter printing processes.

53.     The Collector Defendants, by way of their operations and agreements, incentivize creditors to create purported agreements with consumers and to use

specific language in purported agreements with consumers.

54.     Attached hereto as **EXHIBIT A** are a sampling of agreements between RMR and creditors that Plaintiff obtained from Wyoming state court filings and public records requests. Pre-existing exhibit labels have been redacted for clarity. These agreements include representations of FDCPA compliance. Daniel B. Wilkerson's signature is on at least one such agreement.

55.     Attached hereto as **EXHIBIT B** are a sampling of consumer forms that RMR creditor clients—including medical facilities across Wyoming—have presented to consumers. Underlining or boxes surrounding individual clauses were not present in the original as presented to the consumer. The Collector Defendants, or one or all of them, provided language to these creditors to place in these forms regarding interest, debt collection, a 35% collection fee, attorney's fees, and costs.

## II.   DEFENDANTS REPEATEDLY VIOLATED PLAINTIFF'S CONSUMER RIGHTS

56.     On or about April 29, 2024, Plaintiff visited WHF for the purpose of blood testing (the "Medical Service"). Plaintiff obtained this Medical Service to monitor medical conditions and diagnoses, and to screen for medical risks.

57.     WHF advertises providing "low cost blood screening[s]" and "testing" including "blood chemistry panel[s]" to check "heart, kidney and liver functions," cholesterol, and fasting glucose; hemograms to "check[] for anemia, infections and other blood disorders;" hemoglobin A1C screenings that WHF "recommend[s] for diabetics or those with a family history of high blood sugar;" vitamin D "screening of deficiency or toxicity;" screening to "detect[] B12 and folate nutrient levels necessary

12

for normal red blood cell … and white blood cell … formation;" LP-PLA2 tests to "help[] your provider assess the likelihood of atherosclerosis … and related heart and stroke risks." Plaintiff obtained some of these tests and was fasting. WHF offered to fax blood test results to Plaintiff's doctor.

58.    A WHF tax return states that the organization "provide[s] low cost health risk assessment and ongoing health support based on the assessment."

59.    Upon walking in the door to visit WHF for the Medical Service, WHF told Plaintiff to sign a sign-in sheet, a copy of which is attached hereto as **EXHIBIT C** (the "Sign-In Sheet").

60.    Plaintiff had desired to pay WHF any amount owed, in full, on the day of the Medical Service, but WHF discouraged it. WHF advertises that it is a "preferred provider with Blue Cross Blue Shield of Wyoming," Plaintiff's health insurer. Plaintiff accepted WHF's suggestions regarding specific blood testing to have performed in reliance on WHF's representations regarding Plaintiff's insurance coverage. WHF initially stated that Plaintiff owed no money for the Medical Service.

61.    At some point, WHF lost Plaintiff's insurance information.

62.    On or about June 5, 2024, WHF internally applied an insurance payment to alleged costs of the Medical Service. WHF did not invoice Plaintiff, request payment from Plaintiff, or tell Plaintiff about any amount allegedly due prior to June 5, 2024.

63.    On or about July 9, 2024, WHF first mailed Plaintiff an invoice with a pre-insurance balance of $272.00 (the "Pre-Insurance Balance"), which was then

reduced to $239.00 after insurance adjustments (the "Post-Insurance Balance").

64.     In July 2024, Plaintiff paid WHF in full, $239.00, yet WHF did not process Plaintiff's payment of $239.00.

65.     The WHF Sign-In Sheet states that in the event of non-payment, interest will be charged "at the rate of 1.75% per month." This calculates to 21% per annum.

66.     On September 26, 2024, WHF added a "finance charge" of $50.19 to the alleged costs of the Medical Service, to reach a new total of $289.19.

67.     $50.19 is 21% of $239.00. So, instead of WHF charging 1.75% per month (which is 21% annualized), WHF charged a flat non-annualized 21% of the principal balance. This occurred within 2–3 months after WHF's first invoice to Plaintiff.

68.     Even assuming *arguendo* an instance of non-payment occurred on or about the date an insurance payment was applied, a $50.19 finance charge would be approximately 67.8% APR as of the date it was assessed.

69.     WHF never called or emailed Plaintiff about a balance due.

70.     At some point between September 2024 and December 12, 2024, WHF referred a balance of $289.19 to RMR.

71.     Defendant RMR sent Plaintiff a letter dated December 12, 2024 (the "Notice of Debt"), which is attached with redactions as **EXHIBIT D**.

72.     RMR's Notice of Debt demanded that Plaintiff pay $390.48 (together with all amounts included therein, the "Alleged Debt") relating to the Medical Service on April 29, 2024 at WHF.

73. Plaintiff's Alleged Debt, and the underlying WHF medical bill, was for personal, family, or household purposes, meeting the definition of a "debt" under the FDCPA. *See* 15 U.S.C. § 1692a(5).

74. RMR's Notice of Debt stated, among other things:

| As of 04-29-24, you owed: | | $ 289.19 |
|---|---|---|
| Between 04-29-24 and today: | | |
| You were charged this amount in interest: | + | $ 0.07 |
| You were charged this amount in fees: | + | $ 101.22 |
| You paid or were credited this amount toward the debt: | − | $ 0.00 |
| Total amount of the debt now: | | $ 390.48 |

75. Plaintiff did not owe WHF or RMR $289.19 as of April 29, 2024.

76. RMR's Notice of Debt did not disclose the existence of $50.19 in interest.

77. The practice of hiding fees or interest in principal balances is a false representation of the character, amount, or legal status of an alleged debt, so the Notice of Debt violated the FDCPA. *See* 15 U.S.C. § 1692e(2)(A).

78. Plaintiff did not owe RMR or WHF $50.19 in interest as of December 12, 2024.

79. Defendants' demand for $50.19 in interest is at least 40% in annualized interest as of approximately December 12, 2024.

80. RMR's Notice of Debt demanded $0.07 in other "interest" from Plaintiff.

81. The $0.07 in interest RMR demanded in its Notice of Debt is calculated as a percentage on top of $289.19, so it is interest-on-interest.

82. RMR's Notice of Debt did not explain what the "interest" was for, did not disclose the interest rate, and did not disclose how the "interest" was calculated.

83.    RMR's Notice of Debt sought to collect $101.22 in "fees" from Plaintiff.

84.    Plaintiff did not owe WHF or RMR $101.22 in fees.

85.    RMR's Notice of Debt did not explain what the "fees" it demanded were for, nor how those "fees" were calculated or purportedly authorized.

86.    RMR's Notice of Debt included a demand for at least 42% of the principal amount as a collection fee on top of the principal amount.

87.    RMR's collection fee amounts to 35% of what RMR falsely claimed was the principal ($289.19), which already had at least 40% annualized interest in it.

88.    RMR routinely sends demands to consumers including a 35% collection fee, and has sent demands to consumers including a 40% or greater collection fee.

89.    RMR's Notice of Debt backdated the purported principal obligation date to April 29, 2024, while WHF did not send an invoice until later.

90.    RMR's Notice of Debt provided no accounting for fees or interest.

91.    Plaintiff disputes the Alleged Debt and the WHF invoice.

92.    WHF improperly coded services submitted to Plaintiff's insurance.

93.    The FDCPA prohibits debt collectors from using abusive, deceptive, misleading, unfair, or unconscionable means to collect a debt. *See* 15 U.S.C. §§ 1692, 1692d, 1692e, 1692f.

94.    As a remedial statute, the FDCPA should be construed liberally in favor of the consumer. *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002).

95.    Courts in this Circuit analyze debt collector communications from the perspective of the "least sophisticated consumer." *Hamilton v. Capio Partners, LLC*,

237 F.Supp.3d 1109, 1113 (D. Colo. 2017) (collecting cases).

96.    "The least-sophisticated-consumer standard is measured by how the 'least sophisticated consumer' would interpret the notice received from the debt collector. The test is how the least sophisticated consumer—one not having the astuteness of a 'Philadelphia lawyer' or even the sophistication of the average, everyday, common consumer—understands the notice he or she receives." *Id.*, citing *Ferree v. Marianos*, 129 F.3d 130, at *1 (10th Cir. 1997) (unpublished) (cleaned up).

97.    The FDCPA enumerates examples of unfair and unconscionable means to collect a debt, including "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

98.    Chapter X of Title 12 of the Code of Federal Regulations contains "Regulation F," which implements the FDCPA by prescribing federal rules governing the activities of a "[d]ebt collector," as that term is defined in the FDCPA.

99.    The prohibition in 15 U.S.C. § 1692f(1) is further specified in 12 C.F.R. § 1006.22(b), which provides that "[a] debt collector must not collect any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law … the term 'any amount' includes any interest, fee, charge, or expense incidental to the principal obligation."

100.   No contractual agreement authorized the interest or fees actually demanded from or collected from Plaintiff, and no law or contract permits interest-

on-interest or fees-on-interest.

101.    A 35% collection fee is unconscionable, unenforceable, and an unlawful penalty, and is prohibited by law, including by Wyo. Stat. § 40-14-508.

102.    Even when consumers have signed documents purportedly agreeing to a 35% collection fee, RMR's 35% collection fee has repeatedly been found by Wyoming courts to be unconscionable, unenforceable, and an illegal penalty. Attached hereto as **EXHIBIT E** are examples of these court orders, some dated prior to RMR's Notice of Debt and prior to the date of the Medical Service.

103.    Attached hereto as **EXHIBIT F** are redacted copies of a default judgment order denying RMR's claim for a 35% collection fee and an order denying a motion for reconsideration of the same in *Rocky Mountain Recovery Services, Inc. v. B.P.*, Washakie County Circuit Court No. CV-2024-0007. In that case, the Court found that RMR's 35% collection fee is an unenforceable penalty. These orders were issued prior to RMR's Notice of Debt to Plaintiff.

104.    Attached hereto as **EXHIBIT G** are redacted copies of an Order Finding Collection Fee Unconscionable Pursuant to Wyoming Statute § 40-14-508 and Une[n]forceable as a Penalty in *Rocky Mountain Recovery Services, Inc. v. S.L.*, Natrona County Circuit Court No. CV-2023-3127. This order was issued prior to RMR's Notice of Debt to Plaintiff.

105.    Defendants' attempted and actual collection of interest and fees, or collection of any debts while using unlawful interest and fees to bargain with consumers, or coordination and conspiracy to do the same, violates the FDCPA.

106.   Multiple statements on RMR's Notice of Debt violate the FDCPA, including the FDCPA's provisions regarding false and misleading representations (15 U.S.C. § 1692e), unfair practices (§ 1692f), and validation of debts (§ 1692g). By way of example, RMR's Notice of Debt provides a deadline for Plaintiff to dispute the Alleged Debt that is earlier than what Plaintiff is afforded by the FDCPA.

107.   RMR's Notice of Debt demanded payment, including for unlawful fees and interest, through asking Plaintiff to "contact [RMR] about [his] payment options," and prompting Plaintiff to "[m]ake [his] check payable to Rocky Mountain Recovery."

108.   On or about December 21, 2024, Plaintiff called RMR at the telephone number listed on the Notice of Debt. This telephone call was a "communication" pursuant to 15 U.S.C. § 1692a(2). RMR was closed, but a voicemail greeting solicited Plaintiff's personal information, including contact information and account number. The voicemail greeting did not state that RMR was a debt collector, that RMR was attempting to collect a debt, or that any information obtained would be used for that purpose, constituting a violation of the FDCPA. *See* 15 U.S.C. § 1692e(11).

109.   On or about December 21, 2024 and continuing through at least July 2025, RMR's voicemail greeting stated: "Thank you for calling Rocky Mountain Recovery, Recovery Systems, Trust Financial, or Wilkerson & Wilkerson…." Each of these companies are owned by the Wilkersons.

110.   The FDCPA prohibits even the mere implication that a communication is from an attorney when it is not from an attorney. *See* 15 U.S.C. § 1692e(2)(3).

111.   The inclusion of Wilkerson & Wilkerson, the name of a law firm, in RMR's voicemail greeting, is misleading and deceives consumers to believe RMR is a law firm, or that RMR is so tightly connected to a law firm that consumers' alleged debts have been reviewed by an attorney, or implies that communications from RMR are communications from an attorney, all of which overshadow consumers' rights to dispute debts and constitutes one or more violations of the FDCPA.

112.   Plaintiff left RMR a voicemail message on or about December 21, 2024. RMR received Plaintiff's voicemail message on or about December 21, 2024.

113.   In Plaintiff's December 21, 2024 voicemail message, Plaintiff stated: he believed the amount demanded by RMR was inaccurate; that the stated principal amount was higher than the full cost of the Medical Service; that the Alleged Debt had already been paid in full; that he was being charged interest and fees unlawfully; that he demanded an accounting; that he demanded copies of all documentation, contracts, and invoices supporting the amounts RMR demanded; that he disputed the Alleged Debt; that he demanded verification and validation of the Alleged Debt; and that he desired written confirmation that the Alleged Debt had been paid in full.

114.   In Plaintiff's voicemail message on or about December 21, 2024, Plaintiff said he was nervous about the Notice of Debt and what else RMR might do to him.

115.   In Plaintiff's voicemail message on or about December 21, 2024, Plaintiff stated, "Do not call me back. I am really concerned about your company … I don't want you to call me."

116.   Plaintiff was nervous, fearful, and upset when calling RMR on or about

December 21, 2024.

117.    A debt collector must cease communication and collection of a debt or any disputed portion thereof upon receipt of a dispute, until verification of the debt is provided. *See* 15 U.S.C. § 1692g(b).

118.    RMR was obligated to accept Plaintiff's telephone message on or about December 21, 2024 as a dispute of the Alleged Debt, because, among other things, RMR's Notice of Debt, Exhibit D, states, "*Call* or write to us by 01-14-25 to dispute all or part of the debt" (emphasis added). In the alternative, if RMR informed Plaintiff that it accepted disputes via telephone call (which it did), but a telephone dispute did not invoke Plaintiff's dispute rights under the FDCPA, then the Notice of Debt is unfair, misleading, and deceptive, and overshadows consumer dispute rights, constituting one or more violations of the FDCPA.

119.    On or about December 21, 2024, Plaintiff wrote to RMR stating, among other things: that he disputed the Alleged Debt; that he demanded verification and validation of the Alleged Debt; that he demanded an accounting, documents, and contracts to support RMR's demands for fees and interest; that he demanded the name and address of the original creditor; that he wanted to be provided a factual and legal basis to support why RMR could collect a debt, fees, costs, or commence any statutory period while it was dissolved by the State of Wyoming; and Plaintiff demanded that RMR cease collection and not call him.

120.    RMR received Plaintiff's dispute letter dated December 21, 2024.

121.    On or about December 23, 2024, an individual who identified themselves

as Mark Edwards with RMR called Plaintiff (the "Edwards Call"), even though Plaintiff had asked two days earlier not to be contacted via phone.

122.    The Edwards Call was an attempt by RMR to collect the Alleged Debt.

123.    On the Edwards Call, Edwards said, "This is an attempt to collect a debt."

124.    Because Plaintiff had already disputed the Alleged Debt, via phone and in writing on or about December 21, 2024, the Edwards Call on or about December 23, 2024, and each of Edwards's statements therein, each constitute collection efforts and communications in violation of the FDCPA.

125.    During the Edwards Call, RMR increased its demand of Plaintiff from $390.48 to $391.32, based on more interest RMR unlawfully added.

126.    Plaintiff had not paid the full amount Edwards demanded, $391.32, prior to the Edwards Call.

127.    The difference between $390.48 and $391.32, or $0.84, is interest-on-interest that already exceeded any lawful amount.

128.    RMR was attempting to collect interest from Plaintiff that accrued daily.

129.    Failing to disclose the accrual of interest when it is occurring, or suggesting that interest is accruing when it is not, are each violations of the FDCPA, including as false representations of the character, amount, or legal status of any debt. Failing to disclose that interest is accruing daily, and failing to state the interest rate or terms, are each a violation of the FDCPA, including as false representations of the character, amount, or legal status of any debt.

130.    During the Edwards Call, Plaintiff asked, "What is the interest rate?"

Edwards responded, "Two percent."

131.    Edwards's statement that 2% interest was being charged on the Alleged Debt was false and misleading, and thus a violation of the FDCPA.

132.    During the Edwards Call, Plaintiff asked, "What's the actual cost of the, like, medical services before all of these fees and interest?" Edwards responded, "$289.19." Plaintiff asked, "So, $289.19 does not include any fees or interest or anything like that?" Edwards responded, "Correct, yes." Plaintiff asked, "It's just medical services actually provided and the value of that for the $289.19?" Edwards responded, "Yes."

133.    Edwards's statement that $289.19 did not include fees or interest, when it did, is false and thus a violation of the FDCPA.

134.    During the Edwards Call, Plaintiff stated that he disputed the Alleged Debt, and that he demanded verification and validation.

135.    During the Edwards Call, Edwards stated: "If you want to get this taken off, you know, $391.32 is what you owe … it will be sent to collections, which it is, and interest will continue to accrue until it is taken care of. So, it's not just gonna magically go away."

136.    The FDCPA is clear that "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor." 15 U.S.C. § 1692g(b).

137.    Edwards's statements that Plaintiff owes funds, that interest will

continue to accrue, and that the Alleged Debt is not magically going to go away, overshadowed Plaintiff's right to dispute the debt and request the name and address of the original creditor, constituting violations of the FDCPA.

138.    On the Edwards Call, Plaintiff asked, "Is this going to go on my credit?" Edwards, responded, "Yes. Yes, it is." Plaintiff asked, "When?" Edwards responded, "So we received it from them on December 9th, you have 30 days, so you have until January 9th to get it resolved."

139.    On the Edwards Call, Plaintiff stated, "You're not going to report this to my credit." Edwards responded, "Yes, we are going to report it to your credit."

140.    On the Edwards Call, Edwards stated, "Unfortunately, we're going to report it to your credit bureau."

141.    Edwards's statement that Plaintiff had until January 9, 2025 to "get it resolved" before RMR "report[s] this to [his] credit" constitutes multiple violations of the FDCPA, including violations of the false and misleading representations (15 U.S.C. § 1692e), unfair practices (§ 1692f), and validation of debts (including overshadowing) (§ 1692g) provisions.

142.    Edwards's threat to report the Alleged Debt on January 9, 2025, 30 days from the date RMR allegedly received the purported collection file from WHF, but not 30 days after Plaintiff's receipt of the Notice of Debt, was less than the validation period required by law, thus overshadowing Plaintiff's dispute rights in violation of the FDCPA and constituting unlawful continued collection attempts.

143.    Plaintiff's Alleged Debt was an alleged medical debt.

144.    As of the Edwards Call, and at all other times, Plaintiff's Alleged Debt was under $500.

145.    As of the Edwards Call, Plaintiff's Alleged Debt was under one year old.

146.    As of the Edwards Call, Plaintiff did not actually owe any money to RMR or WHF.

147.    Effective July 1, 2022, medical debts that are less than one year old are prohibited from being reported to any of the three major credit reporting agencies.

148.    Effective on or about April 11, 2023, medical debts that are less than $500 are prohibited from being reported to any of the three major credit reporting agencies.

149.    Effective July 1, 2022, paid medical debts are prohibited from being reported to consumer credit reports at all three major credit reporting agencies.

150.    During the Edwards Call, Edwards knew the Alleged Debt was an alleged medical debt, that it was under one year old, and that it was under $500.

151.    The Alleged Debt was not eligible for credit reporting.

152.    RMR's systems and processes are configured to include interest and collection fees in amounts reported to credit reporting agencies.

153.    Collection accounts can significantly drop consumer credit scores, are derogatory and negative, and can harm consumer creditworthiness.

154.    One of RMR's debt collection letter templates states, "Most accounts are credit reporting and interest is being added daily."

155.    Plaintiff had already paid all amounts validly owed related to the

Alleged Debt prior to December 23, 2024, without admitting that any amount at all was validly owed to any Defendant.

156.   Through the Edwards Call, RMR used false, deceptive, and misleading representations in connection with the collection of the Alleged Debt, including by threatening to take action(s) that cannot legally be taken or that are not intended to be taken, in violation of 15 U.S.C. §§ 1692e, 1692e(5), 1692e(8), and 1692e(10).

157.   RMR sent Plaintiff a letter dated December 26, 2024 (the "December 26 Letter"), which is attached with redactions as **EXHIBIT H**.

158.   The December 26 Letter is dated exactly two weeks after the date on the Notice of Debt.

159.   RMR routinely sends debt collection letters to consumers that are substantially similar to Exhibit H two weeks after the first notice of debt sent by RMR. On information and belief, this is configured as a "strategy" in RMR's software.

160.   RMR sent the December 26 Letter after its receipt of Plaintiff's written notice of dispute, which contained demands for the name and address of the original creditor, a refusal to pay, and demands for verification and validation.

161.   RMR placed the December 26 Letter into the U.S. Mail after its receipt of Plaintiff's written notice of dispute, which contained demands for the name and address of the original creditor and demands for verification and validation.

162.   The December 26 Letter states, among other things:

> Previous efforts to collect this past due account have been
> disregarded, therefore we have been authorized to take any lawful
> action necessary to enforce collection.
>
> There are two ways of settling a legitimate debt – payment in full
> immediately or recommendation for further action. At this time the
> choice is still yours.
>
> Should you choose to avoid the consequences of non-payment, <u>remit
> the balance to our office without further delay</u>.

163.    RMR was required to cease its communications and collection activity
after Plaintiff's dispute, so the December 26 Letter violated the FDCPA, 15 U.S.C. §
1692c, and the language of the December 26 Letter—including statements that
previous efforts were disregarded, that RMR was authorized to take any lawful action
necessary to enforce collection, that the alleged debt was legitimate, demanding
payment in full or further action, suggesting that Plaintiff had an immediate choice
to make, informing Plaintiff to avoid consequences of non-payment, and demanding
remittance of payment without further delay—overshadowed Plaintiff's right to
dispute the Alleged Debt, constituting a violation of 15 U.S.C. § 1692g.

164.    The December 26 Letter did not provide verification or validation, and
did not provide the original creditor's address.

165.    The December 26 Letter is a form or template that RMR routinely uses.

166.    The December 26 Letter demanded $391.52 from Plaintiff.

167.    The December 26 Letter stated that Plaintiff owed RMR:

| CREDITOR | AMOUNT | INTEREST | FEES | TOTAL |
|---|---|---|---|---|
| WYOMING HEALTH FAIRS | 390.41 | 1.11 | 0.00 | 391.52 |

27

168.    In the December 26 Letter, RMR purported that the principal balance of the Alleged Debt was now $390.41. Within this number, RMR included: the Post-Insurance Balance of $239.00, $50.19 in interest, and a $101.22 collection fee.

169.    In the December 26 Letter, RMR stated that $1.11 in interest was being collected. This was false, because interest was already included in the $390.41 in the 'Amount' column, constituting an FDCPA violation.

170.    In the December 26 Letter, RMR stated that $0.00 in fees were being collected. This was false, because fees were already included in the $390.41 in the 'Amount' column, constituting an FDCPA violation.

171.    Through the December 26 Letter, RMR was demanding $51.30 in interest on the WHF bill.

172.    RMR's December 26 Letter falsely represented the character, amount or legal status of the Alleged Debt in violation of the FDCPA. *See* 15 U.S.C. § 1692e(2).

173.    When Plaintiff received the December 26 Letter, he felt distressed, upset, and concerned.

174.    At some time after Plaintiff received RMR's Notice of Debt, Plaintiff submitted payment(s) to WHF. The total Plaintiff paid in December 2024, after receiving RMR's communications, was $391.48. WHF then gave the funds to RMR. RMR then gave some amount of the principal balance plus some amount of the interest back to WHF, while keeping the collection fee. The collection fee RMR retained exceeded 35% of the Post-Insurance Balance.

175.    The payment(s) Plaintiff made toward the Alleged Debt after Plaintiff

received the Notice of Debt were made with a notation similar to: "Submitted under duress and without waiver of any rights or remedies. All rights and remedies, including for a full refund, reserved."

176.    Plaintiff paid the amounts that RMR demanded because, among other things: Plaintiff was not fully aware of his rights and remedies; to the extent Plaintiff suspected illegality, it caused even more stress regarding what else Defendants might do to harm him; he was threatened with credit reporting and he was not aware that medical debts could not be reported to his consumer credit reports; he did not want to be sued; he was fearful of negative credit reporting; he did not want his privacy (including medical privacy) invaded or violated in public court filings; he did not want interest to accrue; he wanted to preserve his reputation; and RMR used unfair, deceptive, misleading, and unconscionable debt collection tactics in violation of law that coerced and extorted him into paying the amounts unlawfully demanded.

177.    RMR has filed lawsuits against other consumers, including 380 lawsuits in Wyoming state courts in the mere four months between September 1, 2024 and December 31, 2024. RMR filed over 5,000 cases in Wyoming state courts against consumers from 2021 to 2024. In some months during that time period, RMR has filed almost 200 lawsuits against Wyoming consumers.

178.    RMR and Wilkerson & Wilkerson routinely reveal medical patients' private and protected health information in public court filings in Wyoming circuit courts. As just a small sampling of only a few cases, RMR publicly revealed that patients had medical procedures performed such as: a breast biopsy; a psychiatric

evaluation; skin tag removal; testicular ultrasound; tooth extractions and fillings; and a surgical procedure performed to remove lesions, tumors, or cysts from the area of the ovary, around the bladder, uterus, rectum, or on the peritoneum. This is in addition to RMR's filings often revealing consumers' cell phone numbers, emergency contacts, and salary information, the chief complaint for medical visits, and responses to medical provider questionnaires, and sometimes revealing credit scores and full unredacted SSNs. Wyoming court rules require partial redactions of SSNs.

179.   This action was originally filed and served on RMR in January 2025, and as of approximately June 2025, the Collector Defendants were continuing to publicly file patient medical conditions and full SSNs in and/or with court filings.

180.   Medical records in RMR's possession would tend to reveal, or likely reveal, one or more of Plaintiff's medical conditions and/or diagnoses.

181.   RMR has agreements with medical clinics that require RMR to comply with the Health Insurance Portability and Accountability Act ("HIPAA").

182.   WHF is a covered entity under HIPAA.

183.   The Collector Defendants have publicly filed medical information about WHF patients in court filings. For example, in 2024, the Collector Defendants publicly filed a document revealing a Wyoming woman had testosterone level testing at Wyoming Health Fairs, along with her name and address.

184.   On December 31, 2024, Michael J. Pinti ("Pinti"), an employee of RMR, called Plaintiff (the "Pinti Call"), even though Plaintiff had asked ten days before not to be contacted via phone.

185.    Pinti resides in Casper, Wyoming. At the time, Pinti worked out of the joint RMR and Wilkerson & Wilkerson office in Casper, Wyoming.

186.    On December 31, 2024, Pinti spoke to Plaintiff while Pinti was physically present in the State of Wyoming.

187.    In court filings, RMR has correctly referred to Pinti as one of RMR's "keeper[s] of the records."

188.    On December 31, 2024, Pinti conveyed to Plaintiff that RMR credited Plaintiff's account for Plaintiff's payments made after RMR sent its Notice of Debt, but that Plaintiff's payments did not fully cover what Plaintiff owed because of additional interest in an amount unknown to Plaintiff.

189.    The additional interest that Pinti was referring to was being illegally calculated, demanded, and collected.

190.    While Pinti said the account was resolved, Pinti said the remaining amounts were "forgiven."

191.    Pinti's statement about forgiven debt caused Plaintiff to fear that a forgiven debt could still carry a continuing reputational risk and may impose tax consequences, giving rise to continuing harm, injuries, and damages.

192.    Forgiven debt is sometimes taxable.

193.    The first time RMR conveyed to Plaintiff that his alleged account was resolved was through Pinti's statements on December 31, 2024.

194.    RMR and WHF collected from Plaintiff double amounts with regard to at least some of the principal balance of the Alleged Debt.

195.   RMR and WHF profited from Plaintiff's payment of fees and/or interest on the Alleged Debt.

196.   RMR and WHF collected interest and/or fees that were unlawfully calculated and collected in violation of the FDCPA.

197.   RMR and WHF owe Plaintiff money as overcharged fees and interest.

198.   On December 31, 2024, Plaintiff asked Pinti for a refund of double collected principal amounts and illegally collected interest and fees. He refused.

199.   Pinti's refusal to provide a refund of unlawfully collected fees and interest on December 31, 2024 was after Plaintiff had already notified RMR and WHF that the fees and interest charged were unlawful.

200.   Plaintiff has asked WHF to provide him with an accounting and a refund of double-paid principal amounts, interest, and/or fees. On December 31, 2024, WHF referred Plaintiff to RMR "as they are the owners of this debt."

201.   At no time did RMR "own" the Alleged Debt.

202.   On December 31, 2024, Pinti told Plaintiff that RMR is WHF's "agent."

203.   On December 31, 2024, Pinti stated that RMR became the authorized agent of WHF, with respect to Plaintiff, on December 9, 2024.

204.   On December 31, 2024, Pinti told Plaintiff that RMR is WHF's "creditor's rights agent."

205.   RMR's use of the phrase "creditor's rights agent" is intended to misrepresent RMR as a law firm and misrepresent its debt collectors as attorneys. The use of this phrase is deceptive and misleading and violates the FDCPA.

206.   On December 31, 2024, Pinti told Plaintiff: "It was improper for you to be communicating with Wyoming Health Fairs on this matter to begin with … there's legal principles that say you should be communicating with the one and only agent on the matter."

207.   On December 31, 2024, Pinti stated to Plaintiff, "You shouldn't be discussing [with WHF] the remainder of the history of the account and some of the other things that we've talked about today."

208.   But on the December 23, 2024 Edwards call, Edwards had encouraged Plaintiff to contact WHF.

209.   Pinti's statements that it was improper for Plaintiff to communicate with WHF, that legal principles say Plaintiff should only communicate with RMR, and that Plaintiff should not be discussing the account history with WHF, are inaccurate, aim to discourage Plaintiff from investigating the Alleged Debt, and overshadow Plaintiff's dispute rights. These are false, deceptive, and misleading representations in connection with the collection of the Alleged Debt and violate the FDCPA as unfair debt collection practices.

210.   Plaintiff is not a licensed attorney.

211.   Pinti is not a licensed attorney.

212.   Pinti told Plaintiff on December 31, 2024 that RMR is not a law firm.

213.   On December 31, 2024, Pinti stated, "We are only their [WHF's] attorney if we take a legal action, and then our legal partner The Wilkerson Law Group becomes their creditor's rights attorneys if we go into a legal action. But even if we're

not in a legal action, we are still their lawful agent."

214.    RMR sent Plaintiff a letter dated December 31, 2024, a copy of which is attached hereto as **EXHIBIT I** (the "December 31 Letter").

215.    RMR's December 31 Letter stated that RMR accepted payment in full of $390.48 effective December 30, 2024.

216.    RMR's December 31 Letter stated that RMR accepted payment for $239.00 as "original principle" *[sic]*, $50.19 in "pre-assigned interest," $0.07 in "interest," and $101.22 as a "collection fee," totaling $390.48.

217.    Plaintiff paid $391.48, so RMR's letter is false and inaccurate.

218.    RMR considers "pre-assigned interest" and "interest" to both be interest.

219.    The $50.26 in "pre-assigned interest" and "interest" as reflected in the December 31 Letter, as calculated on the "original princip[al]" of $239.00, exceeds any amount authorized by contract or law.

220.    RMR and WHF collected, accepted, and/or ledgered payments from Plaintiff toward interest and fees illegally demanded and collected by RMR and WHF.

221.    RMR collected, accepted, and/or ledgered payments from Plaintiff after RMR received a written dispute, demand for validation and verification, refusal to pay, and demand for the original creditor's name and address, but prior to RMR providing such validation and/or the original creditor's name and address, constituting a violation of the FDCPA.

222.    RMR's December 31 Letter referred to Plaintiff as "patient."

223.    With regard to the Alleged Debt, Plaintiff was a medical patient.

224.    RMR's December 31 Letter states: "We are trying to collect a debt that you owe."

225.    Plaintiff did not owe RMR or WHF any money on December 31, 2024.

226.    RMR's December 31 Letter does not meet the requirements of the FDCPA as verification or validation of a debt.

227.    At no time has RMR provided Plaintiff with satisfactory verification or validation of the Alleged Debt.

228.    The Notice of Debt, December 26 Letter, and December 31 Letter each include interest exceeding 21% per year.

229.    The Notice of Debt, December 26 Letter, and December 31 Letter each include interest exceeding 36% per year.

230.    The Notice of Debt, December 26 Letter, and December 31 Letter each include interest exceeding 1.75% per month.

231.    The Notice of Debt, December 26 Letter, and December 31 Letter each include a collection fee exceeding 35% of the principal balance.

232.    RMR's internal collection software record regarding Plaintiff contains a note stating, "ALL CALLS TO DBW," as in, Daniel B. Wilkerson. Tammy Mattson added this notation.

233.    RMR's internal collection software record regarding Plaintiff stated, "NEXT STEP COURT."

234.    RMR has configured its internal collection software to track attorney's fees owed and received.

235.    Letters on Wilkerson & Wilkerson letterhead are part of, or connected to, RMR's internal collection software.

236.    On December 31, 2024, RMR's internal collection software still had Plaintiff's alleged account open and an entry stated, "ADD TO TICKLER."

237.    On January 2, 2025, RMR's internal collection software contained an entry with respect to Plaintiff stating, "CANCEL CR RPTG." This means cancel credit reporting.

238.    On January 8, 2025, Daniel B. Wilkerson emailed Plaintiff stating among other things: "Wilkerson Law Group represents Rocky Mountain Recovery in all matters, and Wyoming Health Fair[s] in this specific matter concerning you. Send all requests, questions, and correspondences to me only." His email was sent from his RMR email address, not his law firm's email address.

239.    RMR has entered into an agreement with Hot Springs County Memorial Hospital that it was operating under in 2024, which states, among other things: "No form of legal action will be initiated on the part of RMR without written authority from the Client. When the Client authorizes legal action, the Client has authority to communicate directly with RMR's attorney … RMR shall not accept any compromise settlement without the prior approval of the Client." RMR and Wilkerson & Wilkerson have filed lawsuits on behalf of Hot Springs County Memorial Hospital.

240.    Plaintiff has demanded a refund of all amounts he paid that were not actually owed, were double collected, and for illegally calculated interest and fees. RMR and WHF have refused to provide such a refund. As of the filing of this Amended

Complaint, RMR and/or WHF are retaining double-collected principal amounts, unlawful collection fees, and unlawful interest.

241.    Plaintiff is entitled to statutory damages, actual damages, nominal damages, injunctive relief, declaratory relief, attorneys' fees, and costs.

242.    Plaintiff is entitled to a declaratory judgment that he owed and owes no funds to Defendants, that Defendants violated his rights, that Defendants' patterns and practices violate his rights and the rights of consumers, that no alleged debt was "forgiven," possibly leading to tax or reputational consequences, and that Defendants' interest charges and fees were and are unlawful, unconscionable, and unenforceable.

243.    Plaintiff has suffered damages because of Defendants' conduct, including without limitation: stress, anxiety, loss of sleep, humiliation, mental anguish, reputational and professional harm (including due to a requirement to disclose Defendants' collection activity to professional licensing agencies), fear, concern that Defendant would publicly reveal Plaintiff's private and medical information as RMR has done to other consumers, time invested into challenging Defendants' unlawful conduct and investigating and protecting Plaintiff's rights and remedies and the rights and remedies of the members of the class(es), mailing costs for dispute letters, travel costs and mileage connected to challenging Defendants' unlawful conduct, and out-of-pocket expenses incurred associated with investigating Plaintiff's and member(s) of the class(es)' rights and remedies, and other damages, attorneys' fees, and costs.

244.    Plaintiff has paid attorneys money because of Defendants' threats,

actions, and violations of law.

245.   Plaintiff was left with no recourse but to file this lawsuit. An actual controversy exists because Plaintiff is entitled to statutory damages for each violation of the FDCPA, Defendants have refused to provide a refund to Plaintiff, Plaintiff has incurred actual damages beyond the refusal to provide a refund, and Defendants have violated and are continuing to violate the law with regard to Plaintiff and all those similarly situated.

## III.   WYOMING HEALTH FAIRS HAS A PATTERN AND PRACTICE OF VIOLATING THE LAW

246.   Plaintiff is not the only one who has been charged illegal interest with respect to WHF invoices that were later sent to RMR for collection. For example, attached as **EXHIBIT J** are invoices from just a few of RMR's lawsuits against Wyoming consumers, all of which were falsely backdated. In these invoices:

247.   M.T., a county jail worker, attended a WHF employee wellness event and had a test performed. Later, he was billed $50, and $10.50 was added in interest, amounting to over 60% annualized interest. WHF then asked RMR to add 35%. RMR sued M.T. related to this alleged debt.

248.   Another county worker, H.T., a public-school teacher, attended the same employee wellness event, and Wyoming Health Fairs later billed her for a $60 medical service, and added $12.60 in interest, amounting to over 60% annualized interest. WHF then asked RMR to add 35%. RMR sued H.T. related to this alleged debt.

249.   J.O. attended the Wyoming Health Fairs Health & Wellness Expo in January 2024 for a blood screening. WHF later billed him $131 after insurance,

adding a $27.51 finance charge, amounting to over 70% annualized interest. WHF then asked RMR to add 35%. RMR sued J.O. related to this alleged debt.

250.    WHF routinely and systematically adds a flat (not annualized) finance charge or interest of 21% of the principal balance approximately three months after the service date or insurance payment, which annualizes to over 50%, 60%, or 70% APR. WHF then sends these invoices to RMR for collection, writing "Please add 35%" on the invoice. RMR sues consumers over WHF bills and obtains settlements, judgments, and wage garnishments.

251.    On or about June 19, 2025, Plaintiff spoke with Renee Redman, WHF's Director of Accounting (the "Redman Call").

252.    During the Redman Call, the following conversation occurred:

PLAINTIFF:    It seems to me that you may or may not have a form that says that it's 1.75% as a finance charge per month, I think, does that sound right?

REDMAN:    No. Our finance charge is 21%.

PLAINTIFF:    Is that like a flat fee or annual?

REDMAN:    It's 21% on the remaining balance on the invoice.

PLAINTIFF:    Okay. Do you have anything that says I ever agreed to that?

REDMAN:    Umm. I don't. It's on our sign-in sheet.

PLAINTIFF:    It is not. So, Rocky Mountain gave me what they claim is the sign-in sheet and it says 1.75% per month.

REDMAN:    I don't -- Okay.

PLAINTIFF:    But my concern is, if Wyoming Health Fairs is charging people 21% as a flat rate -- and I believe that happens right after month three, right?

REDMAN:    Generally, uh-huh [affirmative].

PLAINIFF:    So, I mean, that annualizes to over 50% APR. And if people aren't agreeing to that, I think that's a really --

REDMAN:    So that 21% would be better, right?

PLAINTIFF:    No.

REDMAN:    Than whatever the 1.7 percent you're talking about.

PLAINTIFF:    1.75% per month, and you said it was after about three months or so, so that's about 5 percent. But you're doing 21% after about three or four months, I don't know exactly, so you kind of have to multiply that, right, to get to an annualized percentage that ends up being gigantic.

REDMAN:    We do 21%. I'm not sure exactly where you're getting the 1.7 or what. I'm not -- I'm not sure. Our finance charge is 21%. And then when it goes to collections there's a 35% charge.

PLAINTIFF:    Is that on top of the 21%?

REDMAN:    It is.

. . .

PLAINTIFF:    I mean, I think that Wyoming Health Fairs has to do a full investigation and probably owes a lot of people a lot of money and Rocky Mountain is then suing people over these bills and I can't -- I mean -- I've seen those cases and I've seen what happens and that has real pain on people . . . Over 50% and then adding 35% on top of that is a gigantic percentage and I don't think that that's allowed.

REDMAN:    Well. I'm really not sure what to tell ya. That is what our standard is. That is what we do.

. . .

REDMAN:        I know that Rocky Mountain did collect what we sent to them from you. And you did pay us, but that cleared your account with them and with us.

PLAINTIFF:     How much money, I guess, was actually handed over to Rocky Mountain?

REDMAN:        All of it.

PLAINTIFF:     But then how much did Wyoming Health Fairs get back from that then?

REDMAN:        The $289.19 to clear your account. Well actually $1.30 less because of the way the payments were, and we just decided, close enough.

. . .

PLAINTIFF:     Are you today saying you're just going to leave all this as-is and just not refund me anything?

REDMAN:        That would be correct.

PLAINTIFF:     Even though I'm telling you this 21% as a flat rate is not legal.

REDMAN:        It is our standard rate. It's what we do for everybody. It is what we do for everybody.

253.   WHF has known that it charges 21% flat instead of 21% annualized for years and has intentionally continued this practice. WHF knew or should have known this practice is not lawful. WHF occasionally sends invoices including a 21% flat finance charge to consumers via the U.S. Mail before referring a matter to RMR.

254.   Plaintiff gave WHF, including its Executive Director Tandi Rinker, notice of its unlawful interest or finance charges in December 2024 and January 2025, but WHF continued to charge excess interest. Rinker started working for WHF in

2009 as an Accounting Manager, then became Director of Accounting, and has been Executive Director since 2017. She is or was a securities broker licensed with the Financial Industry Regulatory Authority.

255.    Janet Marschner, President of the WHF Board of Directors, is or was a Certified Public Accountant ("CPA") and previously worked as Chief Financial Officer of a physician group. Stephanie Means, WHF's Treasurer, is a CPA.

256.    At some prior time, RMR informed WHF of inaccurate interest charges, but both RMR and WHF continued to charge excess interest.

257.    WHF altered the language on its invoices to conceal this practice. In 2023, WHF invoices stated "Finance Charge (1.75% per month)" while charging much more, a flat 21% of the principal:

| Date | Description | Location | Amount |
|------|-------------|----------|--------|
| 04/27/2023 | | Fremont County Employees-Riverton | $50.00 |
| 05/31/2023 | Check - BCBS denial | Fremont County Employees-Riverton | $0.00 |
| 09/01/2023 | Finance Charge (1.75% per month) | Fremont County Employees-Riverton | $10.50 |
| **Total** | | | **$60.50** |

258.    But between 2023 and 2024, WHF changed its invoice language to remove references to 1.75% per month and replace it with "Finance Charge on Overdue Balance":

| Date | Description | Location | Amount |
|------|-------------|----------|--------|
| 01/13/2024 | | Ford Wyoming Center Health Expo | $48.00 |
| 01/13/2024 | | Ford Wyoming Center Health Expo | $28.00 |
| 01/13/2024 | | Ford Wyoming Center Health Expo | $55.00 |
| 01/13/2024 | | Ford Wyoming Center Health Expo | $20.00 |
| 01/24/2024 | Check | Ford Wyoming Center Health Expo | ($20.00) |
| 04/30/2024 | Finance Charge on Overdue Balance | Ford Wyoming Center Health Expo | $27.51 |
| 07/02/2024 | Credit Card | Ford Wyoming Center Health Expo | ($25.00) |
| **Total** | | | **$133.51** |

259.   Both of the invoices in the immediately preceding paragraphs were referred to RMR for debt collection. WHF wrote "Please add 35%" on the invoices. WHF's actions in changing invoice text to conceal promised 1.75% rates while continuing to demand 50% APR, and to refer such invoices to RMR, was done to conceal their unlawful conduct and in furtherance of its violations of law as pled herein.

260.   At sometime within approximately the last year, WHF removed the language "I will pay interest thereon at the rate of 1.75% per month" from its sign-in sheet form and replaced it with "I agree to pay finance charges on overdue balance."

**Sign-In Sheet from April 2024:**

- I, the undersigned, agree to pay for all services rendered to me immediately upon demand. I further agree that in the event of non-payment of any amounts due under this agreement, I will pay interest thereon at the rate of 1.75% per month, and pay all reasonable attorney fees and court costs should suit be instituted. I also agree that in the event this agreement is assigned to an agency for collection, I promise to pay an additional fee of 35% of the unpaid balance due.

**Sign-In Sheet as seen after Plaintiff reported
Wyoming Health Fairs' misconduct:**

- I, the undersigned, agree to pay for all services rendered to me immediately upon demand. I further agree that in the event of non-payment of any amounts due under this agreement, I agree to pay finance charges on overdue balance, and pay all reasonable attorney fees and court costs should suit be instituted. I also agree that in the event this agreement is assigned to an agency for collection, I promise to pay an additional fee of 35% of the unpaid balance due.

261.   WHF's language changes to its invoices and Sign-In Sheet were performed in furtherance of concealing its excess interest and fee scheme.

262.   WHF's excessive interest rates are incompatible with a 501(c)(3) non-profit charitable organization and violate the exempt and charitable purpose requirements of law.

263.   WHF has made no effort to inform patients of its overcharging.

43

264.    WHF has made no effort to refund patients it has overcharged.

265.    WHF has made no effort to reverse the consequences of any collection activity, credit reporting, court judgments, wage garnishments, or property seizures, if applicable.

## IV.    THE COLLECTOR DEFENDANTS HAVE A PATTERN AND PRACTICE OF VIOLATING THE LAW

266.    The Collector Defendants engage in systemically and routinely violating consumer rights as a matter of course.

267.    The Collector Defendants are aware of all of the requirements of the FDCPA, and Wyoming law and regulations pertaining to debt collectors and the collection of consumer debts.

268.    RMR is owned by debt collection attorneys who are aware of the requirements of the FDCPA.

269.    Tammy Jo McNulty, an RMR employee, stated in a Google review of RMR: "This company follows all FDCPA regulations and treats people professionally."

270.    On December 31, 2024, RMR employee Michael Pinti told Plaintiff: "We're kind of the specialists and the experts who understand the law."

### A.    ROCKY MOUNTAIN RECOVERY SYSTEMS USES "PRE-COLLECTION NOTICES" TO VIOLATE CONSUMER RIGHTS

271.    Attached hereto as **EXHIBIT K** are redacted copies of two letters dated January 17, 2024 and February 10, 2023 (the "Pre-Collection Notice(s)"), that RMR

sent to Wyoming residents and J. and K. (p. 1), and K. and K. (p. 2), respectively. RMR filed these documents (without redactions) in a Wyoming county circuit court.

272.   With regard to Wyoming residents J. and K. referenced on page 1 of Exhibit K, J. is/was a first responder, and K. is/was a teacher. With regard to Wyoming residents K. and K. referenced on page 2 of Exhibit K, the first K. listed is/was a healthcare worker, and the second K. listed is/was a rail worker.

273.   The Pre-Collection Notices are true and accurate copies of a letters RMR drafted, prepared, and sent via U.S. Mail on the dates stated on the documents.

274.   The Pre-Collection Notices are substantially the same in content. The J. and K. version states, among other things:

> Original Creditor: Family Dentistry
> …
> Balance Due: $2,134.11
> Patient: Family
>
> **PRE-COLLECTION NOTICE**
>
> To Whom It May Concern,
>
> This letter is to notify you that the above balance has been forwarded to our collection agency. To protect you as a consumer and to ensure that your creditor is paid in a reasonable manner, we are giving you an opportunity to pay this account before it is turned for collection.
>
> **You have <u>30 days</u> from the date of this letter to pay this account to <u>Platte River Family Dentistry</u>**. If you do not pay this bill to Family Dentistry or make satisfactory arrangements with us, we will immediately mail the federal notice that triggers the time period for (1) **Credit Reporting** (2) Statutory **Interest** which will be back dated to the time of service and increase the amount due, and (3) **Legal Action** including fees and higher interest rates and additional damage to your credit report as we may pursue a legal judgment.

> To avoid further action, contact:
> Platte River Family Dentistry
> …
> Your prompt attention to this matter is appreciated.
> Rocky Mountain Recovery Systems, Inc.

275.    The Pre-Collection Notices are each attempts to collect an alleged debt.

276.    The Pre-Collection Notices are each a "communication" as that term is defined pursuant to 15 U.S.C. § 1692a(2).

277.    The Pre-Collection Notices are on RMR letterhead.

278.    The Pre-Collection Notices do not state that any information obtained will be used for debt collection, in violation of 15 U.S.C. § 1692e(11).

279.    Because the Pre-Collection Notices are an attempt to collect a debt by a debt collector, they must include the information required to be in a notice of debt, including statements about the consumer's dispute rights. *See* 15 U.S.C. § 1692g(a). Because they do not, they violate the FDCPA.

280.    The wording of the Pre-Collection Notices is abusive, deceptive, and unfair, especially according to the "least sophisticated consumer" standard.

281.    The Pre-Collection Notices falsely, deceptively, and misleadingly state that they seek to protect the recipients, when they do not; they seek to collect an alleged debt through threats.

282.    The Pre-Collection Notices falsely state that the recipients' account has not been "turned for collection," when each letter was in fact sent by a debt collector attempting to collect an alleged debt.

283.    The Pre-Collection Notices state that the recipients have 30 days from

the date of the letter to pay, thus misstating the recipients' dispute rights, not providing the required dispute rights statements, and overshadowing the recipients' dispute rights.

284.    The Pre-Collection Notices state that RMR "…will immediately mail the federal notice that triggers the time period…," which is phrased as a threat rather than a consumer right, namely, the beginning of the dispute and validation period.

285.    The Pre-Collection Notices refer to "trigger[ing] the time period for (1) Credit Reporting," implying that credit reporting will occur 30 days from the date of the letter, thus overshadowing the recipients' dispute rights.

286.    The Pre-Collection Notices refer to "trigger[ing] the time period for … (2) Statutory Interest which will be back dated to the time of service and increase the amount due," which implies a severe financial consequence for not paying within 30 days from the date of the letter, thus overshadowing the recipients' dispute rights and creating a false representation of the character, amount, or legal status of a debt.

287.    Platte River Family Dentistry, P.C. was already charging the recipients of the Pre-Collection Notices attached as Exhibit K at or above the maximum interest rate allowed by contract or law. Therefore, RMR could not lawfully add more interest nor backdate more interest. RMR's Pre-Collection Notices to these recipients threatened action that could not lawfully be taken, in violation of the FDCPA.

288.    The Pre-Collection Notices refer to "trigger[ing] the time period for … (3) Legal Action including fees and higher interest rates and additional damage to your credit report as we may pursue a legal judgment," which falsely implies that

RMR is a law firm, overshadows the recipients' dispute rights, and falsely implies that some damage has already been done to the recipients' credit report.

289.   Because the recipients of the Pre-Collection Notices were already being charged an interest rate higher than the legal judgment interest rate under law, RMR's threat of "Legal Action including … higher interest rates" was false, an unlawful threat, and a misrepresentation.

290.   The Pre-Collection Letters were created using a template that RMR uses with many consumers. RMR has used this template since at least 2019.

291.   The Pre-Collection Notices attached hereto each concern alleged debts that had not been paid in a timely manner as of the date each notice was sent.

292.   The Pre-Collection Notices attached hereto each concern alleged debts that were in default as of the date each notice was sent.

293.   RMR has entered into an agreement with Hot Springs County Memorial Hospital that states: "WHEREAS, the client has unpaid delinquent accounts which it desires collected…" and, "RMR agrees to provide pre-collect letters…." RMR was operating under this agreement in 2024.

294.   The Pre-Collection Notices fraudulently seek to collect alleged debts by making false representations of material facts with the intent to induce action by the recipients.

**B.   ROCKY MOUNTAIN RECOVERY SYSTEMS PROVIDES CONSUMERS WITH LESS THAN THE FULL DEBT VALIDATION AND DISPUTE PERIOD REQUIRED BY LAW**

295.   The Collector Defendants routinely, systematically, and as a pattern and practice, violates the FDCPA by providing consumers with less than the full debt validation period required by federal law.

296.   The Collector Defendants routinely, systematically, and as a pattern and practice, uses a template debt collection notice that is substantially in the same format, stylization, time calculation, and contents as the Notice of Debt sent to Plaintiff.

297.   RMR's Notice of Debt is a "notice of debt" and a "written notice," as each of those phrases are used at 15 U.S.C. § 1692g(a).

298.   Notices of debt, like RMR's Notice of Debt to Plaintiff, must include, *inter alia*:

    (a)    "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector," 15 U.S.C. 1692g(a)(3);

    (b)    "a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector," 15 U.S.C. § 1692g(a)(4); and

    (c)    "a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor," 15 U.S.C. § 1692g(a)(5).

299.   Importantly, the thirty-day period prescribed by 15 U.S.C. § 1692g(a) does not begin until "after [the consumer's] receipt of the notice." 15 U.S.C. § 1692g(a)(3).

300.    Specifically, the thirty-day period does not commence until "at least five days (excluding legal public holidays identified in 5 U.S.C. 6103(a), Saturdays, and Sundays) after the debt collector provides [the required statements]." 15 U.S.C. § 1692g(a)(3); 12 C.F.R. § 1006.34(b)(5).

301.    This period of time is known as the "validation period," and it terminates "30 days after the consumer receives or is assumed to receive the validation information." 12 C.F.R. § 1006.34.

302.    This delay in commencement of the thirty-day period to account for mailing time is especially important in light of the State of Wyoming's particularly slow U.S. Mail delivery around the time RMR sent the Notice of Debt.[1]

303.    RMR's template notice of debt does not provide the statement required by 15 U.S.C. § 1692g(a), as it does not include the language "thirty days after receipt." Instead, RMR's template notice of debt provides a date-certain that the validation period terminates. But that date falls short of the validation period required by law. RMR does this intentionally to pressure consumers to promptly pay alleged debts.

304.    In the case of Plaintiff, RMR's Notice of Debt states that it was sent on December 12, 2024, and provides a specific date of January 14, 2025 upon which the

---

[1] Renée Jean, Wyoming Mail Goes Hundreds Of Extra Miles Before Delivery, COWBOY STATE DAILY, Dec. 26, 2024, https://cowboystatedaily.com/2024/12/26/wyoming-mail-goes-hundreds-of-extra-miles-before-delivery/ [https://perma.cc/7VUU-LLWW]; Renée Jean, Rural Wyoming Can Expect Even Slower Mail Delivery Under New USPS Proposal, COWBOY STATE DAILY, Aug. 23, 2024, https://cowboystatedaily.com/2024/08/23/rural-wyoming-can-expect-even-slower-mail-delivery-under-new-usps-proposal/ [https://perma.cc/L67A-R2MZ]; Renée Jean, Postmaster General Gives Himself An "A" For Gutting Wyoming Mail Delivery, COWBOY STATE DAILY, Dec. 12, 2024, https://cowboystatedaily.com/2024/12/12/postmaster-general-gives-himself-an-a-for-gutting-wyoming-mail-delivery/ [https://perma.cc/P4J5-5ZSQ].

validation period terminates. Specifically, RMR's Notice of Debt to Plaintiff stated, among other things:

- "Call or write to us by 01-14-25, to dispute all or part of the debt. If you do not, we will assume that our information is correct."

- "If you write to us by 01-14-25, we must stop collection on any amount you dispute until we send you information that shows you owe the debt …"

- "Write to ask for the name and address of the original creditor, if different from the current creditor. If you write by 01-14-25, we must stop collection until we send you that information …"

305.   In the case of Plaintiff, RMR's Notice of Debt bears a date of December 12, 2024. Accordingly, excluding Saturdays and Sundays within the first five days, the thirty-day period did not start until December 19, 2024, and did not end until January 18, 2025. Indeed, Plaintiff did not receive the Notice of Debt prior to December 19, 2024.

306.   RMR's template notice of debt sent to other consumers uses substantially the same time period calculation for the validation period as the Notice of Debt sent to Plaintiff, or a time period calculation for the validation period that is even less favorable for consumers than the unlawful one in the Notice of Debt sent to Plaintiff. This demonstrates FDCPA violations, damages, and injuries not only to Plaintiff, but also to all those similarly situated to Plaintiff.

307.   By way of example, RMR sent M.C., a mechanic, a notice of debt on February 21, 2024 in the substantially same format as the Notice of Debt that RMR sent to Plaintiff, stating that M.C.'s dispute and validation deadline was March 20,

2024, when in fact this was incorrect and was less time than the amount of time RMR was required by law to provide.

308.   RMR's Notice of Debt sent to Plaintiff, and RMR's notices of debt sent to other consumers, provided less than the full validation period to exercise rights than consumers must be afforded by federal law, constituting violations of the FDCPA, specifically: (a) the explicit requirements regarding what must be included in a notice of debt, § 1692(g); and (b) the overshadowing prohibition, § 1692(b).

309.   "Overshadowing generally occurs when the debt collector indicates that the time for disputing the debt has passed or when the statements by the debt collector misrepresent or cloud the amount of time remaining to dispute the debt." *Kalebaugh v. Cohen, McNeile & Pappas, P.C.*, 76 F.Supp.3d 1251, 1258 (D. Kan. 2015), citing *Friedman v. Leading Edge Recovery Solutions, LLC*, 2014 WL 1674083, 2014 U.S. Dist. LEXIS 58694, at *7 (N.D. Ill. Apr. 28, 2014). Other circuits have found that a debt collector's misstatements regarding when the validation period starts or ends in a notice of debt violate the FDCPA. *See, e.g.*, *Jacobson v. Healthcare Fin. Servs., Inc.*, 516 F.3d 85, 92–93 (2d Cir. 2008).

310.   In an FDCPA action against Trust Financial, one of the Wilkersons' other debt collection companies, it was alleged that the notices of debt provided less than the full validation period, constituting an FDCPA violation. *See Cutler v. Trust Financial, LLC, et al.*, No. 14-cv-541 (D. Idaho), ECF No. 1 at ¶¶ 39–44.

311.   The Wilkersons had a role in reviewing, drafting, and/or approving the template notice of debt that was used to prepare the Notice of Debt that RMR sent to

Plaintiff, and otherwise ensuring the implementation of the template notice of debt at RMR.

### C. THE COLLECTOR DEFENDANTS COLLECT ILLEGAL INTEREST AND FEES AND DOES NOT REVIEW APPLICABLE CONTRACTS TO VERIFY WHETHER SUCH INTEREST OR FEES ARE LAWFUL

312. The Collector Defendants routinely, systemically, and as a pattern and practice, violates the FDCPA and other laws by not reviewing contractual agreements between original creditors and consumers to verify that the Collector Defendants have express authorization to assess the interest and fees it assesses, and by not conducting accounting on interest that an original creditor has already assessed.

313. In the case of Plaintiff, RMR's Notice of Debt and subsequent collection activities are similar to activities conducted against other consumers, and are attempts to collect illegal interest, fees, interest-on-interest, and fees-on-interest.

314. In the case of Plaintiff, the Collector Defendants hid interest within the stated principal balance on its Notice of Debt; and hid a collection fee and interest in the December 26 Letter. This is similar to the Collector Defendants' conduct toward other consumers.

315. In the case of Plaintiff, Plaintiff actually paid interest to RMR at a rate of at least 44% annualized interest, and Plaintiff actually paid at least a 42% collection fee, both of which RMR has refused to refund. This is similar to the Collector Defendants' conduct toward other consumers.

316. RMR has sent Plaintiff and other consumers notices of debt seeking to collect a 35% collection fee even after RMR's 35% collection fee was found by one or

more courts to be unconscionable, unenforceable, and an illegal penalty.

317.    In an FDCPA lawsuit against Trust Financial, one of the Wilkersons'
other debt collection firms, the consumer in that case alleged: "The amount Trust
Financial attempted to collect included … charges that were incidental to that
principal obligation, including the late fees, the enhancement fee, and the 40%
administration fee … At the time Trust Financial attempted to collect these
incidental charges, it had actual knowledge that these incidental charges, including
the 40% 'administration fee,' are hidden in the principal demand." *See Castillo v.
Trust Financial, LLC*, et al., No. 20-cv-126 (D. Idaho), ECF No. 1 at ¶¶ 21–32. The
Wilkersons have personal knowledge of the claims and defenses in the *Castillo* case.

318.    The FDCPA prohibits debt collectors from using unfair or
unconscionable means to collect a debt, and one example provided by statute is "the
collection of any amount (including any interest, fee, charge, or expense incidental to
the principal obligation) unless such amount is expressly authorized by the
agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). This
prohibition is further specified in 12 C.F.R. § 1006.22(b), which provides that "[a] debt
collector must not collect any amount unless such amount is expressly authorized by
the agreement creating the debt or permitted by law … the term 'any amount'
includes any interest, fee, charge, or expense incidental to the principal obligation."

319.    The Collector Defendants are obligated to comply with Regulation F.

320.    On December 31, 2024, RMR employee Pinti admitted that it is not
RMR's practice to ask original creditors for copies of contractual agreements until

RMR is considering suing a consumer.

321.   On December 31, 2024, Pinti admitted that it is RMR's practice to not conduct an accounting of interest already charged by an original creditor to verify that RMR is not attempting to collect excess interest on an alleged debt, unless and until RMR is considering suing a consumer related to the alleged debt.

322.   At all times relevant to this Complaint, it was not RMR's practice to conduct an accounting of interest already charged by an original creditor to verify that RMR was not attempting to collect excess interest on an alleged debt, unless and until RMR was considering suing a consumer related to the alleged debt.

323.   On December 31, 2024, after RMR had sent its Notice of Debt to Plaintiff and after Plaintiff had disputed the Alleged Debt, Pinti stated that he had still never seen any contractual agreement between Plaintiff and the original creditor.

324.   On December 31, 2024, Pinti admitted that RMR has an obligation to review original creditor accountings to ensure that RMR's interest calculations are compliant with the law. Pinti defined interest as "late fees, finance charges, or interest … because those are all kind of describing something that a court would consider interest."

325.   At all times relevant to this Complaint, the Collector Defendants considered late fees, finance charges, and interest to be one and the same: interest.

326.   On December 31, 2024, Pinti stated that if an original creditor has already added late fees, finance charges, or interest to an account, "yes, we'll review their calculations, especially -- actually, we won't unless and until we -- we have to --

we decide to go to a legal action, and then we'll review it in more detail."

327.    At all times relevant to this Complaint, RMR did not review original creditor calculations for late fees, finance charges, or interest that the original creditor had already added to an account prior to RMR sending a notice of debt to a consumer.

328.    On December 31, 2024, Pinti stated that even if there is no contractual agreement between an original creditor and a consumer allowing for the collection of fees and interest on an alleged debt, RMR will *still* attempt to collect fees and interest from such consumers related to those alleged debts.

329.    At all times relevant to this Complaint, even if there was no contractual agreement between an original creditor and a consumer allowing for the collection of fees and interest on an alleged debt, RMR still attempted to collect fees and interest from such consumers related to those alleged debts.

330.    On December 31, 2024, Pinti stated:

> Um, if -- if we have an original creditor, Anthony, who has no written signed version of those stipulations [interest and collection fees], and they ask us to try to collect those things, we -- we -- we -- we will properly and legally attempt to collect those things. If the consumer is not willing to make those payments voluntarily, and we are forced to consider an actual legal action … if we were to have to consider actually filing a complaint in Circuit Court, we would probably drop those -- um -- uh -- interest and fee categories -- either drop them or reduce them to state statute indicated levels. Why would we do that? Because we would know, from experience, that a court probably will not award those to us at those maximum amounts, but there's certainly nothing improper about, uh, billing for them once it gets to our agency and collecting that money, um, to the extent that someone is able to pay it. So, when push comes to shove, uh, if there's no signed contract language, we may have to strike or reduce those categories accordingly.

331.    RMR has filed and served court complaints on consumers asserting a claim that included a 35% collection fee even after RMR's 35% collection fee was found by one or more courts to be unconscionable and unenforceable. These complaints are filed by RMR as the plaintiff, with a Wilkerson & Wilkerson attorney signing the complaint.

332.    The Collector Defendants have filed notarized affidavits in support of default judgments stating that 35% collection fees were owed by consumers even after RMR's 35% collection fee was found by one or more courts to be unconscionable and unenforceable. These affidavits state: "35% contractual collection fee."

333.    Many of these affidavits are signed by Tammy Mattson, "as agent for the Plaintiff" RMR.

334.    A LinkedIn page under Tammy Mattson's name states that she is a Legal Assistant at Wilkerson & Wilkerson.

335.    Many of these affidavits are notarized by Anthea Jones. The Wilkerson & Wilkerson website listed Jones as a paralegal. On a Wyoming notary commission renewal, she swore her employer was Wilkerson & Wilkerson, that her email address was an RMR email address, that her work phone number was the same as RMR's phone number, and that her employer's address was the same as RMR's address.

336.    There is common financial control, financial management, shared finances, and comingling of funds or fund control between the Collector Defendants.

337.    By way of example, Jennifer Hieb is a paralegal at Wilkerson & Wilkerson and has appeared on the law firm's website as a paralegal as early as

March 1, 2021, and as recently as August 1, 2025.[2] She is also a Wyoming notary. Hieb has signed checks drawn on Wyoming bank accounts titled under Rocky Mountain Recovery Systems Inc., including check number 33697 dated March 22, 2022. Hieb has signed documents filed with the Wyoming Secretary of State as Manager of RMR and as Treasurer or Fiscal Agent of RMR. A LinkedIn profile identifies Jennifer Hieb of Gillette, Wyoming, as "Client Services as RMRSI" as of August 1, 2025.

338.    As a pattern and practice, the Collector Defendants attempt to, and do, collect interest, fees, charges, or expenses incidental to the principal obligation without this being expressly authorized by agreement or law, in clear violation of the FDCPA and other law; and only when the Collector Defendants are preparing to sue a consumer will they then *sometimes* drop or reduce its demands for interest, fees, charges, or expenses incidental to the principal obligation to what the law allows, because they know courts will not award impermissible fees, charges, or expenses incidental to the principal obligation. This demonstrates FDCPA violations and other violations of law, specifically the causes of action pled herein, and injuries in fact not only to Plaintiff, but also to all those similarly situated to Plaintiff.

339.    The Collector Defendants, and each of them, have constructed a scheme, including charging excess interest and fees, in furtherance of increasing both

---

[2] Wilkerson Law Group, *Jennifer Hieb, Paralegal* (Mar. 1, 2021), https://web.archive.org/web/20210301091438/https://www.wilkersonlawgroup.com/jennifer-hieb; Wilkerson Law Group, *Jennifer Hieb, Paralegal* (Aug. 1, 2025), https://www.wilkersonlawgroup.com/jennifer-hieb [https://perma.cc/8G85-TFLC]; LinkedIn, *Jennifer Hieb, Client Services at RMRSI* (Aug. 1, 2025), https://www.linkedin.com/in/jennifer-hieb-002455160/.

Collector Defendant profit and delivering more funds to original creditors, in order to retain clients.

340.    Defendants' interest charging practices are unconscionable, usurious, abusive, and unfair, both to Plaintiff and the class members.

341.    Defendants' collection fees are unconscionable, usurious, and unfair, abusive, both to Plaintiff and the class members.

342.    RMR reports consumer balances to credit reporting agencies that include interest, fees, charges, or expenses incidental to the principal obligation.

343.    RMR reports consumer balances to credit reporting agencies that include interest, fees, charges, or expenses incidental to the principal obligation that exceed what is authorized by contract.

344.    RMR reports consumer balances to credit reporting agencies that include interest, fees, charges, or expenses incidental to the principal obligation that exceed what is permitted by law.

345.    RMR sometimes negotiates the removal of alleged debt from credit reports in exchange for consumer payments of the alleged debt, a practice also known as "pay for delete." This contributes to an overall extortionate scheme.

> **D.    THE COLLECTOR DEFENDANTS RETAIN AND REFUSE TO REFUND ILLEGALLY COLLECTED INTEREST AND FEES ON ALLEGED DEBTS AS A MATTER OF COURSE**

346.    In the case of Plaintiff, and as discussed above, RMR demanded interest, fees, charges, or expenses incidental to the principal obligation without being expressly authorized by contract or law, in clear violation of the FDCPA. RMR then actually collected these amounts, and also additional amounts of interest unlawfully

accruing after Plaintiff's original payment in full, but refused to refund any interest, fees, charges, or expenses that it collected.

347.   RMR's interest and fee charges are a percentage of what is allegedly owed as a principal balance. In the case of Plaintiff, RMR and/or the original creditor added interest to the alleged principal balance and wrongfully backdated it. Then, RMR added even more interest and fees as a percentage based on an amount that already included interest. Therefore, RMR sought to collect interest and fees that were based on a percentage of an alleged principal balance that itself was incorrect and already included illegal interest within it. The Collector Defendants also engage in these practices with other consumers. This is unlawful.

348.   In the case of Plaintiff, Plaintiff paid all amounts demanded by RMR, including illegal fees and interest, under duress and with a reservation of rights.

349.   Plaintiff demanded that RMR and/or WHF refund illegally collected double payments of principal balances, fees, and interest, but RMR and WHF refused to provide a refund. The Collector Defendants also engage in these practices with other consumers.

350.   RMR, and/or WHF, collected, retained, and refused to refund interest that accrued after the date Plaintiff had paid all amounts that RMR demanded. In other words, RMR, and/or WHF on RMR, collected, retained, and refused to refund interest charged on the full amount of the Alleged Debt even after the Alleged Debt had been paid to zero. The Collector Defendants also engage in these practices with other consumers.

351.    On December 31, 2024, Plaintiff stated to Pinti: "It looked like they added something and backdated it to April [later discovered to be interest] and I've asked for an accounting to figure out what was added, and so far, I've not received it. I've also asked for an accounting on the interest and additional fees that were added, and I've not received it . . . I actually believe that *I'm* owed . . . ." Pinti admitted that Plaintiff paid "an amount greater than [the original creditor's] assignment, and [RMR] applied it to the interest category."

352.    On December 31, 2024, Plaintiff stated to Pinti, "I still think if you collected something that wasn't owed, if you made a demand for something that wasn't owed, it should be refunded to me, so I guess my bottom line is I would like an accounting, and -- [cut off by Pinti]," and Pinti responded:

> That's not really a legal principle though. The -- the -- idea of one party paying what the other party demands and then the party who paid it saying, 'now I want an accounting, and I want to be refunded this amount and that amount,' that -- that's -- that's getting real -- it's kind of in the weeds, Anthony, it doesn't really happen that way. I mean, I understand your point, I get what you're saying, and I'm not saying it has zero substance or -- or zero mathematical reality, but that's -- it's really just -- that's not how it's done, right? So, you can look at it a different way. When -- when sometimes consumers are in a position and a mindset the way that you are about those points, they will say 'okay, do a legal action, and I'll have my day in court, and I will argue these points with the judge,' and you know -- you have those rights in these United States and this society of law that we live in, and that would be the venue that you would either win or lose those arguments, and the results would be, you know, probably more gratifying or more disappointing depending on how it went, with some of those arguments and some of those points. But that's not what happened … you made the payment … no, I don't see any kind of refund happening.

353.    On December 31, 2024, Pinti told Plaintiff that it might be possible that Plaintiff could receive a refund from a medical provider of a principal amount if there

was an insurance error or double collection from Plaintiff of principal amounts paid.

Indeed, Plaintiff contends that both an insurance error and double collection from

Plaintiff of principal amounts occurred. Because RMR's interest and fee calculation

is based on an amount Plaintiff contends was in error, Plaintiff sought a refund of

any excess interest and fees he paid, and any illegal interest and fees he paid.

354.    On December 31, 2024, Plaintiff had the following exchange with Pinti:

PLAINTIFF:   But if I owed less, then you wouldn't be able to collect the same fees and interest that you were trying to collect. Right?

PINTI:       I would say that I understand your point. However, I don't believe I have ever seen patient refunds issued in those circumstances that took into account the fact that the patient may have had to pay more interest on those things … ultimately if they have a legitimate patient refund, they're gonna kinda calculate it based on what their obligations are with that benefit carrier and specifically with the error that was made. They're probably not going to include any kind of mathematically hypothetical interest amounts like, 'well, if we hadn't made that error, or if this had happened, then the amounts would have been smaller, and then these – ultimately these interest categories would have been smaller.' That's not something that's typically done. I'm not saying it's never done, but I wouldn't expect it if I was in your position.

PLAINTIFF:   But aren't the interest and the collection fee a percentage of the amount that was due?

PINTI:       Yes, but you've already paid them.

PLAINTIFF:   Mm-hmm [affirmative].

PINTI:       We're not in a legal action where -- so, again, if we were in a legal action, and you got the court to recognize that the original creditor had made some missteps when they went through that process with your insurance carrier,

and the result was that now the interest amounts and collection fee, which is a percentage-based amount, that those percentage based amounts were now no longer valid because the amounts that were carried into those were erroneous, *that argument would hold water in that venue* [emphasis added].

355.    Pinti's suggestion that a consumer can only dispute RMR's interest and fee collection amounts after RMR brings a lawsuit against a consumer overshadows (if not extinguishes) consumers' rights to dispute debts—especially considering that whether RMR sues or not is in the discretion of the Collector Defendants, allowing them to decide to delay or never sue over disputed debts in order to never provide consumers with the opportunity to dispute fees and interest, while such interest allegedly continues to accrue daily, and while damaging credit reporting occurs simultaneously. And, in at least some consumer debt collection actions, a valid agreement allowing for some fee and cost recovery in collection actions may exist. In such actions, a decision to defer verifying the validity and legality of collection fees and interest until an attorney is involved (*i.e.*, RMR's owners' law firm, Wilkerson & Wilkerson) is a decision to verify the validity and legality of collection fees and interest only when performing this statutory duty is subsidized by the consumer.

356.    The Collector Defendants tend to formulaically seek attorney's fee recovery for the substantially same amount and for substantially identical line items in many cases, with time entries lacking disclosure of the name of the attorney or paralegal who allegedly performed the work, or the date the work was allegedly performed. In *Rocky Mountain Recovery Services, Inc. v. B.B. and S.B.*, Albany

County Circuit Court No. CV-2024-0148, Wilkerson & Wilkerson sought attorney's fees that were "based on studies of the firm's average time expenditures."

357.   On December 31, 2024, Plaintiff asked Pinti, "I'm asking for an accounting. I'd like to see all the plusses and minuses that reached, you know, the end amount, and I'd like a refund for the fees and interest and any double payments, along with that accounting. Is that something that you're still saying you're not going to do?" Pinti responded, "No, that's not going to happen. That's not going to happen. This is closed on our end."

358.   On information and belief, RMR and/or Pinti recorded the December 31, 2024 call between Pinti and Plaintiff.

359.   Defendants' practices with respect to Plaintiff, and Pinti's admissions to Plaintiff, demonstrate that Plaintiff put Defendants on notice that its fees, interest, and other amounts demanded and collected from Plaintiff were unlawful, and Defendants still refused to provide a refund. Defendants' conduct was willful and knowing, and justifies an award of punitive damages.

360.   RMR's practices with respect to Plaintiff, and Pinti's admissions to Plaintiff, demonstrate that the Collector Defendants have a pattern or practice of refusing to issue refunds to consumers for amounts of fees and interest unlawfully demanded or collected by RMR. Specifically, and without limitation, Pinti's statements that "it doesn't really happen that way," his observations of consumers "in a position and mindset" such as Plaintiff, his statement that he "doe[sn't] believe [he] has ever seen patient refunds in [these] circumstances," and his statement that

refunds are "not something that's typically done," demonstrate rampant FDCPA violations, injuries in fact, and damages, applicable not only to Plaintiff, but to all similarly situated consumers, further justifying punitive damages.

361.    Plaintiff, through this lawsuit on behalf of himself and all those similarly situated, seeks an accounting and refund of all interest, fees, charges, or expenses incidental to the principal obligation collected from Plaintiff and class members without being expressly authorized by contract or law (including refunds of funds paid in response to the Collector Defendants' collection activity or because of a court judgment), an injunction providing for the same, declaratory relief that the Collector Defendants' conduct discussed in this Complaint is unlawful, declaratory relief regarding what the Collector Defendants' obligations are and what consumers' rights are in connection with the Collector Defendants, and disgorgement of the Collector Defendants' (and where applicable, WHF's) profits from FDCPA violations or other violations of the law.

### E.    RMR'S NOTICES OF DEBT ASK CONSUMERS TO CALL RMR, BUT THE RMR VOICEMAIL SYSTEM DOES NOT DISCLOSE THAT RMR IS A DEBT COLLECTOR

362.    As discussed above, RMR's notices of debt invite consumers to call RMR.

363.    Because RMR's voicemail system is what any consumer who receives an RMR letter would hear upon calling RMR while RMR is closed or unable to answer the phone, any consumer who has encountered RMR's voicemail message, which does not disclose that RMR is a debt collector, has experienced a violation by RMR of the FDCPA.

### F. RMR USES CREDIT REPORTING THREATS TO PRESSURE CONSUMERS TO PAY DISPUTED DEBTS

364. As described above, Defendants pressured Plaintiff into paying an alleged debt by threatening to report it to his credit report after he disputed the debt, but prior to RMR providing validation of the Alleged Debt. This constitutes prohibited continued collection and overshadowed Plaintiff's right to dispute the debt.

365. The Collector Defendants' systems, processes, and training—to the extent they exist—should have prevented its debt collector from making credit reporting threats to Plaintiff. That it was possible for RMR's debt collector to make credit reporting threats during a dispute, or to make any collection efforts at all, demonstrates systemic issues and FDCPA violations by RMR that have harmed not only Plaintiff, but the entire class.

### G. THE COLLECTOR DEFENDANTS PRESSURE CONSUMERS TO PAY MEDICAL DEBTS THAT IT KNOWS CANNOT BE REPORTED TO CREDIT REPORTS

366. As described above, RMR pressured Plaintiff into paying an alleged medical debt despite the fact that the alleged debt was under $500 and less than a year old, both of which are categories that make medical debt not eligible for credit reporting. This constituted a violation of the FDCPA, specifically its prohibition regarding threatening to take an action that cannot legally be taken or is not intended to be taken. *See* 15 U.S.C. § 1692e(5).

367. The Collector Defendants knew prior to sending Plaintiff the Notice of Debt that the Alleged Debt was a medical debt, less than $500, and less than a year old. The Collector Defendants are obligated to comply with Experian, Equifax, and/or

TransUnion credit reporting rules. Experian, Equifax, and TransUnion each prohibit the credit reporting of medical debt less than one year old or less than $500.

368.   In the case of the Pre-Collection Notice sent to K. and K., Exhibit K at page 2, those consumers had a zero balance with Platte River Family Dentistry as of June 8, 2022, and then allegedly accrued a $211.80 balance after a dental insurance payment dated June 20, 2022. Interest was added until the balance reached $233.25. On February 10, 2023, RMR sent K. and K. its pre-collection notice stating, "You have 30 days from the date of this letter to pay … If you do not pay … we will immediately mail the federal notice that triggers the time period for (1) **Credit Reporting** … and additional damage to your credit report …" (emphasis in original).

369.   Because K. and K.'s alleged medical debt was less than one year old, it was not eligible for credit reporting at the time RMR sent its February 10, 2023 pre-collection notice.

370.   The Collector Defendants' systems, processes, and training—to the extent they exist—should have prevented the Collector Defendants from making such credit reporting threats to Plaintiff and other consumers. That it was possible for RMR to make these credit reporting threats demonstrates systemic issues and violations by the Collector Defendants that harmed Plaintiff and the class members.

## H.   THE COLLECTOR DEFENDANTS COLLECT DEBTS FROM CONSUMERS AFTER RECEIVING A DISPUTE BUT PRIOR TO PROVIDING VALIDATION

371.   As discussed above, the Collector Defendants attempted to, and actually did, collect an alleged debt from Plaintiff after he disputed it, but before RMR

validated the Alleged Debt, constituting one or more violations of the FDCPA.

372.    That the Collector Defendants' systems and processes are designed to allow debt collection efforts to continue, to allow debt collectors to threaten credit reporting, and to allow communication to consumers to continue after a consumer has disputed a debt and before RMR has provided validation, which violates the FDCPA, demonstrates systemic harm applicable to Plaintiff and the entire class.

## I. THE COLLECTOR DEFENDANTS' LITIGATION CONDUCT RAISES CONCERNS ABOUT ITS DEBT COLLECTION PRACTICES

373.    The Collector Defendants have filed over 2,000 court actions against Wyoming consumers in 2023 and 2024 in Wyoming courts. Many of these lawsuits end in default judgments. From there, the Collector Defendants garnish wages and/or obtain orders to seize property. The Collector Defendants have continued to file and serve complaints and obtain and enforce judgments while terminated by the CAB.

374.    The Collector Defendants often serve complaints on consumers stating that a 35% collection fee is owed. Some of these cases settle.

375.    One of the Collector Defendants' practices in Wyoming circuit courts is that RMR files notarized affidavits in support of motions for default judgment where the affiant is not identified by name. This is not an isolated incident but rather is pervasive throughout the Collector Defendants' court filings. For example, the Collector Defendants have routinely filed "Affidavit[s] of Account and Costs," that refers to the affiant as "the undersigned being first duly sworn," with the affiant stating that they are a manager at RMR, but the signature line simply states

"Manager" with an illegible signature, while proclaiming a consumer's indebtedness. One of the notaries who notarizes these documents is Anthea Jones, discussed *supra*.

376.   The Collector Defendants routinely prepare affidavits for original creditors to sign. Many of these affidavits have been notarized by Pinti.

377.   The Collector Defendants routinely file motions for attorney's fees that contain substantially the same or similar line items and claimed time spent. In a review of over 100 of these fee motions, none have stated a date that an attorney or paralegal performed the claimed work, nor the name of the attorney or paralegal who allegedly performed the work.

378.   As described above, the Collector Defendants routinely files consumers' private and protected health information in public court files, including full Social Security Numbers and specific medical procedures performed.

379.   These practices violate the rights of Plaintiff and the class.

### J.   ROCKY MOUNTAIN RECOVERY SYSTEMS COLLECTED DEBTS WHILE DISSOLVED BY THE STATE OF WYOMING

380.   RMR was delinquent on its tax obligations as of October 2, 2024.

381.   RMR was dissolved by the State of Wyoming on December 9, 2024.

382.   Pursuant to Wyo. Stat. § 17-16-1405, a dissolved corporation may not carry on any business.

383.   The Alleged Debt was not RMR's asset.

384.   Sending notices of debt are not "proceedings" within the meaning of Wyo. Stat. § 17-16-1405.

385.   RMR was not authorized to conduct business in Wyoming at the time

RMR sent the Notice of Debt to Plaintiff. RMR sent other notices of debt to other consumers during this time.

386.    RMR's sending of debt collection notices, acceptance of collection files from clients for profit, assessment of collection fees, assessing of interest, and commencing any period of statutory rights are each a business activity.

387.    Conducting debt-collection activities in violation of state law violates the FDCPA.

388.    RMR's collection fee to Plaintiff, and some collection fees charged to other consumers, were assessed on a date or dates when RMR was dissolved.

389.    RMR added and collected daily interest in connection with Plaintiff's Alleged Debt on dates when RMR was dissolved and prohibited from conducting business in Wyoming. RMR did the same to other consumers.

390.    Debt collectors who are not authorized to conduct business in Wyoming may not be issued a debt collector license.

391.    RMR was acting in violation of its debt collector license at the time it sent its Notice of Debt to Plaintiff. The same is true of other consumers.

392.    RMR was not authorized to commence debt collection, contact Plaintiff, charge fees, charge interest, make demands for payment of alleged debts, or commence any statutory period of time during which Plaintiff could exercise his rights while RMR was dissolved. The same is true of other consumers.

393.    WHF and RMR have executed a collection agreement.

394.    On information and belief, the agreement between RMR and WHF

includes RMR's representation that it will comply with the FDCPA. It is a contingency agreement.

395.    The agreement between RMR and WHF does not impose any costs or fees on the Medical Provider upon assignment of the alleged debt to RMR.

396.    On information and belief, the agreement between RMR and WHF does not transfer ownership of any alleged debt to RMR.

### K.    THE COLLECTOR DEFENDANTS VIOLATED THE WYOMING DEBT COLLECTION STATUTE AND COLLECTION AGENCY BOARD REGULATIONS

397.    All Wyoming licensed collection agencies must comply with the Collection Agency Act, Wyo. Stat. §§ 33-1, et seq., and the Collection Agency Rules, 031-1 Wyo. Code R (the "Rules"). *See* 031-1 Wyo. Code R. § 1-4.

398.    "Every [collection agency] licensee shall deal openly, fairly and honestly in the conduct of the collection agency business." 031-4 Wyo. Code R. § 4-1.

399.    "No [collection agency] licensee shall collect, or attempt to collect … by methods of intimidation." 031-4 Wyo. Code R. § 4-5.

400.    The Rules have adopted the FDCPA as of October 13, 2006. *See* 031-4 Wyo. Code R. § 4-6. Accordingly, violations of the FDCPA as of and after October 13, 2006 are violations of the Rules.

401.    "At the consumer's written or verbal request, licensees shall furnish to the consumer a complete written accounting of matters pertaining to him." 031-3 Wyo. Code R. § 3-2.

402.    "No licensee shall collect or sue, either as an assignee or as agent for any creditor, for more than the actual amount due or claimed to be due on any claim or

claims, plus legal interest and court costs; provided, when suit is brought upon a note or notes providing for an attorney fee, such attorney fee may be added if the licensee is represented by a duly licensed attorney, in which case the attorney fee shall be paid to such attorney and no part thereof shall be retained by the licensee." 031-3 Wyo. Code R. § 3-3.

403.   As discussed above, RMR's CAB license was terminated. Yet RMR has continued debt collection after its license was terminated, causing injuries to other consumers.

404.   RMR and/or Daniel B. Wilkerson have falsely represented to the Collection Agency Board that there is no pending litigation against RMR, including without limitation this action.

405.   Because the Collector Defendants failed to deal openly, fairly, and honestly, attempted to collect through methods of intimidation, failed to produce a written accounting, collected or sued for more than the actual amount due, and violated the FDCPA as incorporated through the Rules, among other things, RMR violated the Collection Agency Rules and the Collection Agency Statute with respect to Plaintiff and the class members.

## L.    WILKERSON & WILKERSON SENDS DEBT COLLECTION LETTERS AS PART OF RMR'S COLLECTION PROCESS

406.   Wilkerson & Wilkerson is integrated in RMR's debt collection letter workflows and sends letters to consumers seeking to collect debts for RMR and RMR's clients. By way of example, attached hereto as **EXHIBIT L** is a copy of a Wilkerson & Wilkerson letter to a consumer.

407.   The Wilkerson & Wilkerson debt collection letter, Exhibit L, threatens litigation, but also states an attorney hasn't reviewed the claims. This is misleading and deceptive in violation of the FDCPA and other consumer rights.

408.   The Wilkerson & Wilkerson debt collection letter, Exhibit L, contains a phone number that connects callers to debt collectors at RMR.

409.   The Wilkersons, and each of them, use the Wilkerson & Wilkerson law firm, and its resources and the law licenses of its attorneys, to conduct violations that are a part of, independently violative of, and in furtherance of the causes of action as pled herein.

## CLASS ALLEGATIONS

410.   Plaintiff brings this class action on behalf of himself, and all other persons similarly situated and their successors in interest, pursuant to Fed. R. Civ. P. 23.

411.   Congress intended to confer substantive rights on consumers by ensuring they are free from abusive debt collection practices like the practices employed by RMR, Wilkerson & Wilkerson, and Daniel B. Wilkerson, performed in conjunction with WHF and other creditors. The Collector Defendants' actions as pleaded herein have created and are poised to create future actual harm and/or an appreciable risk of harm to the interests Congress intended to protect by enacting the FDCPA.

412.   Any one consumer may lack knowledge of their rights or the resources to enforce their rights. A class action is the best way to protect the rights and remedies

of consumers harmed by the conduct plausibly alleged herein, especially considering that Plaintiff will be able to prove Defendants' violations of the law were caused by patterns, practices, policies, and techniques that violate the rights of the entire class.

413.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

414.   One of Plaintiff's and the class's key claims is that the Collector Defendants maintain policies, patterns, and practices of demanding fees and interest from consumers while knowing that no contract expressly authorizes such fees and interest, no law permits Defendants' request for or collection of such fees and interest, and/or that courts have found the fees demanded to be unconscionable, uncollectable, and illegal. At least some of this interest accrues daily, and at least some of the interest and fees are interest-on-interest and fees-on-interest. This conduct pressures consumers to not exercise their rights to dispute debts, and makes it harder for consumers who validly owe debts to pay those debts off, keeping them under the thumb of Defendants' predatory collection tactics, prolonging the time debts may appear on credit reports, and risking perpetually extending one or more statute of limitations periods as consumers may be unable to catch up even when making payments in good faith.

415.   The pains and consequences of the Collector Defendants' conduct on consumers are serious. As one consumer wrote in a Better Business Bureau review:



416.   The Collector Defendants' debt collection notices and practices violate the law, and each member of the putative class and one or more subclasses has a claim for damages including actual, compensatory, exemplary, punitive, nominal, and statutory damages, plus attorney's fees and costs.

417.   With respect to Wyoming Health Fairs, the organization's fraudulent billing practices and unconscionable, usurious, and illegal interest rates and fees alone, and in coordination or conspiracy with RMR, violate the law and consumer and patient rights, and each member of the putative class and one or more subclasses has a claim for damages including actual, compensatory, exemplary, punitive, nominal, and statutory damages, plus attorney's fees and costs.

418.   Plaintiff brings claims, specifically the causes of action pled herein, on behalf of a class, with the class ("**Collector Defendant Class**") being defined as:

> All consumers with regard to whom RMR, Wilkerson & Wilkerson, or Daniel B. Wilkerson, or any of them, engaged in debt collection communications or activities, within ten years prior to the filing of this Class Action (to the present and continuing thereafter), in which they violated the rights of consumers.

419.    Plaintiff brings claims, specifically the causes of action pled herein, on

behalf of a class, with the class ("**Wyoming Health Fairs Class**") being defined as:

> All persons with regard to whom Wyoming Health Fairs
> invoiced, charged, or collected interest, finance charges, or
> fees in excess of a lawful amount, within ten years prior to
> the filing of this Class Action (to the present and
> continuing thereafter).

420.    Plaintiff seeks to represent a subclass (the "**Debt Collection Letter**

**Subclass**") consisting of:

> All consumers to whom RMR sent a letter, within four years
> prior to the filing of this Class Action (to the present and
> continuing thereafter), which did not include the required
> dispute language, misstated the validation period end date,
> demanded unlawful fees or interest, overshadowed
> consumer dispute rights, or otherwise violated the FDCPA.

421.    Plaintiff seeks to represent a subclass (the "**$500 Medical Debt**

**Subclass**") consisting of:

> All consumers who experienced the Collector Defendants'
> threats to report, or actual credit reporting of, a medical
> debt of less than $500 since April 11, 2023.

422.    Plaintiff seeks to represent a subclass (the "**One-Year Medical Debt**

**Subclass**") consisting of:

> All consumers who, since July 1, 2022, experienced the
> Collector Defendants' threats to report, or actual credit
> reporting of, a medical debt of less than one year old.

423.    Plaintiff seeks to represent a subclass (the "**Fee Subclass**") consisting

of:

> All consumers from whom the Collector Defendants
> attempted to collect or did collect interest, fees, charges, or
> expenses incidental to the principal obligation without

76

express authorization by contract or law within ten years (if a contract exists) or four years (where no contract exists) prior to the filing of this Class Action (to the present and continuing thereafter).

424. Plaintiff seeks to represent a subclass (the "**Voicemail Subclass**") consisting of:

All consumers who RMR alleged owed a debt, who called RMR, and who reached a voicemail greeting that lacked disclosure that RMR was/is a debt collector or that improperly implied that RMR was/is a law firm, within four years prior to the filing of this Class Action (to the present and continuing thereafter).

425. Plaintiff seeks to represent a subclass (the "**Phone Dispute Subclass**") consisting of:

All consumers who initiated a dispute via telephone, but whose dispute RMR did not honor, within four years prior to the filing of this Class Action (to the present and continuing thereafter).

426. RMR routinely collects debts inside and outside the State of Wyoming.

427. By way of example, RMR has sought to collect debts from Montana residents within the past year, including by way of sending collection letters or notices of debt to Montana addresses, and by filing lawsuits against consumers in Montana state courts.

428. Excluded from the Class and all subclasses are RMR; Wilkerson & Wilkerson; Wyoming Health Fairs; RMR, Wilkerson & Wilkerson or WHF's agents, affiliates, parents, subsidiaries; any entity in which Defendant RMR has a controlling interest; any RMR or WHF officer or director; any successor of RMR or WHF; Daniel B. Wilkerson and his immediate family; Michael B. Wilkerson and his immediate

family; Charlotte B. Wilkerson and her immediate family, any entity which the Wilkersons or their immediate family beneficially owns or meaningfully controls; and any judge who adjudicates this case, their staff, and their immediate family.

429. Plaintiff reserves the right to amend the class and subclass definitions.

430. Plaintiff, through this lawsuit on behalf of himself and all those similarly situated, seeks restoration of dispute rights, damages for violations occurring during dispute periods or because dispute periods were unlawfully cut short, refunds for unlawfully collected monies, an injunction providing for the same, declaratory relief that the Defendants' conduct discussed in this Complaint is unlawful, declaratory relief regarding what the Defendants' obligations are and what consumers' rights are in connection with the Defendants, and disgorgement of the Defendants' profits from FDCPA violations or other violations of the law.

431. Plaintiff, on behalf of himself and the class(es), requests injunctive relief in the form of a Court order requiring Defendants to (1) cease charging and collecting unlawful interest rates and fees, (2) conduct a complete audit of all accounts to identify unlawfully charged interest/fees, (3) issue refunds for all unlawfully collected interest and fees and other damages where applicable, and (4) provide detailed accounting to affected consumers showing all interest/fees charged.

432. Plaintiff, on behalf of himself and the class(es), also requests injunctive relief in the form of a Court order requiring the Collector Defendants to undergo systemic reforms, including: (1) implementation of new policies and procedures for interest/fee calculation and collection, (2) regular compliance audits and reporting,

(3) enhanced employee training on FDCPA requirements, and (4) independent oversight/monitoring of collection practices. Plaintiff also seeks a Court order requiring WHF to do the same, where applicable.

433.    In addition, Plaintiff, on behalf of himself and the class(es), requests injunctive relief in the form of a Court order as to consumer protection measures, requiring from Defendants: (1) clear disclosures to consumers about interest rates and fees, (2) a simplified process for consumers to dispute charges/debts, (3) regular statements showing interest/fee calculations, and (4) establishment of a dedicated consumer complaint response system.

434.    Plaintiff, on behalf of himself and the class(es), also requests injunctive relief in the form of a Court order requiring Defendants to correct any inaccurate credit reporting of balances that include unlawfully included fees or interest, as to any debts that any Defendant has reported to or is reporting to consumer credit reports.

435.    Additionally, Plaintiff, on behalf of himself and the class(es), requests injunctive and equitable relief in the form of a Court order requiring Defendants to serve a copy of any order providing for injunctive relief as to Defendants' practices to all persons who Defendants attempted to collect fees or interest from in the ten years prior to the filing of this Class Action, and requiring Defendants to file and serve any such order in each of its debt collection lawsuits for a period of five years into the future.

436.    Plaintiff, on behalf of himself and the class(es), requests injunctive relief

in the form of a Court order requiring Defendants to improve their documentation and reporting to such an extent that it complies with the law, including: (1) regular compliance reports to the Court for a period of five years, (2) maintenance of detailed records of all interest/fees charged, (3) documentation of employee training and policy changes, and (4) periodic independent audits with results reported to Plaintiff's counsel, an independent reputable third-party, and/or the Court.

437.    <u>Ascertainability</u>. All members of the proposed class are readily ascertainable from information in Defendants' custody and control. Defendants have already identified these individuals, including by sending them notices of debt or invoices and assigning them account numbers. Defendants have such individuals identified by name and address, and often additionally by date of birth, phone number, employer name, and/or Social Security Number.

438.    As to subclasses: the Defendants have information including billing statements, invoices, and/or documents indicating which letters Defendants sent to which consumers; RMR keeps logs of its communications with consumers including regarding disputes; and RMR has phone logs indicating who has called and who has left voicemails.

439.    <u>Numerosity</u>. The class members are so numerous that joinder of all class members is impractical. The size of the class is not known at this time, but some facts show numerosity:

440.    The Collector Defendants file approximately 100 lawsuits per month. Some of RMR's lawsuits are against co-defendants, meaning there is more than one

class member per lawsuit RMR has filed. Many of RMR's lawsuits seek 35% collection fees.

441.   RMR filed over 2,000 debt collection lawsuits in Wyoming state courts in the calendar years 2023 and 2024.

442.   RMR typically begins its debt collection activities by communicating with consumers, including in the ways identified in this Complaint that violate the FDCPA and/or other laws, prior to initiating litigation. Three of RMR's template debt collection notices are exhibits to this Amended Complaint, and all three violate the law. Anyone who received a similar letter has had their rights violated by RMR in a way redressable by the proposed class described herein.

443.   On December 31, 2024, RMR's employee, Pinti, stated to Plaintiff, "We actually don't take legal actions on a high percentage of accounts. We -- our particular organization does a little bit more than some of our competitors in the industry, but it's still a relatively small percentage."

444.   If an average of 100 lawsuits per month is a "relatively small percentage" of RMR's debt collection accounts, the class and subclasses are significantly larger than the number of defendants in the approximately 380 lawsuits filed in the last four months of 2024, as discussed above.

445.   RMR sent at least 26,147 debt collection notices between approximately January 17, 2024 and approximately December 12, 2024. RMR account numbers are sequentially assigned. An RMR letter to J. and K. was assigned account number 300776 on January 17, 2024 and Plaintiff was assigned account number 326923 in

December 2024. Some of these debt collection notices, as in the case of J. and K. referenced above, include multiple recipients.

446.    Conservatively then, the class as to the Collector Defendants likely exceeds 26,000 members.

447.    With respect to class claims against WHF, Redman's statements discussed *supra* show a pattern and practice supporting numerosity.

448.    According to WHF's 2015 tax return, the organization took in income of $3,828,604 from medical services similar to the services Plaintiff received and wrote off $90,316 in alleged bad debts. That is approximately 2.4% of its medical service income. Applied to WHF's 2023 tax return, a quantity of 2.4% of the 44,358 patients served by WHF in a single year would be over 1,000 patients. WHF's excess interest scheme has been continuing for years, so the class as to WHF is likely thousands of patients.

449.    The annual Wyoming Health Fairs Health and Wellness Expo at the Ford Wyoming Center, a large arena in Casper, Wyoming, is well-attended and receives significant media coverage. At that event, WHF conducts medical services leading to the imposition of illegal interest and fees described herein.

450.    <u>Typicality</u>. Plaintiff's claims are typical of the class members' claims, as each arises from the same violative debt collection notices similar to the Notice of Debt, December 26 Letter, or Pre-Collection Notice; same voicemail greeting; same policies and practices of collecting unlawful fees, interest, and/or costs; same type of dispute handling; and other violations of the law identified in this Complaint. With

respect to WHF, Plaintiff's claims are typical of the class members' claims, as each arises from the same interest and fee charging practices, medical services, and, where applicable, sign-in sheet.

451. <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed class's common interests. Plaintiff's interests do not conflict with the class members' interests. Plaintiff has retained counsel experienced with complex litigation, consumer and civil rights issues, and class actions to prosecute this action on behalf of the class.

452. <u>Commonality and Predominance</u>. Plaintiff's and the class's claims raise common fact and legal questions, which predominate over any questions affecting individual class members. A class-wide proceeding will answer such questions for all class members, without requiring more than 26,000 individual lawsuits over what may be argued to be relatively small amounts of money each.

453. <u>Superiority</u>. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial harm suffered by individual class members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for class members, on an individual basis, to obtain effective redress for their harm, injuries, and damages caused by Defendants. Not only would individual litigation increase the delay and expense to all parties and the courts, but individual litigation would create the danger of inconsistent or contradictory judgments arising from the

same set of facts. By contrast, a class action provides the benefits of adjudication of these serious allegations of substantial and systematic FDCPA and other violations in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

454.   Plaintiff has an interest in securing class certification and relief for the class. Plaintiff has expended time and costs in this case while researching and investigating Defendants' conduct, to which Defendants subjected the class; while retaining experienced counsel to prosecute this action on behalf of the class; and while researching and investigating the facts supporting the legal claims of Plaintiff and class members.

455.   Plaintiff has an economic interest securing class certification and relief for the class through shifting some or all of the costs of investigation and litigation to the entire class, who will share in the benefits of such investigation and litigation if and when the class is certified and this class action ultimately prevails.

456.   Plaintiff has retained counsel properly qualified under Rule 23(g) to serve as counsel for the class and subclasses.

457.   Attorney Scott M. Flaherty has eighteen years of experience litigating in the areas of civil rights, regulatory, complex commercial, and intellectual property matters in state and federal courts, and has participated as an attorney for plaintiffs and defendants in several class action, collective action, and/or multi-plaintiff lawsuits. Mr. Flaherty has experience with the FDCPA, including defending claims involving several of the same FDCPA provisions involved in this case.

458.   Attorney Tim Phillips has sixteen years of experience litigating in the areas of civil rights, employment, data access and privacy, and criminal matters in state and federal courts, and has participated as an attorney for plaintiffs in several class action, collective action, and/or multi-plaintiff lawsuits. Mr. Phillips has experience with the FDCPA, including consumer representation.

459.   Attorney Kellie Nelson Fetter has been licensed to practice in Wyoming state and federal courts since 2009.  She has more than fifteen years' experience litigating in the areas of commercial litigation, healthcare billing litigation, and intellectual property matters. She has served as Wyoming local counsel on multiple matters.

460.   Plaintiff's counsel has conducted extensive research into the FDCPA and investigated members of the class by reviewing Plaintiff's claims, prior lawsuits filed against RMR, the communications between Plaintiff and RMR, public records regarding RMR and its officers, and RMR's litigation against consumers.

461.   Plaintiff's counsel has no interests that might cause them not to vigorously pursue this action.

## CLAIMS FOR RELIEF

### COUNT I
### FAIR DEBT COLLECTION PRACTICES ACT VIOLATIONS
### (Against All Defendants)

462.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

463.   Defendants, including through their employees, contractors, agents, and individual and collective actions, have violated the FDCPA in all the ways described

herein, and conspired to violate the FDCPA and the rights granted to consumers, with respect to both Plaintiff and the class(es).

464.   Defendants are liable to Plaintiff and the class(es), including for statutory damages, actual damages, attorneys' fees, and costs.

## COUNT II
## FRAUD
### (Against All Defendants)

465.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

466.   The Collector Defendants knowingly and intentionally made false representations, misrepresentations, and omissions of material facts to Plaintiff, and members of the class(es), including as to the amount or nature of alleged debts, the amount or nature of alleged interest, the amount or nature of alleged fees, the deadline to respond to demands for payment of alleged debts, what actions they were entitled to or intended to take, and when and if they would report harmful information to credit reports.

467.   Wyoming Health Fairs knowingly and intentionally made false representations, misrepresentations, and omissions of material facts to Plaintiff and members of the class(es), including as to the cost of services, nature of services, insurance coverage, finance charges, interest, collection fees, legality or permissibility of a 35% collection fee, and the debt collection activities of the Collector Defendants.

468.   Defendants made these knowingly false representations and material omissions to Plaintiff, and the class members, with an intent to induce action by

Plaintiff, and the members of the class(es), including without limitation giving up rights, expending money or time, executing documents or entering into so-called agreements, and/or making payments. WHF took affirmative actions to conceal its fraud and acts in furtherance of fraud.

469.   Plaintiff, and the members of the class(es), reasonably relied on these representations, and Plaintiff, and the members of the class(es), actually relied on these false representations and suffered damages, including without limitation by taking or not taking actions, not questioning representations, signing documents, not exercising rights, not making payments, exercising rights in a manner that was costly or harmful to them, or making payments of amounts that included unlawful interest and/or fees.

### COUNT III
### NEGLIGENCE
### (Against All Defendants)

470.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

471.   The Collector Defendants owed consumers, including Plaintiff and the members of the class(es), a duty of care and honesty as debt collectors and as a collection agency, including without limitation in its supervision of its debt collection activities and its debt collectors. Wyoming Health Fairs owed consumers, including Plaintiff and the members of the class(es), a duty of care and honesty as a medical office and service, including without limitation in its supervision of its sign-in processes, purported agreement language, fees, interest, finance charges, and billing activities. Defendants breached these duties through the conduct alleged herein,

causing injuries in fact and damages, and those breaches were and are the proximate cause of the injuries and damages caused to Plaintiff and the class members.

472.   The Collector Defendants have unique expertise as debt collectors, a collection agency, a debt collection law firm, and licensed attorneys. The Collector Defendants have credit reporting capabilities and contractual relationships with credit reporting agencies. They know and should know that unlawful collection practices such as reporting or threatening to report alleged debts to consumer credit reports have incredibly high personal, financial, and reputational consequences. They acted at least recklessly in at least some of the conduct described in this Complaint. They exercised a power to sue over debts.

473.   WHF has unique expertise as a medical facility under contract with or in a relationship with a debt collector and debt collection law firm, and because its employees have extensive accounting experience. Plaintiff, and the members of the class(es), suffered damages as stated above due to the Defendants' negligence.

474.   To the extent that any Defendant or its affiliates, agents, or representatives engaged in false notarizations or false affidavits, notaries and affiants in debt collection actions seeking judgment are held to a high standard of care, the notary or affiant was acting under the authority of Defendants or its affiliates, and the notary or affiant breached their duty to the applicable class members, causing damages, including without limitation judgments including unauthorized fees or interest, or judgments including attorney's fees for time that was not actually spent on the applicable case.

## COUNT IV
## NEGLIGENCE PER SE
### (Against All Defendants)

475.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

476.   The Collector Defendants violated the FDCPA, Collection Agency Act, Collection Agency Rules, and acted contrary to prior court orders finding collection fees unconscionable, unenforceable, and illegal. WHF violated state law and consumer rights by charging excess interest and fees, and preparing false invoices and documents. Defendants violated these provisions of law by acting in all of the ways pleaded herein.

477.   A violation of a statute or regulation constitutes negligence per se when the statute or regulation is designed to protect a specific class of persons from a particular type of harm, and Plaintiff and members of the class(es) are members of that protected class and have suffered the type of harm that the statute or regulation(s) at issue were intended to prevent. The Wyoming Collection Agency Act and the Collection Agency Rules are designed to protect consumers from unfair or deceptive debt collection practices. State law as to maximum interest rates and unconscionability is designed to protect consumers from usury and abuse. Plaintiff and members of the class(es) are consumers and members of the protected classes.

478.   The harm suffered by Plaintiff and members of the class, including damages due to excessive fees and interest, stress, anxiety, and loss of time spent addressing Defendants' unlawful billing and debt collection practices, is the type of harm the regulations were designed to prevent.

479.   Defendants' violations constitute negligence per se. These violations proximately caused harm to Plaintiff and members of the class(es).

480.   As a direct and proximate result of Defendants' negligence per se, Plaintiff and members of the class(es) seek actual damages, statutory damages as permitted by law, and punitive damages to punish Defendants and deter such conduct in the future, an order enjoining Defendants from continuing their unlawful debt collection practices described in this Complaint, including but not limited to demanding or collecting unauthorized fees and interest and failing to provide accountings upon request. Plaintiff and the class(es) also seek attorneys' fees and costs associated with this action.

## COUNT V
## UNJUST ENRICHMENT
### (Against All Defendants)

481.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

482.   Plaintiff, and members of the class(es) paid money or had money or property unlawfully taken by demand, coercion, extortion, settlement, judgment, garnishment, or writ of execution by Defendants, which were accepted, used, and enjoyed by Defendants, under such circumstances which reasonably notified Defendants that such monies were not owed and were expected to remain with and be returned to Plaintiff or the members of the class(es), requiring restitution and causing damages.

## COUNT VI
## CIVIL CONSPIRACY
## (Against All Defendants)

483.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

484.   Defendants engaged in civil conspiracy including through the Collector Defendants, and each of them; and the Collector Defendants and Wyoming Health Fairs collectively or together. Defendants acted with a specific goal or objective of extracting unlawful interest, finance charges, fees, and conducting unlawful debt collection practices with a mutual understanding or agreement among themselves, making overt unlawful acts as pleaded herein, causing damages to Plaintiff and the class(es) as proximate result thereof.

## COUNT VII
## BREACH OF CONTRACT
## (Against All Defendants)

485.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

486.   If the Sign-In Sheet and similar documents allegedly signed by consumers are found to be contracts and are not invalidated by fraud or fraudulent inducement, Plaintiff and member(s) of the class(es) fulfilled their obligations or were excused from doing so, and Defendants have breached the terms therein by assessing interest or finance charges in excess of 1.75% per month and charging a collection fee exceeding 35% or lawful amount.

487.   Plaintiff, and member(s) of the class(es), suffered damages as a direct

and proximate result of the foregoing paragraph, including payment of interest, finance charges, collection fees, court costs, attorney's fees, credit reporting, reputational harm, emotional distress, and are entitled to restitution and injunctive relief. Defendants acted with bad faith, malice, and fraudulent intent. If a breach of contract occurred, Defendants are liable for punitive damages to Plaintiff and the class(es). Plaintiff, and the class(es), seek relief, including injunctive relief, to prevent continued breach and remedy prior breaches.

## COUNT VIII
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against All Defendants)

488.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

489.   If a contract has formed between Plaintiff or member(s) of the class(es) and Defendant(s) or the Collector Defendants' creditors, Defendant(s) or the Collector Defendant(s)' creditors actions as pleaded herein hindered, prevented, or interfered with performance or justified expectations, and acted with bad faith, improper motive, or egregious conduct inconsistent with the agreed common purpose or justified expectations of the parties, causing damages to Plaintiff and the class(es).

## COUNT IX
## FRAUDULENT INDUCEMENT
### (Against All Defendants)

490.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

491.   If a contract has formed between Plaintiff or the member(s) of the class(es) and any Defendant, Defendants, and each of them, made false

representations and concealed material facts, knew such representations were false, acted with reckless disregard for the truth, Plaintiff and the member(s) of the class(es) reasonably believed representations to be true, and detrimentally relied on such representations including in taking actions, not taking actions, and signing purported agreements, which caused damages. Plaintiff and the class(es) are entitled to damages, and recission or reformation at their election.

## COUNT X
## DECLARATORY JUDGMENT
### (Against All Defendants)

492.   Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

493.   Plaintiff requests a finding and declaratory judgment that Defendants are collaterally estopped from relitigating, and thus making demands or claims for, a 35% or greater collection fee.

494.   Plaintiff requests declaratory judgment that a 21% or greater annualized interest rate and 35% or greater collection fee, including without limitation in the Sign-In Sheet, creditor agreements, complaints, and in any debt collector communication, is unconscionable, unenforceable, unfair, inequitable, unreasonable, and illegal, including with respect to all of Defendants' and their creditors, and all of Defendants' current, prior, and future purported agreements, invoices, collection letters, complaints, or demands, under Wyo. Stat. § 40-14-508, the WUCCC, and any other applicable law.

## COUNT XI
## UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against All Defendants)

495.  Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

496.  Defendants, and each of them, have violated Wyo. Stat. § 40-12-105 by engaging in unfair and deceptive trade practices proscribed therein, against Plaintiff and the class(es), and Plaintiff and the class(es) have relied on these practices and suffered actual damages as a result.

497.  Plaintiff provided notice to Defendants sufficient to satisfy Wyo. Stat. § 40-12-109 in December 2024, January 2025, and June 2025, but the unfair and deceptive trade practices remain uncured.

498.  Plaintiff, for himself and the class(es), seeks damages, the restraint of unlawful practices, costs, and attorney's fees.

## COUNT XII
## WYOMING UNIFORM CONSUMER CREDIT CODE VIOLATIONS
### (Against All Defendants)

499.  Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

500.  The acts by Defendants as described herein, against Plaintiff and members of the class(es), violate and conspire to violate the WUCCC, including by demanding, charging, or collecting excess interest, excess finance charges, and/or excess collection fees greater than a permissible amount under statute or such other unconscionable or illegal amounts, and where applicable, failing to make disclosures

or making misleading or false disclosures. Such violations were willful, knowing, and intentional.

501.    Plaintiff and member(s) of the class were damaged by Defendants' violations of the WUCCC, and are entitled to damages, penalties, attorney's fees, costs, and other relief.

502.    Pursuant to Wyo. Stat. § 40-14-521, persons charged such excess interest, finance charges, or fees are entitled to a refund, multiplication damages, costs, and attorney's fees. Pursuant to Wyo. Stat. § 40-14-522, disclosure violations entitle the consumer to damages including multiplication damages, costs, and attorney's fees.

503.    The Collector Defendants were on notice of the provisions of the WUCCC, including Wyo. Stat. §§ 40-14-508 and 40-14-521, including because a copy was filed and served on them by a Wyoming Circuit Court Judge on or about April 29, 2024. *See* Ex. G, p. 7.

## COUNT XIII
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against All Defendants)

504.    Plaintiff, and the class(es), incorporate all prior paragraphs as if fully set forth herein.

505.    Defendants RMR, Wilkerson & Wilkerson, and Daniel B. Wilkerson constitute an association-in-fact enterprise, and the Collector Defendants with Wyoming Health Fairs or other creditors also constitute an association-in-fact enterprise, within the meaning of 18 U.S.C. § 1961(4).

506.    Defendants' conduct as pled herein constitutes a pattern of racketeering activity in violation RICO, 18 U.S.C. §§ 1961, *et seq*. This racketeering activity includes fraud, mail fraud, and wire fraud. This enterprise is not fully possible without its component parts: a creditor to present misleading and unlawful purported agreements, a collection agency to collect illegal interest and fees by way of threats of credit reporting and interest, a law firm to continue this campaign and add fees to increase negotiation pressure, and an attorney to sign pleadings, threaten and seek attorney's fees on top of illegal fees and interest, and to obtain judgments.

507.    As predicate acts thereto, Defendants committed mail fraud pursuant to 18 U.S.C. § 1341 by sending fraudulent billing communications and collection letters seeking unlawful interest and fees, including with knowledge of the illegality, through the U.S. Mail, and through other ways as pled herein; and wire fraud pursuant to 18 U.S.C. § 1343 by devising or intending to devise a scheme or artifice to defraud, obtaining money or property under false pretenses, transmitting via mail and phone fraudulent demands and other statements in furtherance of the scheme, including through all of the other ways pled herein, and took affirmative steps to conceal and/or misrepresent continue their unlawful conduct. This pattern is open-ended and continuing as of the date of this Amended Complaint.

508.    Defendants' acts crossed state lines by fact or function, including without limitation by taking unlawful actions against persons outside of Wyoming; the Collector Defendants routinely using the services of a RevSpring, a "financial communications and payment solutions" company in Tennessee with respect to

consumer mailings in furtherance of unlawful debt collection activities; the Collector Defendants reporting and threatening to report information to out-of-state credit reporting agencies; and the Wilkersons directing acts, predicate acts, signing documents, and committing unlawful conduct in Wyoming from their properties in Idaho, and/or in other states from their properties in Wyoming; and the use of email servers and other interstate wire facilities located outside of Wyoming to conduct Wyoming debt collection activity; all of which affects interstate commerce.

509.    Plaintiff, and members of the class(es), have suffered damages as a result of the Defendants' violations of law, proximately related to the enterprise(s) and their acts, and joint and predicate acts. Plaintiff, for himself and the class(es), seeks to restrain further violations, treble damages, and attorney's fees.

## DEMAND FOR JURY TRIAL

510.    Plaintiff, for himself and as a member of and on behalf of the class(es) and subclass(es), demands a jury trial on all issues so triable.

## DEMAND FOR RELIEF

Plaintiff, and the class(es) and subclass(es), request judgment in favor of Plaintiff and the class(es) and subclass(es), and request that the Court enter an order:

a.    Certifying this case as a class action on behalf of Plaintiff and the proposed class(es), including any appropriate subclass(es), appointing Plaintiff as class representative, and appointing Plaintiff's counsel to represent the class(es);

b.    Awarding declaratory judgment as necessary to protect the interests of Plaintiff and the class(es);

c. Awarding injunctive relief or other equitable relief as necessary to protect the interests of Plaintiff and the class(es);

d. Awarding Plaintiff and the class(es) damages including any applicable actual, compensatory, exemplary, punitive, and statutory damages that may be allowed by law, and including any multiplication damages or penalties where applicable;

e. Awarding restitution and damages to Plaintiff and the class(es) in an amount to be determined at trial;

f. Disgorging Defendants' profits with respect to Plaintiff and the class(es) where applicable and allowed by law;

g. Awarding attorneys' fees and costs as allowed by law;

h. Awarding pre-judgment and post-judgment interest, as provided by law;

i. Granting Plaintiff and the class(es) leave to amend this Complaint either before trial or to conform to the evidence at trial;

j. Awarding nominal damages; and

k. Granting such other, further, different, and/or additional relief as the Court may deem just and equitable.

Respectfully submitted,

Dated:  August 1, 2025                    By:  _/s/ Scott M. Flaherty_
                                              Kellie Nelson Fetter (WSB 7-4597)
                                              Scott M. Flaherty (*pro hac vice*)
                                         TAFT STETTINIUS & HOLLISTER LLP
                                         675 Fifteenth Street, Suite 2300
                                         Denver, Colorado 80202
                                         Telephone:   (303) 297-2900
                                         Email:  kfetter@taftlaw.com
                                                 sflaherty@taftlaw.com

                                         Tim Phillips (*pro hac vice*)
                                         LAW OFFICE OF TIM PHILLIPS PLLC
                                         331 Second Avenue South, Suite 400
                                         TriTech Center
                                         Minneapolis, MN 55401
                                         Telephone:   (612) 470-7179
                                         Email:   tim@timphillipslaw.com

                                         **ATTORNEYS FOR PLAINTIFF
                                         AND THE PUTATIVE CLASS**