```
 1    In The District Court of the Fourth Judicial District
 2
              In and for the County of Ada
 3
 4
      CELINA ABERNATHY,           )
 5                                ) Case No. CVOC-1506385
                                  )
 6              Plaintiff,        )
                                  )
 7                                )
      Vs.                         )
 8                                )
                                  )
 9    WILKERSON & BREMER, P.C.,   )
      et al,                      )
10                                )
                Defendant.        )
11    _____)
12
13                    TRANSCRIPT OF PROCEEDINGS
14
         Held on July 23, 2015, before Cheri C. Copsey, district
15    court judge.
16
17
18    For the Plaintiff:    Scott Rose
                            Attorney at Law
19                          300 W. Main Street
                            Boise, Idaho   83221
20
21
      For the Defendant:    Jonathan W. Harris
22                          BAKER & HARRIS
                            266 West Bridge Street
23                          Blackfoot, Idaho   83221
24
25
```

# I N D E X

| WITNESS | EXAMINED BY | PAGE NO. |
|---|---|---|
| ABERNATHY, CELINA | Direct by Mr. Rose | 3 |
|  | Cross by Mr. Harris | 10 |
|  | Redirect by Mr. Rose | 12 |
| WILKERSON, DANIEL | Direct by Mr. Rose | 13 |
|  | Cross by Mr. Harris | 48 |

# E X H I B I T S

| Number | Marked | Admitted |
|---|---|---|
| Plaintiff's 1 | 4 | 4 |
| Plaintiff's 2 | 7 | 10 |

**3**

1  BOISE, IDAHO, JULY 23, 2015
2
3  THE COURT: All right. This is -- this is
4  the time set for the motion for injunction -- for
5  preliminary injunction. Mr. Rose, I believe this
6  is your motion.
7  MR. ROSE: Yes, Your Honor. I would like to
8  call to the stand Celina Abernathy, please.
9  CELINA ABERNATHY,
10 produced at the instance of the Plaintiff, having
11 been first duly sworn, testified as follows:
12 THE COURT: You may proceed, counsel.
13 MR. ROSE: Thank you, Your Honor.
14                    DIRECT EXAMINATION
15 BY MR. ROSE:
16 Q. Celina, will you please state and spell
17 both your first name and last name.
18 A. Celina, C-e-l-i-n-a. And my last name
19 is A-b-e-r-n-a-t-h-y, Abernathy.
20 Q. And are you the plaintiff in this case?
21 A. Yes.
22 MR. ROSE: May I approach to have this
23 marked?
24 THE COURT: Certainly.
25 THE CLERK: Exhibit 1 is marked.

**4**

1  (Plaintiff's Exhibit No. 1 marked for
2  identification)
3  MR. ROSE: Let the record reflect I'm
4  handing Celina what's been marked as Exhibit 1.
5  Q. BY MR. ROSE: Celina, do you recognize
6  this document without discussing it?
7  A. Yes.
8  Q. Is that something that you received in
9  the mail?
10 A. Yes.
11 Q. Was that approximately back in August
12 of 2014?
13 A. Yeah, it was.
14 Q. Okay.
15 MR. ROSE: I'll move to admit Plaintiff's
16 Exhibit No. 1.
17 THE COURT: Any objection?
18 MR. HARRIS: You're talking about the Trust
19 Financial letter dated August 22nd, 2014?
20 MR. ROSE: That's correct.
21 MR. HARRIS: No objection.
22 THE COURT: Exhibit 1 is admitted.
23 (Plaintiff's Exhibit No. 1 was admitted)
24 Q. BY MR. ROSE: Celina, will you tell the
25 Court what you thought when you received that

**5**

1  letter.
2  A. I thought that I was going to have my
3  wages garnished and be sued eventually if I didn't
4  pay my money.
5  Q. At the time that you received that
6  letter, at that time how did you feel?
7  A. I felt scared. I guess I was --
8  MR. HARRIS: Your Honor, I'm going to object
9  to this line of questioning as to her emotional
10 state and damages. I think that's beyond the
11 scope of the preliminary injunction hearing.
12 THE COURT: Well, I'm not sure what it's
13 relevant to, but I'm going to allow him to pursue
14 this to a point where he can tie it up so I
15 understand what the relevancy is.
16 MR. HARRIS: I would request a standing
17 objection then.
18 THE COURT: Certainly.
19 MR. HARRIS: Thank you.
20 Q. BY MR. ROSE: Did you feel that to
21 resolve your feelings that you had to make
22 payments to the collection agency?
23 A. Yes.
24 MR. HARRIS: Objection. Leading.
25 THE COURT: Can you rephrase the question.

**6**

1  MR. ROSE: Yes, I can Your Honor.
2  Q. BY MR. ROSE: Celina, what did you
3  think your strategy was going to be to deal with
4  that letter?
5  A. To make monthly payments to them until
6  it was paid off.
7  Q. And did you have any conversations with
8  the collection agency about that plan?
9  A. Yes.
10 Q. Do you recall the name of the person
11 you talked with?
12 A. Yeah, her name is Mia.
13 Q. Is that the same Mia on the letter?
14 A. Yes.
15 Q. And do you recall what Mia told you?
16 A. She told me that we had to set up a
17 payment plan and if I didn't, then she would
18 either garnish my wages or sue me and it would end
19 up being a lot more than the amount of money she
20 was asking for.
21 Q. What -- would it have mattered to you
22 at the time if you knew you had a federal right to
23 verify the validity of the debt?
24 A. Yes.
25 MR. ROSE: May I approach for this document

ABERNATHY VS. WILKERSON & BREMER                                  CVOC1506395

**Page 7**

1  to be --
2     THE COURT: Yes.
3     MR. HARRIS: Can I see that first?
4     MR. ROSE: Yes. Sorry.
5     THE CLERK: Exhibit 2 is marked.
6     (Plaintiff's Exhibit No. 2 marked for
7  identification)
8     MR. ROSE: Thank you.
9     Q. BY MR. ROSE: I'm handing Celina what's
10 been marked as Plaintiff's Exhibit No. 2. Do you
11 recognize this document?
12    A. Yes.
13    Q. Did you receive that document in the
14 mail?
15    A. Yes, I did.
16    Q. And what did you think when you
17 received that letter?
18    A. I thought that I was going to get sued
19 for the money. That's the impression I got from
20 it.
21    Q. Did you have any particular thoughts
22 about it being attorney letterhead?
23    A. Yeah, I took it a little more seriously
24 than the last one.
25    Q. Did you at that time have any questions

**Page 8**

1  about whether that law firm was licensed in Idaho?
2     A. No, I didn't.
3     Q. Did you make any assumptions?
4     A. No.
5     Q. Were you concerned about being sued?
6     A. Yes, very.
7     Q. Why is that?
8     A. I was going through financial
9  difficulty and I just didn't have the money. I
10 mean, I was barely able to, like, feed myself and
11 put gas in my car, so it was a hard time.
12    Q. Going back to Exhibit -- Plaintiff's
13 Exhibit No. 1, do you see in that letter a
14 reference to a credit report -- or credit
15 reporting?
16    A. Uh-huh, yes.
17    Q. At that time were you concerned about
18 your credit history?
19    A. Yeah.
20    Q. And on the bottom of that letter do you
21 see some language about calling the collection
22 agency?
23    A. Yes.
24    Q. Did you take the advice from that
25 letter to call the collection agency when you

**Page 9**

1  talked to Mia?
2     A. Yes.
3     Q. Is there any language similar at the
4  bottom of that exhibit to the language that's on
5  the bottom of Exhibit No. 2 in that smaller print?
6     A. Yes.
7     Q. Is it the full body of the same
8  language or not?
9     A. No -- yes. I'm sorry, yes.
10    Q. Is the language on Exhibit 1 and
11 Exhibit 2 at the bottom identical?
12    A. No. I'm sorry, they're not, no.
13    Q. Do you see in Exhibit No. 2 where it
14 tells you that you can write to get validation and
15 verification?
16    A. Uh-huh.
17    Q. Is that on Exhibit No. 1?
18    A. No.
19    MR. ROSE: I have no further questions, Your
20 Honor.
21    THE COURT: Are you -- Exhibit No. 2, are
22 you moving for its admission?
23    MR. ROSE: I'm sorry, I am.
24    MR. HARRIS: No objection.
25    THE COURT: Exhibit No. 2 is admitted.

**Page 10**

1     (Plaintiff's Exhibit No. 2 was
2  admitted)
3     THE COURT: Go ahead. Cross-examine.
4         CROSS-EXAMINATION
5  BY MR. HARRIS
6     Q. Ms. Abernathy, I believe you testified
7  when you received Exhibit No. 1 you were afraid
8  that you were going to get sued?
9     A. Uh-huh, correct.
10    Q. Where on Exhibit 1 does it indicate
11 that you may get sued?
12    A. Well, I talked to Mia and she told me
13 that was going to happen if I didn't pay her any
14 money.
15    Q. You tried to set up payment
16 arrangements to allow you to do that; is that what
17 happened?
18    A. Yeah, pretty much. She never took out
19 any money out of my account and so --
20    Q. Do you admit that you owe this debt?
21    MR. ROSE: Objection. Calls for a legal
22 conclusion, Your Honor.
23    THE COURT: Sustained.
24    Q. BY MR. HARRIS: Do you admit that you
25 received services from the dentist that this

**Page 11**

1  account pertains to?
2      A. Yes, I believe so.
3      Q. Did you pay for all those services?
4      A. Some of them.
5      Q. Not all of them?
6      A. No.
7      Q. Okay. And prior to receiving Exhibit
8  1, had you received other communications from
9  Trust Financial or Bingham Collections, Inc.?
10     A. I don't believe so.
11     Q. Okay. How long have you lived at REDACTED
12  REDACTED, Boise Idaho?
13     A. I've lived there for a few years.
14     Q. When did you move there?
15     A. I believe it was 2012, I think it was.
16     Q. Where were you living when you received
17  services from the dentist that this account
18  pertains to?
19     A. Pocatello. I don't remember the exact
20  address. It's been a while. I don't remember.
21     Q. All right. So it looks like you
22  received services in 2008, 2009 -- well, it looks
23  like just in 2008. I'm sorry. Does that sound
24  about right?
25     A. Yes.

**Page 12**

1      Q. Okay. And in that time you were living
2  in Pocatello?
3      A. Correct.
4      Q. And when you moved from Pocatello, did
5  you provide the dental office with a forwarding
6  address?
7      A. I can't remember actually.
8      Q. Do you think that's something you would
9  have done?
10     A. Yeah.
11     MR. HARRIS: I don't have any further
12  questions, Your Honor.
13     MR. ROSE: Thank you, Your Honor.
14         REDIRECT EXAMINATION
15  BY MR. ROSE:
16     Q. Celina, on page two of Exhibit 1, which
17  is the ledger that Mr. Harris was referring to,
18  can you see the date of May 19th of 2009?
19     A. Yes.
20     Q. There's an entry that there was a $50
21  payment; isn't that correct?
22     A. Yeah, that's correct.
23     Q. Did -- when you talked to Mia about
24  this dental bill, did she inform you that more
25  than five years had passed since you made your

**Page 13**

1  last payment?
2      A. No, she didn't.
3      Q. Did she talk to you at all about the
4  statute of limitations?
5      A. No.
6      Q. Had you ever heard that term before you
7  talked to me?
8      A. I've heard of it. I didn't know what
9  it was, though, until I talked to you.
10     MR. ROSE: No further questions, Your Honor.
11     THE COURT: Thank you. You are excused at
12  this time. You may call your next witness.
13     MR. ROSE: I will call Mr. Wilkerson to the
14  stand.
15         DANIEL WILKERSON,
16  produced at the instance of the Plaintiff, having
17  been first duly sworn, testified as follows:
18     THE COURT: You may proceed.
19     MR. ROSE: Thank you.
20         DIRECT EXAMINATION
21  BY MR. ROSE:
22     Q. Mr. Wilkerson, will you also spell your
23  first and last name for the record.
24     A. The first name is Daniel, D-a-n-i-e-l,
25  last name Wilkerson, W-i-l-k-e-r-s-o-n.

**Page 14**

1      Q. And can you please tell us what your
2  relationship is to a Michael Wilkerson, if any.
3      A. Michael Wilkerson is my father. He's
4  also -- we are partners in the collection agency
5  and he is the principal of the law firm of
6  Wilkerson & Bremer.
7      Q. Are you a licensed attorney?
8      A. I'm not.
9      Q. Have you gone to law school?
10     A. No.
11     Q. So you're here as the representative of
12  Trust Financial?
13     A. Yes.
14     Q. The collection agency; correct?
15     A. Yes.
16     Q. All right. What is -- what is the
17  purpose of the collection agency in getting an
18  attorney firm, entities, authorized to do business
19  in the state of Idaho with the law firm entities
20  not being licensed in Idaho, if you know?
21     A. Our --
22     MR. HARRIS: Objection. I think it's
23  confusing.
24     THE COURT: I would like you to rephrase the
25  question. I had some difficulties, Mr. Rose.

ABERNATHY VS. WILKERSON & BREMER                                    CVOC1506385

**15**

1   MR. ROSE: Thank you.
2   Q. BY MR. ROSE: Mr. Wilkerson, Trust
3   Financial, LLC, is a Wyoming corporation?
4   A. Yes, sir.
5   Q. But it has authorization to operate in
6   Idaho?
7   A. Yes.
8   THE COURT: Just wait, wait, wait. It's not
9   a corporation, is it?
10  THE WITNESS: Excuse me. It's a limited
11  liability company.
12  THE COURT: And it's in Wyoming?
13  THE WITNESS: It's a Wyoming, LLC, and then
14  it's a foreign LLC in Idaho.
15  THE COURT: Thank you. Go ahead.
16  Q. BY MR. ROSE: And the law firm by the
17  name of Wilkerson & Bremer, PC; Wilkerson & Bremer
18  Law Group, LLC, those are also domiciled similarly
19  in Wyoming with the ability to get registered with
20  the Secretary of State here; correct?
21  A. Yes.
22  Q. Okay. So --
23  MR. HARRIS: By "here" you mean Idaho?
24  MR. ROSE: Yes.
25  MR. HARRIS: Thank you.

**16**

1   Q. BY MR. ROSE: It's clear to me in my
2   mind why the collection agency is -- within the
3   Idaho Secretary of State's parameters to operate
4   in Idaho.
5   What I would like you to do is address
6   why law firms that do not have a licensed attorney
7   in Idaho obtain authorization to operate in Idaho?
8   A. Because the lawyer firm's staff; the
9   secretary staff, the paralegals do a lot of
10  documentation preparation, the data entry. And so
11  we have Idaho attorneys who are of counsel to
12  Wilkerson & Bremer. And since Wilkerson & Bremer
13  has a staff and the processes and procedures in
14  place, since we have collection agencies in other
15  states and we have a sizeable staff, we use the
16  staff members. So that's why Wilkerson & Bremer
17  needed to -- we needed to come into Idaho.
18  Q. And if you look at Exhibit --
19  Plaintiff's Exhibit 2, is that still with you?
20  A. No.
21  THE COURT: It would be helpful if I knew
22  what it looked like. Is this one of the exhibits
23  to the complaint?
24  MR. ROSE: They are. It's Exhibits 1 and 2
25  in the opposite order.

**17**

1   THE COURT: So Exhibit 2 is October 22nd,
2   2014?
3   MR. ROSE: You are correct.
4   THE COURT: All right. Thank you.
5   MR. ROSE: May I approach?
6   THE COURT: Yes.
7   Q. BY MR. ROSE: So looking at the October
8   --
9   A. Exhibit 2?
10  Q. Yes.
11  A. Okay.
12  Q. That was a document that was generated
13  from the staff of Trust Financial; correct?
14  A. No, sir. From Wilkerson & Bremer.
15  This -- this letter will not go out from the
16  agency. It can't. This letter --
17  THE COURT: What agency are you talking
18  about?
19  THE WITNESS: Trust Financial. Trust
20  Financial is a licensed collection agency.
21  THE COURT: Correct. So this letter did not
22  come from Trust Financial?
23  THE WITNESS: No, this -- this letter came
24  from Wilkerson & Bremer and --
25  THE COURT: Just let me ask the questions,

**18**

1   sir.
2   THE WITNESS: Yes.
3   THE COURT: Wilkerson & Bremer, Attorneys at
4   Law, where is that located?
5   THE WITNESS: They are located in -- they
6   have an office in Idaho Falls, Idaho, and an
7   office in Powell, Wyoming, and --
8   THE COURT: How do they have an office in
9   Idaho Falls? Who on their staff in Idaho Falls is
10  an Idaho lawyer?
11  THE WITNESS: They do not have an attorney
12  in Idaho Falls. They have a staff member in Idaho
13  Falls.
14  THE COURT: So they don't have any attorneys
15  in-house who are licensed to practice in Idaho?
16  THE WITNESS: No.
17  THE COURT: Where are on Exhibit 2 does it
18  list of counsel attorneys?
19  THE WITNESS: I don't see that it does.
20  THE COURT: Who are the of counsel
21  attorneys?
22  THE WITNESS: At this time on October 22nd
23  of 2014 the of counsel attorney was Chad Campos of
24  Campos Law in Idaho Falls.
25  THE COURT: And why is that not on this

ABERNATHY VS. WILKERSON & BREMER                               CVOC1506385

**19**

1  letter?
2      THE WITNESS: That's a question for the law
3  firm. I don't know.
4      THE COURT: Are you -- you're a
5  representative, are you not?
6      THE WITNESS: I'm a representative of Trust
7  Financial. I don't know why the decision was made
8  to not put the name of the of counsel attorney on
9  this letter. I was -- I was not privy to the
10 conversation where that was discussed.
11     THE COURT: Well, let me ask you a question.
12 Please look at Exhibit 2. Would you not concede
13 that exhibit mis- -- is misleading at best?
14     THE WITNESS: No, I would not conclude that.
15     THE COURT: Well, if you received this
16 letter, would you not conclude that Wilkerson &
17 Bremer, attorneys at law, were located in Idaho
18 Falls, Idaho?
19     THE WITNESS: Yes.
20     THE COURT: Would you not conclude that
21 Wilkerson & Bremer were licensed to practice here
22 in Idaho?
23     THE WITNESS: I wouldn't conclude that
24 myself. I wouldn't jump to that conclusion.
25     THE COURT: Really?

**20**

1      THE WITNESS: No.
2      THE COURT: Thank you. You may proceed,
3  Mr. Rose.
4      MR. ROSE: Thank you, Your Honor.
5      Q. BY MR. ROSE: Mr. Wilkerson, at the
6  bottom of that Exhibit No. 2, the last paragraph
7  --
8      MR. ROSE: May I approach, Your Honor, so we
9  can --
10     THE COURT: Yes.
11     Q. BY MR. ROSE: Yes, this bottom
12 paragraph here, the main body where it starts with
13 "at this time."
14     A. Right.
15     Q. Will you read that first sentence into
16 the record.
17     A. "At this time no attorney with this
18 firm has personally reviewed the particular
19 circumstances surrounding the account listed
20 above.
21     THE COURT: Continue.
22     MR. ROSE: I'm sorry, Your Honor.
23     THE COURT: Thank you.
24     THE WITNESS: "If you fail to take care of
25 this matter or call, our client may ask us to

**21**

1  provide additional services to recover the balance
2  due."
3      THE COURT: And what client are they
4  referring to?
5      THE WITNESS: Well, since this is a letter
6  from Wilkerson --
7      THE COURT: No, I'm asking you a question.
8  What client --
9      THE WITNESS: The client would be us, Trust
10 Financial. The client is Trust Financial.
11     THE COURT: I'd like you to look at the
12 paragraph above it. Can you read that one into
13 the record, please.
14     THE WITNESS: "If you have any questions or
15 want to discuss possible payments, you need to
16 call 1-208-522-7598 and ask for your account
17 manager. Office hours are from 8:00 a.m. to 5:00
18 p.m. Monday through Friday. You may send
19 correspondence to Wilkerson & Bremer, Box 1825,
20 Idaho Falls, Idaho 83403.
21     THE COURT: Would you go to the paragraph
22 above that.
23     THE WITNESS: Would you like me to read
24 that?
25     THE COURT: I actually would like you to

**22**

1  read the first sentence, please.
2      THE WITNESS: "Our client, Trust Financial,
3  LLC, formerly known as Bingham Collections, Inc.,
4  claims that the account listed above and assigned
5  to them for collection has not been paid and they
6  have retained Wilkerson & Bremer to represent them
7  in this matter.
8      THE COURT: Correct. And Wilkerson & Bremer
9  are not licensed in Idaho; correct?
10     THE WITNESS: As a foreign corporation -- my
11 understanding as --
12     THE COURT: They are not licensed to
13 practice law in the state of Idaho; correct?
14     THE WITNESS: I'm confused, Your Honor. My
15 --
16     THE COURT: Is Wilkerson & Bremer licensed
17 to practice law? Are there any attorneys working
18 for Wilkin- -- Wilkerson & Bremer, Attorneys at
19 Law, is there anyone there licensed to practice in
20 Idaho?
21     THE WITNESS: No attorneys.
22     THE COURT: Thank you. Go ahead. I'm
23 sorry.
24     MR. ROSE: That's fine, Your Honor.
25     Q. BY MR. ROSE: Are you familiar with the

Kim Madsen, Official Court Reporter, Boise, Idaho        03/23/2016 11:01:05 AM

**EXHIBIT H**                                                      **Page 7 of 19**

ABERNATHY VS. WILKERSON & BREMER                             CVOC1506385

**23**

1 Fair Debt Collection Practices Act as a manager of
2 the -- Financial Trust?
3    A. Yes, sir.
4    Q. Would you agree that the font at the
5 bottom of your October 22nd letter, Exhibit No. 2,
6 is a smaller size than the body of the letter?
7    A. Yes.
8    Q. And would you agree that that language
9 is not included in Exhibit 1?
10   A. Yes.
11   Q. Would you agree that your understanding
12 is that the very first communication a collection
13 agency under the Fair Debt Collection Practices
14 Act must give is this verification of validation
15 notice?
16   A. Yes.
17   Q. And is it the fault of your attorneys
18 in your mind for Financial Trust's letter of
19 August 22nd's failure to have that language or is
20 it an oversight on behalf directly of Financial
21 Trust Company?
22   A. The letter dated the 22nd of August,
23 2014, was not the first correspondence.
24   Q. Okay. Would you agree with me on
25 Exhibit No. 1 that the body of the language

**24**

1 invites Celina to make a phone call instead of
2 write for a verification of validation?
3    A. I'm -- I'm sorry. After you said right
4 to make a phone call, what was your second
5 question?
6    Q. Rather than to write for verification
7 and validation.
8    A. Yes, it does appear that way.
9    Q. In Exhibit No. 2, the October 22nd
10 letter, it also invites a phone call; correct?
11   A. Yes.
12   Q. And that's in a larger font than the
13 font that lays out the requirement of debtors to
14 write for verification and validation; correct?
15   A. Yes.
16   Q. And did the collection agency receive a
17 letter from me requesting verification and
18 validation?
19   A. I do remember receiving a letter from
20 you. The request for verification and validation
21 is within 30 days from the date the first notice
22 was sent. I do remember when we received that
23 letter, at least my feeling was that some of the
24 claims and statements you made, especially in
25 regard to statute of limitations were worth

**25**

1 considering and so we stopped all actions at that
2 point. I don't remember specifically all of the
3 wording of your letter at this point.
4    Q. The letter did not receive a written
5 response of verification or validation; correct?
6    A. No, I -- we -- we stopped all actions.
7 We did not respond to the letter.
8    Q. Do you understand you have a duty under
9 the Fair Debt Collection Act to provide that
10 verification or validation when requested in
11 writing?
12   MR. HARRIS: Objection. It calls for a
13 legal conclusion, Your Honor.
14   THE COURT: Well, he claims to be a
15 financial -- this Trust Financial, LLC, they are
16 in the business of collections. I think it's fair
17 to ask him the question. So I'm going to overrule
18 the objection.
19   THE WITNESS: Yes -- yes, sir. When we send
20 the first notice giving the 30-day period, we need
21 to respond if a request for validation is received
22 within 30 days. When this attorney letter was
23 sent and you responded to that, we needed to
24 provide you validation within 30 days of sending
25 it.

**26**

1    Q. BY MR. ROSE: You claim that Exhibit
2 No. 2 was from the law firm and not from Trust
3 Financial; correct?
4    A. Yes, sir. I misspoke. The law needs
5 to provide you -- we -- we -- as Your Honor said,
6 we're representing both entities here. The law
7 firm needs to send you validation.
8    THE COURT: I thought you said that you do
9 not represent the law firm; you're only here to
10 represent Trust Financial.
11   THE WITNESS: Yes, Your Honor. Then you
12 told me I was representing both.
13   THE COURT: No, I didn't say you were
14 representing --
15   THE WITNESS: Okay.
16   THE COURT: I'm trying to find out who you
17 are representing. Where do you live, sir?
18   THE WITNESS: In Idaho Falls, Idaho.
19   So, yes -- to answer your question,
20 yes. The two letters that are sent either from
21 the agency or the law firm that invoke federal law
22 and need responded to in 30 days if that request
23 is made is the first letter that was sent years
24 before this August letter. But when Wilkerson &
25 Bremer sent the letter on October 22nd of 2014,

03/23/2016 11:01:05 AM           Kim Madsen, Official Court Reporter, Boise, Idaho

**EXHIBIT H**                                                          Page 8 of 19

**27**

1  then that law was invoked again since it was going
2  to a new entity.
3      Q. BY MR. ROSE: How many letters does
4  Trust -- did Trust Financial send out similar to
5  the letter of Exhibit 1 in 2014?
6      A. I don't know the exact number. This
7  letter is going to be a letter that is not sent on
8  every account. It's a letter in an attempt to --
9  you know, first and foremost possibly that new
10 address was found in Boise, Idaho, and so it's a
11 letter to reestablish connection with the
12 consumer.
13     As for a wrong number, I can certainly
14 -- I can look in our system and find you an exact
15 number. Guessing off my hand, five to ten --
16     MR. HARRIS: Objection. Speculation.
17     THE COURT: Overruled. You can go ahead and
18 answer.
19     THE WITNESS: A few of mine, not just one or
20 two, but not 50 or 60. I could -- I could
21 certainly get an exact number.
22     Q. BY MR. ROSE: And those letters, am I
23 correct, from the information I have obtained in
24 the pleadings are primarily sent to people that
25 reside in Bonneville County?

**28**

1      A. Are you asking if most of the consumers
2  we pursue reside in Bonneville County?
3      Q. I'm asking you if most of the
4  recipients of those letters are -- Exhibit No. 1
5  is addressed to are mailed to -- to residents of
6  that county, Bonneville?
7      A. Bonneville and Bingham County.
8      Q. And you --
9      A. Most of our clients are in Bonneville
10 and Bingham Counties and we have a good number of
11 clients in both.
12     Q. And you've reached out to Ada County
13 for some of your collection efforts?
14     A. Yes, sir.
15     Q. Some of the letters of Exhibit 1 have
16 been sent, for instance, to Ada County besides
17 Celina's?
18     A. I believe that would be correct.
19 Without -- without looking at the database right
20 now.
21     Q. And what about toward northern Idaho?
22     A. We have very -- so we have two large
23 clients in Ada County. We do not have -- when you
24 speak of northern Idaho, Coeur d'Alene, those
25 towns, we don't have clients in northern Idaho,

**29**

1  but it is not -- it wouldn't surprise me if once
2  or twice or a few times a year we mail a letter --
3  or in Ms. Abernathy's case she lived in Pocatello
4  and now lives in Boise, it's very conceivable that
5  someone lived in Idaho Falls and has moved to
6  Coeur d'Alene or something like that.
7      Q. It's conceivable that you would have
8  sent a letter like Exhibit 1 to a Bonners Ferry
9  resident that owed a debt originally down in
10 Bonneville County?
11     A. That's conceivable, yes, sir.
12     THE COURT: Who are your two large clients
13 in Ada County?
14     THE WITNESS: Intermountain Gas and Cole
15 Diagnostics. Your Honor, we might have one or two
16 more. Those are the two coming to mind.
17     Q. BY MR. ROSE: With regard to Exhibit
18 No. 2, the Wilkerson & Bremer letter of October
19 22nd, is that letter also sent out approximately
20 five to ten times a month?
21     A. No, sir. That letter is sent out --
22 this is a guess, 40 to 60 times a month, if not a
23 few more or a few less.
24     Q. Throughout Idaho?
25     A. Throughout Idaho, yes, sir.

**30**

1      Q. Looking at that exhibit on the
2  letterhead, it has a PO box. Is that a PO box
3  only used by Wilkerson & Bremer?
4      A. I believe so. We are -- I'm not sure,
5  to tell you the truth. I'd have to look into
6  that.
7      Q. Is the employee that collects the mail
8  from that PO box paid by Wilkerson & Bremer or by
9  Trust Financial?
10     A. I'm not sure. I'm not sure if
11 Wilkerson & Bremer has an employee there or if
12 they -- you know, likely share an office. We
13 might share a PO box, too.
14     Q. In fact, Wilkerson & Bremer, the law
15 firm does not have employees in Idaho Falls?
16     A. It does. It has an employee, Anna
17 Christensen, who works at the same office -- works
18 in our same Idaho Falls office. There is a
19 portion of that office that is rented out to
20 Wilkerson, just one suite or one office.
21     Q. What is her name?
22     A. Anna Christensen.
23     Q. What is Anna Christensen's title with
24 Wilkerson & Bremer?
25     A. I'm not sure the title. She's staff.

**Page 31**

1  She's a staff member.
2  Q. She's not an attorney; correct?
3  A. No, not at all. No, she's a staff
4  member.
5  Q. Is she also a staff member of Trust
6  Financial?
7  A. No, sir.
8  Q. Mr. Wilkerson, are you familiar with
9  the Idaho case law for collection agencies?
10  MR. HARRIS: That's pretty vague, Your
11  Honor.
12  THE COURT: Well, let's hear his answer and
13  then we can narrow it.
14  THE WITNESS: I certainly with our attorneys
15  review different case laws in the states we work
16  in. I certainly have not reviewed all case law.
17  THE COURT: And when you say your attorneys,
18  you're talking about Wilkerson & Bremer?
19  THE WITNESS: And the of counsel. So I'll
20  meet with the of counsel for Wilkerson & Bremer in
21  our Wyoming and Montana offices and they'll --
22  we'll discuss any cases or any situations where,
23  you know, case law is prevalent or the attorneys
24  need to -- need to help us understand things. And
25  the same in Idaho, discuss all kinds of things

**Page 32**

1  with our of counsel attorney.
2  And then Michael Wilkerson is the only
3  -- Wilkerson & Bremer Law Group, it's Michael
4  Wilkerson and Dwight Bremer, and I discuss many
5  things with Michael Wilkerson.
6  So with him as the attorney of
7  Wilkerson & Bremer Law Group and our of counsel
8  attorneys, we'll discuss cases.
9  Q. BY MR. ROSE: Who is the of counsel
10  attorney for Idaho?
11  A. Mr. Harris is.
12  Q. Is he the only one?
13  A. Yes, this -- with Mr. Campos passing
14  away in April, he's the only one at this time.
15  Q. Who was the of counsel attorney on
16  October 22nd, 2014?
17  A. Chad Campos.
18  Q. Are you familiar with an Idaho case
19  called *Medical Recovery Services, LLC, versus
20  Strawn?* Have you heard of that case?
21  A. I've maybe heard of the point, sir, but
22  I'm not familiar with the name there.
23  Q. Would you agree in the demand letter
24  from the October 22nd letter that the law firm was
25  trying to collect interest?

**Page 33**

1  A. Yes, sir.
2  Q. In reviewing Exhibit No. 2 where it
3  says no attorney has reviewed the file, are you
4  aware of anyone at Trust Financial that was in
5  management or had knowledge to review the file
6  before directing Mia to collect on it?
7  A. I would have been the individual who
8  would have reviewed it and I did not review it.
9  So I -- I can state that I did not review it. Mia
10  forwarded the account to Wilkerson & Bremer and
11  then this letter was sent prior to preparing a
12  lawsuit and having an attorney.
13  Q. Well, who is it that's responsible at
14  Trust Financial to ascertain whether or not the
15  statute of limitations has run?
16  A. I am through training and through
17  review.
18  Q. Okay. And so why didn't you review
19  this matter before demand was made?
20  A. Because it was an oversight on Mia's
21  part.
22  Q. You take no responsibility for that?
23  A. I do take responsibility for not
24  training more clearly. Yes, sir, I absolutely do.
25  You know, with collection agencies training is

**Page 34**

1  everything and we train and train and train, but
2  if there are gaps, the buck absolutely stops with
3  me.
4  Q. When was this account assigned to Trust
5  Financial?
6  A. I don't know. That's in our system. I
7  -- I don't know and was not made aware that -- I
8  apologize for not having that more ready for you
9  at this point. Certainly that could be found out
10  quickly. And I'm sorry, the -- me and my partner,
11  Mike Wilkerson, we closed -- we purchased Bingham
12  Collections, Inc. in November 2012. I believe
13  this account was assigned to Bingham Collections
14  prior to November of 2012. The reason I believe
15  that is the date, looking over Mr. Harris'
16  shoulder there, I could validate all of that with
17  you.
18  So just for clarification it was --
19  Trust Financial formerly took ownership of all of
20  the assets in the business of Bingham Collections
21  last summer on August 1st of 2014.
22  Q. How many accounts were assigned?
23  A. During what time period?
24  Q. When you took over Bingham Collections.
25  A. I --

ABERNATHY VS. WILKERSON & BREMER                                CVOC1506386

**35**
1  Q. More than a thousand?
2  A. Oh, more than 100,000.
3  Q. In accounts?
4  A. And when you said in accounts assigned,
5  do you mean over the extended period of time or
6  within the past year or five years or --
7  Q. Well, you took over Bingham
8  Collections, Inc. in November of --
9  A. 2012.
10  Q. 2014?
11  A. '12. We took over Bingham Collections
12  November 1st, 2012.
13  Q. Okay. At that time did Trust Financial
14  purchase the creditor papers from Bingham
15  Collections, Inc.?
16  A. Yes, sir. We purchased --
17  Q. How many --
18  A. Sorry. We purchased the corporation
19  including all of the things within it.
20  Q. Okay. So all of the things within it
21  includes what I would call paper --
22  A. Right.
23  Q. -- which --
24  A. Accounts. If we're on the same page,
25  accounts.

**36**
1  Q. How many accounts were purchased at
2  that time?
3  A. A few hundred thousand, a couple
4  hundred thousand.
5  Q. And out of that few hundred thousand,
6  about how many were expired because of the statute
7  of limitations?
8  A. I have to do mental math quickly here.
9  MR. HARRIS: I'm going to object to the
10  extent it calls for speculation.
11  THE COURT: Overruled.
12  THE WITNESS: 60 to 80,000 accounts would
13  have been assigned in the previous five years.
14  Bingham Collections, I believe, was started in the
15  late 80's or early 90's, and so, you know, that
16  would have been a couple -- at least a couple
17  100,000 accounts that weren't activated because
18  they were older accounts or paid in full or what
19  have you.
20  Q. BY MR ROSE: Was Trust Financial able
21  to get debtors to pay on debt that had expired?
22  A. Not -- I don't know the specific answer
23  to that. I can tell you that many times a
24  debtor/consumer will call in and they will
25  revalidate an account that's older and offer to

**37**
1  pay it and they'll pay that. I know in all of our
2  agencies that happens. With the specific
3  instances you're talking about, I'm not sure.
4  Q. You don't really expect us to believe
5  that some debtors just call up and say I want to
6  make a payment to you without having been
7  contacted by the collection agency?
8  A. The conversation doesn't go that way.
9  Idaho statute of limitations is four years on an
10  oral contract and five years on a signed contract.
11  And items stand on credit reports for
12  seven years. And so very, very often a consumer
13  will call and they're -- not out of the goodness
14  of their heart, I don't want you to believe that,
15  but many, many times we take payments on items
16  past four or five years because they want to clear
17  it off their credit report.
18  THE COURT: Well, let me ask you a question.
19  Do you routinely use the same letter format that
20  you used in Exhibit 1?
21  THE WITNESS: Yes, this is -- this is a
22  letter we use many times, Your Honor, at least a
23  number of times a month.
24  THE COURT: And you'd admit that that letter
25  doesn't suggest to the recipient that the statute

**38**
1  of limitations had run on the debt?
2  THE WITNESS: I absolutely admit that.
3  Q. BY MR. ROSE: Mr. Wilkerson, are you
4  aware that the Fair Debt Collection Practices Act
5  at 15 USC 1692e(3) about lawyers requires the
6  lawyer to review a collection file and supporting
7  documents prior to causing a collection letter to
8  issue?
9  MR. HARRIS: Objection. Calls for a legal
10  conclusion.
11  THE COURT: He's only asking if he is aware.
12  He can answer that.
13  THE WITNESS: I'm not.
14  Q. BY MR. ROSE: Are you aware that the
15  Fair Debt Collection Practices Act forbids a
16  collection agency to mail out a letter carrying an
17  attorney's letterhead?
18  A. Yes, sir.
19  Q. Were you aware of that in October of
20  2014?
21  A. Yes, sir.
22  Q. Does Trust Financial pay Wilkerson &
23  Bremer an hourly rate?
24  A. Trust -- Trust Financial pays Wilkerson
25  & Bremer attorneys a salary. Trust Financial pays

Kim Madsen, Official Court Reporter, Boise, Idaho          03/23/2016 11:01:05 AM

**EXHIBIT H**                                                     Page 11 of 19

**39**

1  -- I'm sorry, Trust Financial pays a monthly
2  payment to Wilkerson & Bremer and then Wilkerson &
3  Bremer distributes that amongst employees, both
4  those on salary, those hourly, and then Trust
5  Financial pays for mailing, postage, fees, those
6  type of things.
7       THE COURT: So when you say monthly
8  payments, you corrected yourself from salary;
9  correct?
10      THE WITNESS: So Wilkerson & Bremer has
11 salaried attorneys and hourly employees also, both
12 hourly and salaried.
13      THE COURT: The question, though, wasn't
14 that. The question was Trust Financial, how does
15 Trust Financial pay for the legal services that it
16 receives from Wilkerson & Bremer?
17      THE WITNESS: It gives Wilkerson & Bremer
18 lump sum payments and Wilkerson & Bremer divvies
19 those out.
20      THE COURT: How are the lump sum payments
21 determined?
22      THE WITNESS: It's a monthly retainer. It's
23 a monthly retainer.
24      THE COURT: How much is that?
25      THE WITNESS: The monthly retainer right now

**40**

1  is -- and I could get specific numbers for you.
2  It's in the range of six or $7,000. And then we
3  cut checks, Your Honor, for -- we cut many, many,
4  many separate checks for the fees.
5       THE COURT: What fees are you talking about?
6       THE WITNESS: Filing fees, service fees.
7  Instead of having Wilkerson & Bremer cut all of
8  those out, many times they'll submit a request for
9  -- for example, if we're filing ten lawsuits in
10 Bingham County and the filing fees are $166 each,
11 they'll request that we cut those checks and get
12 them to them and then they mail them out.
13      THE COURT: What's Mike Wilkerson's role in
14 Trust Financial?
15      THE WITNESS: He and I are partners. We are
16 the two owners of Trust Financial.
17      THE COURT: Thank you. I'm sorry, Mr. Rose.
18      MR. ROSE: That's fine, Your Honor.
19      Q. BY MR. ROSE: Is there a written
20 contract between the law firm Wilkerson & Bremer
21 and Trust Financial?
22      A. I'm not sure if there is.
23      Q. I looked on the Idaho repository a few
24 months ago, Mr. Wilkerson, and it looked like
25 there was maybe a half dozen to a dozen cases

**41**

1  filed in Ada County with Trust Financial as the
2  plaintiff, different debtor defendants --
3       A. Okay.
4       Q. -- and a number of them -- I think
5  maybe all of them were default judgments. Are you
6  familiar with the lawsuits that are filed in Ada
7  County, for instance?
8       A. Yes, sir. I'm familiar with many of
9  them. To call one up at this point, I wouldn't be
10 able to. You know, I'm especially brought in and
11 I get more intimate details and am familiar with
12 specific cases versus all of them.
13      Q. And in those generalized situations,
14 those cases, for instance, does Wilkerson --
15 pardon me, does Trust Financial request attorney
16 fees in the event of default?
17      A. Yes, sir.
18      Q. And those were awarded in Ada County,
19 for instance?
20      A. I'm assuming they were. In most cases
21 -- in most of the default judgments, my
22 understanding is once the judge has reviewed those
23 -- they are -- they are awarded attorney fees.
24      Q. And so for each of those individual
25 debtors that default judgment was taken against

**42**

1  them, how was it that Wilkerson & Bremer
2  calculated the reasonable attorney fee to request
3  if they're only lump sum monthly retainer in
4  general?
5       MR. HARRIS: Your Honor, I'm going to object
6  on relevance. I think it goes beyond the scope of
7  preliminary injunction.
8       THE COURT: Overruled.
9       THE WITNESS: Sir, what was your question
10 again?
11      Q. BY MR. ROSE: My question, if I can
12 paraphrase --
13      A. Oh, I know the answer. Our retainer
14 goes way beyond the attorney fees we collect. We
15 purchase these companies and they're in the red
16 and so we -- we give all of collected attorney
17 fees to Wilkerson & Bremer plus much more. I
18 understand what you're asking.
19      If we were in the black, then the
20 attorney fees collected, those would -- each and
21 every one of those would go to Wilkerson & Bremer.
22 If we are -- we're in the red, we have to give
23 them more money than that.
24      Q. Mr. Wilkerson, I think you did
25 misunderstand my question.

**43**

1  A. Okay. Sorry.
2  Q. That's okay. I'll try again. My
3  question is how does the plaintiff allege a
4  particular dollar amount for attorney fees to get
5  an award of attorney fees against that defaulted
6  debtor/defendant when the fees that Wilkerson &
7  Bremer charges the plaintiff, you, Trust
8  Financial, a retainer per month that's not related
9  to that specific case?
10  A. No.
11  MR. HARRIS: Same objection, Your Honor.
12  THE COURT: I'm going to overrule the
13  objection. It's relevant to a whole lot of things
14  including if I were to grant a preliminary
15  injunction on what bond I would require.
16  THE WITNESS: Sir, my understanding of the
17  awarded fees -- and, again, I don't know if this
18  is by statute or by judges, but the -- the suits
19  are very, very similar in their request for
20  attorney fees and the attorney fees on most of the
21  suits are $300. My understanding is that suits
22  where the principal amount is above a thousand,
23  then it's requested that a third -- a third be the
24  attorney fees.
25  So the attorney fees don't vary. In

**44**

1  the state of Idaho ever since we've been doing
2  business here, we've been doing it this way and we
3  were informed of that from attorneys here in Idaho
4  when we started doing business in Idaho. The
5  amounts requested for attorney fees are rather
6  uniform, what we request and what we receive is
7  rather uniform. The exception is there have been
8  times when judges have reduced the amount of
9  attorney fees on a case.
10  Q. BY MR. ROSE: If I understood you
11  correctly, you're explaining that the amount of
12  attorney fees requested on a lawsuit depends on
13  the principal balance?
14  A. Yes, sir.
15  Q. Okay. Is there any indication to you
16  that it takes more or less time to generate form
17  documents for filing complaints and summons and
18  default paperwork depending on the size of the
19  principal?
20  A. Yeah, it's not dependent on the size of
21  the principal.
22  Q. Would you agree that the request for
23  attorney fees then between a case where you're
24  seeking a principal amount of $80 and a principal
25  amount of $800 or $2,000 requires the same type of

**45**

1  work, the same amount of work for the lawyer?
2  A. In general. As a generality, yes.
3  Q. Where there's a default in general?
4  A. Yes, sir.
5  Q. Do you think it's misleading at all to
6  the Court to plead different amounts of attorney
7  fees for the same amount of work dependent simply
8  on the amount of the debt?
9  A. My understanding is that the request is
10  because of what has been asked of the courts of
11  the law firm, that this is what will be awarded
12  and considered reasonable by the Court.
13  Q. You receive a garnishment against a
14  debtor that includes the attorney fees and the
15  costs of court; correct?
16  A. Yes, sir.
17  Q. Okay. At that point, then, I think I
18  understood you, Trust Financial takes the money
19  into its accounts?
20  A. Into a trust account, yes, sir. So
21  when we receive a payment from -- whether it's a
22  check from the Court or a credit card payment from
23  the consumer --
24  Q. Let's just talk about from the Court.
25  A. Yeah, that money is deposited into a

**46**

1  trust account.
2  Q. Okay. And then from that trust account
3  payments are made to whom?
4  MR. HARRIS: Your Honor, I'm going to renew
5  my objection as to relevancy and scope of the
6  preliminary -- and it's beyond the scope of the
7  preliminary injunction.
8  THE COURT: Sustained.
9  Q. BY MR. ROSE: Mr. Wilkerson, does
10  Wilkerson & Bremer receive additional monies on
11  top of the monthly retainer?
12  MR. HARRIS: Objection, Your Honor.
13  Relevance and beyond the scope.
14  THE COURT: What's the question again?
15  MR. ROSE: Whether Wilkerson & Bremer
16  receives additional income or revenue on top of
17  the monthly retainer.
18  THE COURT: I'm going to sustain the
19  objection.
20  Q. BY MR. ROSE: Mr. Wilkerson, does the
21  attorney fees collected from the defaulted debtor
22  stay with Wilkerson -- pardon me. Strike that.
23  Stay with Trust Financial?
24  MR. HARRIS: Objection. Relevance and
25  beyond the scope.

ABERNATHY VS. WILKERSON & BREMER                                    CVOC1506385

**Page 47**

1    THE COURT: Overruled.
2    THE WITNESS: That money stays in the trust
3    account and then is paid out to Wilkerson & Bremer
4    as part of the monthly retainer even plus -- plus
5    more money that we pay them because we're in the
6    black or in the red.
7    Q. BY MR. ROSE: Okay. So if I understand
8    you right, the monthly retainer stays the same,
9    but if some of it is generated through attorney
10   fees, then the amount is the same?
11   A. The monthly retainer -- we wish it
12   could stay the same, it does fluctuate slightly
13   with expenses. Wilkerson & Bremer has to be able
14   to cover those expenses, again, because the
15   recovered fees are not covering the expenses of
16   doing the work.
17   Q. Does Trust Financial share at all in
18   the attorney fee awards from --
19   A. Not at all, no. That's illegal, in
20   fact, or not ethical, whatever it was.
21   MR. ROSE: I have no further questions, Your
22   Honor.
23   THE COURT: You may cross-examine.
24   MR. HARRIS: Thank you, Your Honor.
25

**Page 48**

1    CROSS-EXAMINATION
2    BY MR. HARRIS:
3    Q. Mr. Wilkerson, is it okay if I call you
4    Dan?
5    A. Sure.
6    Q. So the law firm Wilkerson & Bremer, who
7    is the Wilkerson in the Wilkerson & Bremer law
8    firm, whether it's Wilkerson & Bremer PC or
9    Wilkerson & Bremer Law Group, LLC?
10   A. Wilkerson is Michael Wilkerson who is
11   also my father.
12   Q. He is not licensed in Idaho?
13   A. He is not licensed as an attorney --
14   Q. In Idaho?
15   A. -- in Idaho.
16   Q. Who is the Bremer?
17   A. Dwight Bremer and he is a Wyoming
18   attorney also.
19   Q. Okay. And so the way Wilkerson &
20   Bremer practices law in Idaho is how?
21   A. We have -- so from the very beginning
22   Wilkerson & Bremer in order to use, you know,
23   their staff -- so Wilkerson & Bremer has a number
24   of staff who are -- who are trained and learned
25   and a paralegal manager there. And so in order to

**Page 49**

1    be able to use the staff, Wilkerson & Bremer as a
2    business in Idaho, but then since there were no
3    Wilkerson & Bremer in-house counsel that were
4    Idaho attorneys, it's with the of counsel
5    attorneys.
6    Q. Chad Campos was one?
7    A. Chad Campos was one. You were one.
8    Justin Oleson is one.
9    Q. Justin Oleson. And where does Justin
10   Oleson practice?
11   A. Blackfoot, Idaho.
12   Q. Okay. With respect to Exhibit 2, do
13   you have those exhibits in front of you?
14   A. Yes, sir.
15   Q. Exhibit 2 is the letter that's on
16   Wilkerson & Bremer letterhead; correct?
17   A. Yes.
18   Q. Did you seek any advice from any of
19   your Idaho attorneys about how that letter should
20   be prepared?
21   A. When we started using Mr. Campos's
22   services -- and to explain this, we purchased
23   Bingham Collections in November and then in April
24   of 2012 we purchased assets from CBS Collection in
25   Idaho Falls and CBS Collections was using

**Page 50**

1    Mr. Campos. So as we moved to Mr. Campos being
2    the of counsel, he reviewed this letter and made
3    changes to it.
4    Q. Okay. So the letter that is Exhibit 2
5    was essentially drafted and recommended to you by
6    Mr. Campos?
7    A. Yes. My understanding is that he
8    looked at the original letter and made enough
9    changes -- or many changes and that this is his
10   draft.
11   Q. So was it your testimony that -- well,
12   you purchased Bingham Collections in 2012. What
13   happened in August of 2014?
14   A. So -- so we purchased Bingham
15   Collections, the corporation, and then we
16   purchased assets from CBS Collections. And so to
17   clean things up since both the agencies were in
18   close proximity to one another and it made more
19   sense to combine them, we merged them together and
20   then we changed the name from Bingham Collections
21   to Trust Financial because just -- just merely
22   because Bingham Collections was a very localized
23   name and we were doing business outside of that
24   county.
25   Q. So in October of 2014 was Bingham

ABERNATHY VS. WILKERSON & BREMER    CVOC1506385

**51**

1  Collections still doing business?
2      A.  In October of 2014 Bingham Collections
3  was not licensed as a collection agency. We
4  changed the license to Trust Financial. There was
5  still the shell of the organization there for
6  taxes and other reasons, but, no, Bingham
7  Collections was not doing business as a collection
8  agency.
9          Because of all the letters and the
10 legal work that was out, we made sure to make two
11 trade names; Trust Financial dba Bingham
12 Collections and Trust Financial dba CBS
13 Collections because a lot of the letterhead from
14 years past that had been mailed out was obviously
15 in the names of those two business.
16     Q.  Now, just to make things clear, CBS,
17 that's another collection agency that you have
18 purchased?
19     A.  In that case we didn't purchase the
20 corporation. We purchased assets from them.
21     Q.  But CBS really has no relevancy to this
22 case; correct?
23     A.  No, sir.
24     Q.  Okay. So looking at Exhibit 1, that's
25 the letter from Trust Financial dba Bingham

**52**

1  Collections dated August 22nd, 2014. As of that
2  date was Bingham Collections still doing business
3  or essentially all of that business had been
4  assumed by Trust Financial?
5      A.  All of the business had been assumed by
6  Trust Financial.
7      Q.  Okay. Trust Financial stands behind
8  the debts and obligations of whatever happens?
9      A.  Yes, sir.
10     Q.  If there is an award in this lawsuit
11 against Bingham Collection or Trust Financial,
12 who's going to pay it?
13     A.  Trust Financial.
14     Q.  You mentioned that Bingham Collections
15 is no longer licensed as a collection agency. Why
16 is that?
17     A.  Because it's -- it's with the state
18 licensing board. That was a requirement, that we
19 relinquish the license to Bingham Collections and
20 just one entity be licensed as the collection
21 agency. That was -- that's an Idaho state
22 requirement or at least was presented to us that
23 way.
24         MR. HARRIS: Your Honor, just a question.
25 Are we in danger of running out of time for this

**53**

1  motion or --
2         THE COURT: No.
3         MR. HARRIS: We have the afternoon?
4         THE COURT: I don't have anything else on my
5  calendar. I would obviously like to be out by
6  5:00.
7         MR. HARRIS: Sure. Okay. Your Honor, I
8  think that's all of the questions I have in
9  cross-examination for this witness. I reserve the
10 right to recall this witness in my case in chief,
11 if you will.
12        THE COURT: Any redirect?
13        MR. ROSE: No, Your Honor.
14        THE COURT: Thank you. You are excused at
15 this time. You may call your next witness.
16        MR. ROSE: I have no further witnesses, Your
17 Honor.
18        THE COURT: All right. You may proceed,
19 counsel.
20        MR. HARRIS: Your Honor, at this point
21 there's been no evidence by the plaintiff as to
22 what the amount of bond ought to be. There's been
23 no effort to try and determine that amount.
24        THE COURT: Well, we're not doing argument.
25 Do you have any witnesses?

**54**

1         MR. HARRIS: Well, it gets into whether or
2  not I need to call my client to talk about what
3  the amount should be.
4         I guess I would -- at this point I
5  would move -- I'd move for sort of a directed
6  verdict. There's no evidence, absolutely none at
7  all, as to what the amount of the bond ought to
8  be. There has been no offer by the plaintiff to
9  post any amount of bond. And so I don't think I'm
10 required to put on evidence of that where the
11 plaintiff has failed to do so.
12        THE COURT: Okay. That's your position.
13 Mr. Rose?
14        MR. ROSE: Your Honor, I have no ability to
15 put forth the bond --
16        THE COURT: Well, let's not -- I think we're
17 jumping ahead.
18        MR. ROSE: Yes.
19        THE COURT: I think the first issue is
20 whether a preliminary injunction should be issued.
21 That's the first issue.
22        MR. ROSE: May I ask for argument, Your
23 Honor?
24        THE COURT: Yes. Thank you.
25        MR. ROSE: Absolutely a preliminary

ABERNATHY VS. WILKERSON & BREMER                                          CVOC1506385

### Page 55

1   injunction should issue, Your Honor. This thing
2   really stinks the way the collection agency and
3   the law firm out of Wyoming misleads Idaho
4   consumers in violation of the Idaho Consumer
5   Protection Act and the Fair Debt Collection
6   Practices Act. We have letters that are
7   implicitly threatening lawsuits getting -- sending
8   these letters all over the state of Idaho, getting
9   debtors to be submissive to pay money to -- either
10  under a default judgment or by the direct letters.
11             There's no Idaho licensed attorney of
12  the law firm Wilkerson & Bremer and yet the letter
13  would certainly indicate that it's coming from an
14  Idaho licensed lawyer. It's outrageous that at
15  the bottom of the letter it says -- the October
16  22nd letter that it says no attorney has looked at
17  the file. I just cannot imagine a licensed Idaho
18  attorney ever sending out a letter with the
19  representation that they wouldn't have at least
20  made a good faith effort, which is required anyhow
21  under the Fair Debt Collections Practices Act.
22             It's certainly required under our
23  professional rules of conduct to make the
24  representation that -- you know, what appears to
25  me, and this is pure argument, Your Honor, it's a

### Page 56

1   way that some fancy schmancy attorneys are trying
2   to get out from underneath their responsibilities
3   or get a gotcha kind of deal because it's just
4   offensive.
5             But for the fact that I know Celina
6   from the Subway store and M & W grocery store on
7   my way to fly fishing, she wouldn't have known to
8   go to an attorney. She couldn't have, like most
9   Idaho debtors, afforded an attorney to fight $300.
10  But this is happening thousands, if not hundreds
11  of thousands times perhaps across the whole state.
12            I think that at a minimum this
13  collection agency should be ordered to directly
14  use licensed attorneys. The injunction should
15  make them comply with that, no letters from any
16  attorneys but that are licensed in Idaho with --
17  clearly stating on the letter what their address
18  is and what their bar number is and things of that
19  sort and that this collection agency not play
20  footloose and fancy free with the Fair Debt
21  Collection Practices Act by not putting in the
22  validation and verification notice that they're
23  required to do, not call the debtors and tell them
24  you're going to be garnished and be sued if they
25  don't make a payment plan and they should be --

### Page 57

1   they should be enjoined to make certain they don't
2   collect on any debt that's past -- beyond the
3   statute of limitations.
4             I mean, I could see the Court
5   fashioning a very, very liberal injunction along
6   those lines. If I had my way, I'd put them out of
7   business. Thank you, Your Honor.
8        THE COURT: Counsel.
9        MR. HARRIS: Just to be clear, Your Honor, I
10  do want to reserve the right to present evidence
11  in the amount of the bond if the Court indicates
12  an inclination to grant the injunction. So I
13  guess I'll make argument then with respect to
14  whether the injunction ought to be granted.
15            Your Honor, I apologize, but after
16  filing my brief, I found a Second Circuit case
17  that I didn't cite in my brief. I would like to
18  provide the Court a copy and counsel a copy, if
19  that's okay.
20       THE COURT: I don't have any problem with
21  that.
22       MR. HARRIS: There's your copy.
23            Your Honor, what this case stands for
24  briefly is the same issue that came up in the
25  Second Circuit Court of Appeals and in that case

### Page 58

1   -- and I'm looking on page four in the lower
2   right-hand corner of this case I've handed the
3   Court -- and in that case letters were being sent
4   out similar to the one at issue in this case where
5   it said no attorney with this firm has personally
6   reviewed the particular circumstances of your
7   account and that was done. And the Second Circuit
8   found that that was not a violation of the Fair
9   Debt Collection Practices Act.
10       THE COURT: I understand all of that,
11  counsel, but I don't think that's what the issue
12  is. The issue here is whether the letter that was
13  sent, especially the one on October 22nd, whether
14  it is misleading under the Idaho Consumer
15  Protection Act because it suggests -- and with due
16  respect to your witness, I don't know how anybody
17  reading that letter would come away with any
18  understanding but that Wilkerson & Bremer is a law
19  firm licensed to practice here in Idaho.
20            So rather than focus on the language
21  and whether it violates the Fair Debt -- I always
22  get -- there's too many words here.
23       MR. ROSE: Collection Practices Act.
24       THE COURT: Collection Practices Act, I
25  think the more -- the bigger concern here is

**59**

1 whether Wilkerson & Bremer is misleading
2 individuals to believe that they are licensed to
3 practice and that this is a law firm here in
4 Idaho. And I think clearly it does on its surface
5 suggest to me that -- I mean, all the way through,
6 "our client," "our client." There's an address
7 there. There's no "of counsel."
8     MR. HARRIS: Okay.
9     THE COURT: That's why I asked him the
10 question.
11     MR. HARRIS: Sure. Now I'm understanding
12 where you're coming from, Your Honor.
13     THE COURT: Yeah. With respect to whether
14 there's a compliance with the Consumer Protection
15 -- with both Consumer Protection -- Consumer
16 Protection Credit Act and the Consumer -- the Fair
17 Debt Collection Practices Act as well as the Idaho
18 Consumer Protection Act, I mean there's a whole
19 lot here.
20     The real issue that I'm being presented
21 with today is whether there is a basis upon which
22 the Court can grant a preliminary injunction and I
23 think the issue comes down to what -- how Ms.
24 Abernathy is being damaged. That is really the
25 question --

**60**

1     MR. HARRIS: Okay.
2     THE COURT: -- that we need to focus on
3 because this is a preliminary injunction.
4     MR. HARRIS: Sure.
5     And so focusing on that issue, if --
6     THE COURT: And I might be wrong.
7     MR. HARRIS: -- in deed Ms. Abernathy's
8 rights were violated under one of these laws,
9 that's unfortunate. We don't admit that any laws
10 are violated. We think everything's fine. But
11 there's no reason for an injunction because
12 there's no continuing damage. There's no -- as to
13 Ms. Abernathy there's -- there's no additional
14 efforts being made to --
15     THE COURT: In other words, what you're
16 saying is whatever damage has been done has been
17 done?
18     MR. HARRIS: Yes, and I'm --
19     THE COURT: Without admitting the damage?
20     MR. HARRIS: Sure. If you look at Rule
21 65(e) it lists a number of bases on which a
22 preliminary injunction could be granted: (1) when
23 it appears by the complaint that the plaintiff is
24 entitled to the relief demanded and such relief or
25 any part thereof consists in restraining the

**61**

1 commission or continuance of the acts complained
2 of. So, again, there has to be some continuing
3 damage to the plaintiff, which there's none in
4 this case. Or if you look at (2) of that rule,
5 when it appears by the complaint or affidavit that
6 the condition or continuance of some act during
7 the litigation would produce waste or great or
8 irreparable injury to the plaintiff. Again,
9 there's none of that.
10     So I would submit this case is not
11 appropriate for an injunction. Certainly there's
12 remedies under these statutes, under the Fair Debt
13 Collection Practices Act. There's damages
14 available. There's attorney's fees available if
15 something's proven, likewise, under the Idaho
16 Consumer Protection Act.
17     So in this case I would submit there's
18 no basis for the injunction. Thank you, Your
19 Honor.
20     THE COURT: Thank you. Mr. Rose. That
21 really is the issue.
22     MR. ROSE: Yes, Your Honor.
23     THE COURT: Because -- and I'm going to sort
24 of jump out on a limb because I'm getting old and
25 about ready to go into semi-retirement, there's a

**62**

1 lot here, counsel, that's very disturbing. I'm
2 sorry. It's very disturbing. The issue,
3 Mr. Rose, though, whether she ultimately is able
4 to get damages from this case -- and I'm not
5 suggesting that she's not -- the issue is for a
6 preliminary injunction you've got to show what I
7 need to enjoin in order to either limit or prevent
8 those damages and that's really the question.
9     MR. ROSE: Yes, Your Honor. If I understand
10 where you're coming from, what the Court needs to
11 limit is the collection agency and Wilkerson &
12 Bremer from utilizing Wilkerson & Bremer law firm
13 in their collection activities until Wilkerson &
14 Bremer obtains an Idaho license and it needs to
15 enjoin the collection agency from trying to renew
16 judgment or debt that is expired through trick by
17 trying to get -- by scaring the debtors into
18 making a payment to renew the statute of
19 limitations.
20     Celina testified just slightly about a
21 payment plan that she had entered with this Mia.
22 We didn't go into a lot of detail about that, but
23 as it turned out -- I have the evidence from the
24 testimony, but for reasons of submission Celina
25 entered into that to try to get into a payment

ABERNATHY VS. WILKERSON & BREMERCVOC1506385

**63**

1  plan. Well, that's happening all across Idaho and
2  the Idaho Consumer Protection Act empowers the
3  Court to protect Idaho consumers at a preliminary
4  level as well.
5  　　　　THE COURT: The question I guess I have is
6  if you were the bar association this would be
7  easy. Because if I -- if the bar association
8  brought a -- or if they joined in this litigation,
9  clearly they would be entitled to a preliminary
10  injunction on behalf of the State of Idaho. The
11  real question here is -- or the Attorney General
12  for that matter and the Attorney General does it
13  all of the time and they do it under the Consumer
14  Protection Act. They have the ability to come in
15  and ask for injunctive relief.
16  　　　　The question here is whether -- since
17  all -- I don't want to -- I don't want to suggest
18  that what happened is in any way not important.
19  Ms. Abernathy luckily was able to talk to an
20  attorney. And I assume that at this point she has
21  not started paying them and so she was able to
22  limit whatever damage occurred.
23  　　　　So I don't know whether a preliminary
24  injunction is appropriate. What I would like to
25  do is take a moment and look at it a few more

**64**

1  minutes and then come out and tell you whether I'm
2  going to grant the preliminary injunction.
3  　　　　But I do want to make it clear, if I
4  don't grant the preliminary injunction, that is
5  not a suggestion that what occurred here is not a
6  violation and maybe a clear violation of several
7  credit laws including a federal one and the Idaho
8  Consumer Protection Act. These letters are in my
9  humble opinion egregious.
10  　　　　And so we're going to take a moment and
11  I'm going to decide whether a preliminary
12  injunction is appropriate.
13  　　　　(Recess)
14  　　　　THE COURT: All right. The issue before the
15  Court is whether a preliminary injunction is
16  appropriate. And while I recognize that the
17  decision to grant or deny a preliminary injunction
18  is discretionary with the trial court, the issue
19  here is whether Rule 65(e) provides me with the
20  grounds upon which a preliminary injunction should
21  be issued.
22  　　　　In this particular case, because
23  whatever damages have been done have already been
24  incurred, I do not think a preliminary injunction
25  is appropriate and I'm going to deny that. But I

**65**

1  want to go on and say a couple of things. That is
2  not to suggest that the defendants in this case
3  are without potential liability. As I pointed
4  out, if the Attorney General were sitting here,
5  and the Attorney General certainly does have the
6  authority under the Idaho Consumer Protection Act
7  to participate in a lawsuit such as this, or the
8  bar association were here, it would be a different
9  matter because I think they may very well be
10  entitled to a preliminary injunction.
11  　　　　I am very concerned by the letter that
12  I saw. What I really am concerned about is this:
13  The reason behind the rules that we have in this
14  state that only licensed attorneys can practice
15  law or engage in this kind of activity is because
16  those licensed attorneys are subject to Rule 11
17  and they're subject to the ethics rules that
18  govern all of us in this state. They are subject
19  to the rules that preclude us from having
20  contractual relationships in these types of
21  entities.
22  　　　　Now, while the defendant suggests that
23  they have an of counsel, it's significant to me
24  that I notice that the "of counsel" doesn't appear
25  in any place in any of the written documents,

**66**

1  which means the of counsel is also avoiding their
2  ethical responsibilities that they have to the bar
3  association to comply with the ethics rules
4  because there's no way for a debtor to identify
5  who that attorney is who's of counsel. They also
6  avoid some of these sanctions of Rule 11.
7  　　　　I am concerned by this. So I want it
8  to be very clear that by denying the preliminary
9  injunction I'm in no way suggesting that this
10  lawsuit has been frivolously brought. And I think
11  it's important for the defendants to seriously
12  consider the course of action that they have taken
13  and to re-examine in their business model and to
14  reconsider the way in which they are approaching
15  debtors.
16  　　　　Now, that's not a preliminary
17  injunction. I've not made a ruling on the
18  ultimate success of this litigation, but I can
19  tell you what I've heard so far suggests to me
20  that it's certainly -- when I was litigating
21  things, we used to call it passing the red faced
22  test.
23  　　　　So I'm denying the request for
24  preliminary injunction. I would ask Mr. Rose --
25  I'm sorry, I would ask opposing counsel to prepare

03/23/2016 11:01:05 AM　　　　Kim Madsen, Official Court Reporter, Boise, Idaho

**EXHIBIT H****Page 18 of 19**

ABERNATHY VS. WILKERSON & BREMER                    CVOC1506385

**Page 67**

1  the appropriate order for the Court denying the
2  preliminary injunction. I don't want anything in
3  there other than the fact that the preliminary
4  injunction has been denied.
5       MR. HARRIS: Thank you, Your Honor. I will
6  do that promptly.
7       THE COURT: Thank you. Is there anything
8  else today?
9       MR. ROSE: No, Your Honor. Thank you.
10      THE COURT: Thank you. Stand in recess.

**Page 68**

REPORTER'S CERTIFICATE

       I, KIM I. MADSEN, Official Court
Reporter, County of Ada, State of Idaho, hereby
certify:
       That I am the reporter who took the
proceedings had in the above-entitled action in
machine shorthand and thereafter the same was
reduced into typewriting under my direct
supervision; and
       That the foregoing transcript contains
a full, true, and accurate record of the
proceedings had in the above and foregoing cause,
which was heard at Boise, Idaho.
       IN WITNESS WHEREOF, I have hereunto set
my hand this 23 day of March 2015.


KIM I. MADSEN, Official Court Reporter
CSR No. 428

**Page 69**

(blank)

**Page 70**

(blank)